UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

UNITED STATES OF AMERICA    *
                            *
              V             *
                            *
IAN JASMIN                  * CRIMINAL FILE NO. 15-37


DEFENDANT'S MOTION TO SUPPRESS INMATE TELEPHONE CALLS
Wednesday, January 20, 2016
Burlington, Vermont



BEFORE:

        THE HONORABLE CHRISTINA R. REISS
            Chief District Judge


APPEARANCES:

        HEATHER E. ROSS, ESQ., Assistant United States
            Attorney, Federal Building, Burlington, Vermont;
            Attorney for the United States

        KAREN SHINGLER, ESQ., 74 Main Street, Burlington,
            Vermont; Attorney for the Defendant




ANNE NICHOLS PIERCE
Registered Professional Reporter
United States District Court
Post Office Box 5633
Burlington, Vermont  05402
(802) 860-2227

## <u>I N D E X</u>

### E X A M I N A T I O N

| WITNESS NAME | | PAGE | LINE |
|---|---|---|---|
| **WAYNE R.  PITTMAN** | | | |
| Direct by Ms. Ross | | 4 | 10 |
| | | 10 | 25 |
| | | 19 | 15 |
| Voir Dire by Ms. Shingler – Re: Government's 2 | | 9 | 25 |
| – Re: Government's 3 | | 18 | 7 |
| Cross by Ms. Shingler | | 38 | 3 |
| Redirect by Ms. Ross | | 51 | 9 |
| Recross by Ms. Shingler | | 58 | 14 |

### E X H I B I T S

| GOVERNMENT'S | DESCRIPTION | IN EVIDENCE |
|---|---|---|
| 2 | Pittman template | 10 |
| 1 | Contact standards from OMS | 14 |
| 4 | Inmate handbook – 8/27/2014 | 26 |
| 7 | E-mail from Shufelt to Przech | 32 |
| 5 | Inmate handbook | 65 |

1   WEDNESDAY, JANUARY 20, 2016

2   (The following was held in open court at 10:35 a.m.)

3               COURTROOM DEPUTY:  Your Honor, the matter

4   before the Court is criminal case number 15-CR-37,

5   United States of America versus Ian Jasmin.

6   Representing the government is Assistant United States

7   Attorney Heather Ross.  The defendant is present today

8   with Attorney Karen Shingler.  And we are here for a

9   hearing on the motion to suppress inmate telephone

10  calls.

11              THE COURT:  Good morning.

12              MS. ROSS:  Good morning, your Honor.

13              MS. SHINGLER:  Good morning, your Honor.

14              THE COURT:  I have read your papers so I have

15  a good idea of what this case is about.  So let's start

16  with the presentation of any evidence, and then if we

17  have time, we can have oral argument on the facts and on

18  the law.  You both did a nice job of briefing the issues

19  for the Court.

20      So let me start with the government and ask, do you

21  have any witnesses that you plan to call?

22              MS. ROSS:  Yes, your Honor.  The government

23  intends to call four, perhaps five witnesses.

24              THE COURT:  All right.  And what about you,

25  Miss Shingler?  Do you think that you have any witnesses

1   at this time?

2          MS. SHINGLER:  I do not.

3          THE COURT:  All right.  So, Miss Ross, you may

4   call your first witness.

5          MS. ROSS:  Thank you, your Honor.  The

6   government calls Wayne Pittman.

7                    WAYNE R. PITTMAN,

8       having been duly sworn by the courtroom deputy,

9       was examined and testified as follows:

10                  DIRECT EXAMINATION

11  BY MS. ROSS:

12  Q    Good morning, Mr. Pittman.

13  A    Good morning.

14  Q    And just for purposes of the record, will you

15  please state your full name again.

16  A    Wayne Robert Pittman.

17  Q    Thank you.

18       And, Mr. Pittman, where do you work?

19  A    Northeast Correctional Complex in St. Johnsbury,

20  Vermont.

21  Q    How long have you worked there?

22  A    Since 2007.

23  Q    And what do you currently do there?

24  A    I am a corrections services specialist, or case

25  worker.

1    Q    And what are the job duties of a corrections

2    service specialist?

3    A    We perform intake interviews, introduce the

4    offender to the facility and what the expectations are

5    to some degree.  We maintain contact standards.  Once

6    the offender is sentenced, we will process them and do

7    assessment tools to see what kind of programs they need

8    or go over their sentence computation and keep them up

9    to date with contacting their attorneys or family, if

10   necessary.

11   Q    And how long have you held that position?

12   A    Just under a year.

13   Q    Okay.  Now, what did you do at the correctional

14   facility prior to being a correction service specialist?

15   A    I was a corrections officer one.

16   Q    And had you been a corrections officer one since

17   2007?

18   A    Yes.

19   Q    Now, I'd like to direct your attention to May of

20   2014.  What role were you performing at that time?

21   A    May of 2014?

22   Q    Yes.

23   A    That was when I was -- case worker.  Yeah, that was

24   around the time I became a case worker.

25   Q    Okay.  Were you filling in in an acting capacity at

1  that time?

2  A    Yes.

3  Q    Okay.  Can you tell us a little bit about that?

4  A    They had held interviews for a case worker who had

5  moved up to the assistant superintendent position.  I

6  interviewed for it; however, it was given to a colleague

7  of mine.  Because I did well in the interview process,

8  the living unit supervisor, which is kind of the head

9  case worker in charge of the case worker department, he

10  went on leave for medical reasons, so another case

11  worker, Steven Russell, filled in his position, and they

12  needed a -- another staff member to fill in as a case

13  worker during that time, and they moved me into that

14  position.

15  Q    Okay.  And just to make sure that I understand

16  correctly, in May of 2014 and in the months thereafter,

17  you filled in as an acting correction service

18  specialist, and then about a year ago you moved into

19  that position permanently; is that correct?

20  A    It was about -- I believe it was May of last year

21  that I moved back into that position permanently.

22  Q    Okay.  And in -- when you were doing the acting

23  correction service specialist position, were the job

24  duties the same as what you have described?

25  A    Yes.

1    Q    Now, what one of the things you described that a

2    case worker does -- and I am going to use "case worker"

3    instead of correction service specialist because it's

4    easier to say.

5    A    Most people do.

6    Q    Is that okay?

7    A    Yes.

8    Q    Okay.  So in describing those job duties, one of

9    the things that you mentioned was you do initial intake?

10   A    Yes.

11   Q    Can you describe for us what that is?

12   A    Generally I have a pre-written kind of a template

13   as to what we do when we do the intake.  I gauge their

14   CVS, which is their convictions and violation summary,

15   to establish what their custody level is.  I will

16   request a record check if necessary.  I will update

17   their projected movement date or PMD code, which is

18   basically a code that we put them in under as to what

19   status they are on.  It's more relevant if someone is

20   sentenced.  I will do the CSS child survey if they have

21   minor children.  I will go over the Americans with

22   Disabilities Act, the grievance policy, the inmate

23   handbook, visiting procedure, and -- and then discuss

24   anything else that they'd like to discuss as far as if

25   they have any needs or -- or anything that needs to take

1    care of -- that I need to take care of for them.

2    Q    And when does that initial intake occur?

3    A    Within five days after them entering the facility.

4    Q    Now, do you document this meeting?

5    A    Yes.

6    Q    And where do you document that?

7    A    It's in the OMS system as of now.  It's the

8    Offender Management System where it kind of follows

9    them.  It's an online file, so to speak.

10   Q    Okay.  And when do you make that documentation?

11   A    When do we -- usually I fill it out as I do the

12   intake process, and then I complete the case note upon

13   completion of the meeting.

14   Q    Okay.  And do you document other meetings that you

15   have with inmates?

16   A    Yes.  We document all contact standards.

17   Q    And how often do you, as part of your job duties,

18   meet with an inmate after initial intake?

19   A    It's supposed to be within 14 days.

20   Q    Does that mean you meet with them at least once

21   every two weeks?

22   A    Yes.

23   Q    Okay.

24        MS. ROSS:  Your Honor, may I approach the

25   witness?

1          THE COURT:  Sure.

2          MS. ROSS:  And we do not -- we have hard

3    copies instead of electronic copies of our exhibits, so

4    I have made one for the Court as well, if that's okay?

5          THE COURT:  Yes.

6    BY MS. ROSS:

7    Q    I'm showing you what's been marked for

8    identification as Government's Exhibit 2.  Do you

9    recognize that?

10   A    Yes.  That's my template.

11   Q    Okay.  And you have referred to this in your

12   testimony already, correct?

13   A    Correct.

14   Q    So tell us again what this template is -- what you

15   use this template for?

16   A    My first meeting with an offender, I use this

17   template to make sure that I cover all the necessary

18   areas for discussion.

19          MS. ROSS:  Your Honor, I move the admission of

20   Government's Exhibit 2.

21          THE COURT:  Any objection?  Miss Shingler?

22          MS. SHINGLER:  Yes.  Or may I voir dire?

23          THE COURT:  You may.

24          MS. SHINGLER:  Thank you.

25               VOIR DIRE EXAMINATION

1    BY MS. SHINGLER:

2    Q    Do you have Government Exhibit No. 2 in front of

3    you, sir?

4    A    Yes, ma'am.

5    Q    And is this an exact duplicate of the template that

6    you used on May 6th of 2014 when you first met

7    Mr. Jasmin?

8    A    Yes.

9    Q    And was this a template that you created on your

10   own when you were being a correctional officer?

11   A    No.  Actually it was handed down to me from the

12   person that I took over for when I became acting.

13   Q    Okay.  So this was something that was a resource

14   that was given to you by a predecessor?

15   A    Yes.

16   Q    And this is an exact duplicate of what you used

17   when you discussed issues with Mr. Jasmin on May 6th?

18   A    Yes.

19        MS. SHINGLER:  Thank you.  I have nothing.  I

20   have no objection, Judge.

21        THE COURT:  Government's Exhibit 2 is

22   admitted.

23        (Government's Exhibit 2 was received in

24   evidence.)

25        CONTINUED DIRECT EXAMINATION

1   BY MS. ROSS:

2   Q    Now, Mr. Pittman, if you would, would you read to

3   us the paragraph from your template?

4   A    Yes.  "I met with Mr." -- at this point it would be

5   "Mr. Jasmin," with a first name listed.  "We discussed

6   the Americans with Disabilities Act or ADA, facility

7   rules, the inmate grievance policy.  I informed him how

8   to access the inmate handbook and visiting procedure.

9   We reviewed the PREA pamphlet and completed the

10  preorientation."

11  Q    Okay.

12  A    Can I actually --

13  Q    Sure.

14  A    Now that I am reading this, I have an additional

15  comment to what she asked me.

16       This has been updated since my meeting with Mr.

17  Jasmin initially.  Just the completed pre-orientation, I

18  believe, is different because that was not a standard at

19  the time that I met with Mr. Jasmin, and I have updated

20  my template to fit that.

21  Q    Okay.  So if I understand you correctly --

22            MS. SHINGLER:  Judge?

23            THE COURT:  Let me just -- go ahead, Miss

24  Shingler.

25            MS. SHINGLER:  In light of that, I do oppose

1    the introduction of the template.  It's -- that's a

2    significant difference between the exhibit and what he

3    said was in existence on May 6th.  So unless we have the

4    actual template, I object.  I think it's confusing and

5    not terribly relevant.

6              THE COURT:  Well, PREA -- we do by question

7    and answer, so don't worry about volunteering -- this

8    doesn't have anything to do with our case.  Is that

9    the --

10             MS. ROSS:  Correct.

11             THE COURT:  -- Prisoners Rape --

12             THE WITNESS:  Prisoner Rape Elimination Act.

13             THE COURT:  Okay.  So I am going to admit it

14   with the caveat that it's not a complete duplicate and

15   that the last sentence did not exist on the template

16   that the witness used.

17             MS. ROSS:  Thank you.

18             THE COURT:  Let's move on.

19             MS. ROSS:  Thank you, your Honor.

20   BY MS. ROSS:

21   Q    Now, Mr. Pittman, you also testified that you made

22   notes of your meeting with inmates.  That was your

23   normal practice?

24   A    Correct.

25   Q    And are you familiar with Mr. Jasmin?

1    A    Yes.

2    Q    Is he an inmate that you, in fact, worked with at

3    Northeast?

4    A    Correct.

5         MS. ROSS:  Your Honor, may I approach?

6         THE COURT:  You may.

7    BY MS. ROSS:

8    Q    I'm showing you what's been marked for

9    identification as Government's Exhibit 1.  Do you

10   recognize this?

11   A    Yes.

12   Q    Okay.  How do you recognize it?

13   A    This is a printoff of contact standards from the

14   Offender Management System.

15   Q    And do you see your -- your name or information

16   suggesting that you made entries --

17   A    Yes.

18   Q    -- on this document?

19   A    Yes.

20   Q    Does this document include the entries you made

21   about your -- of your contacts with Mr. Jasmin?

22   A    Yes.

23   Q    And this is -- this is the notes that are kept in

24   the regular course of your work as a case worker,

25   correct?

1    A    Yes.

2              MS. ROSS:  Your Honor, at this time I move the

3    admission of Government's Exhibit 1.

4              THE COURT:  Any objection?

5              MS. SHINGLER:  No, Judge, subject to cross

6    examination.

7              THE COURT:  It's admitted.

8              (Government's Exhibit 1 was received in

9    evidence.)

10   BY MS. ROSS:

11   Q    Mr. Pittman, directing your attention to

12   Government's Exhibit 1, I'd like you to go right across

13   the top.  The first thing that is identified is a

14   booking number, and then behind that is -- are a series

15   of numbers?

16   A    Yes.

17   Q    Do you see that?

18   A    Yes.

19   Q    What do those numbers refer to?

20   A    After the booking numbers is date of contact.

21   Q    Okay.  And the numbers that immediately followed --

22   what is the booking number?

23   A    The booking number is 166383.

24   Q    And what does the booking number mean?  What does

25   it refer to?

1    A    It's a number provided to the offender once they

2    get processed into the facility.

3    Q    Okay.  So that is a number that is associated with

4    a particular inmate?

5    A    Correct.

6    Q    Okay.  Now, you were going to tell us -- the next

7    entry is date of contact.  So tell us what the date of

8    contact is and what that means.

9    A    It's the date that I met with the offender and put

10   in the case note.

11   Q    Okay.  And in this particular case, what is the

12   date of contact?

13   A    5/6/2014.

14   Q    Followed after the date of contact appears to be a

15   number or a time; is that correct?

16   A    Correct.

17   Q    And what does that mean?

18   A    The time that the case note was put into OMS.

19   Q    And then following that there's an entry that says

20   "duration."  What does that mean?

21   A    Approximately how long the meeting took place.

22   Q    And is that duration in minutes?

23   A    Yes.

24   Q    And then it says your -- it appears to say your

25   name when it says "created by"; is that correct?

1    A    Correct.

2    Q    And what does that reflect?

3    A    Who put in the contact note.

4    Q    Directing your information -- or directing your

5    attention to the comments, did you put those comments

6    in?

7    A    Yes.

8    Q    And could you read those comments to us?

9    A    It says, "Comments:  I met with Mr. Jasmin, Enri.

10   We discussed ADA, facility rules and the inmate

11   grievance policy and the PREA pamphlet.  I informed him

12   how to access inmate handbook and the visiting

13   procedure.  I provided a phone call to" --

14       Would you like the phone number read?

15   Q    You don't need to read the phone number.

16   A    Okay.

17       -- "for the purpose of bail.  He hopes to get

18   bailed out either tonight or tomorrow.  I also discussed

19   how to receive a PIN number so that he can make more

20   phone numbers to help get bail.  He has already

21   submitted the PIN sheet form and is waiting for it to be

22   returned."

23   Q    So in the second-to-last line there, you say -- you

24   discuss how to receive a PIN number.  What are you

25   referring to?

1   A   The number assigned to the offender so that he can

2   make calls through the facility telephone system.

3   Q   And in the last line you say, "He has already

4   submitted the PIN sheet form."  How did you know --

5   well, let's first say, what is the PIN sheet form?

6   A   It's a standard form provided by the facility for

7   the offender to submit phone numbers for approval so

8   that they can contact them through the inmate telephone

9   system.

10          MS. ROSS:  Your Honor, may I approach the

11   witness?

12          THE COURT:  You may.

13   BY MS. ROSS:

14   Q   Mr. Pittman, if you could take a look at what's

15   been marked for identification as Government's Exhibit

16   3.  Do you recognize this?

17   A   Yes.

18   Q   What do you -- what is it?

19   A   It's the PIN request or telephone request form.

20   Q   Is this what you mean when you say a PIN sheet

21   form?

22   A   Correct.

23   Q   And when you state that Mr. Jasmin "has already

24   submitted the PIN sheet form" in your notes on May 6th,

25   how do you know that?

1    A    He would have to tell me.

2              MS. ROSS:  Your Honor, the government moves

3    for the admission of Exhibit 3.

4              THE COURT:  Any objection?

5              MS. SHINGLER:  If I may voir dire?

6              THE COURT:  You may.

7                     VOIR DIRE EXAMINATION

8    BY MS. SHINGLER:

9    Q    Mr. Pittman, is this the exact form that was in

10   existence at the time that you were discussing the

11   processes with Mr. Jasmin in May of 2014?

12   A    I believe it is.

13   Q    Do you know for certain?

14   A    Unless they have updated the form.

15   Q    Okay.  This is a blank form?

16   A    Yes.

17   Q    And you don't know if it's been updated or how it's

18   been updated since May of 2014?

19   A    It doesn't appear to be.  It seems exactly as I

20   remember it.

21   Q    Okay.  You were very new and an acting case worker

22   at the time, however, correct?

23   A    That is correct.

24   Q    And so you had come fresh off of your job as a

25   correctional officer?

1    A    Yes.

2              MS. SHINGLER:  Judge, I object.

3              THE COURT:  All right.  I assume the objection

4    goes to weight as opposed to admissibility.  He hasn't

5    affirmed that he is a hundred percent sure, but he has

6    testified "I believe it is.  It seems exactly as I

7    remember it."  That's sufficient for the Court's

8    purposes that a form of this nature was in existence at

9    the time.

10        I will ask counsel to direct the witness to the

11   relevant language and ask if he remembers that because

12   it's not the form so much as the disclosure on the

13   bottom that the Court is interested in.

14             MS. ROSS:  Thank you, your Honor.

15                  CONTINUED DIRECT EXAMINATION

16   BY MS. ROSS:

17   Q    Mr. Pittman, I'd like to direct your attention to

18   the bottom third of the form to what is indicated in

19   bold.  Is that part of the form -- has that part of the

20   form been part of the form when you were working in May

21   of 2014?

22   A    Yes.

23   Q    And could you read aloud that part of the form?

24   A    "Your acceptance of a PIN and use of the inmate

25   telephones shall deem as consent to the conditions and

1    restrictions placed upon inmate telephone calls,

2    including monitoring, recording and call detail."

3    Q    And, again, you worked with inmates in May of 2014

4    on a daily basis, correct?

5    A    Correct.

6    Q    And you did many initial intakes; is that correct?

7    A    Correct.

8    Q    And you reviewed with them PIN sheet forms; is that

9    correct?

10   A    Correct.

11        MS. SHINGLER:  Judge, I object to the leading

12   nature of the questions.

13        THE COURT:  They are leading, and if we're

14   going to get four or five witnesses in, they -- we need

15   to move more quickly and so not have cumulative

16   information.  So I am going to sustain the objection.

17   BY MS. ROSS:

18   Q    Now, in your notes, Mr. Pittman, you also state

19   that you informed Mr. Jasmin how to access the inmate

20   handbook; is that correct?

21   A    Yes.

22   Q    Now, how does an inmate or how did an inmate in May

23   of 2014 access the inmate handbook?

24   A    I had a copy provided on my desk, but during my

25   initial intake, what I would express to them is that the

```
1    inmate handbook is accessible at any officer's podium.
2    All you have to do is ask, and the most up-to-date
3    version of the inmate handbook should be provided for
4    you.
5              MS. ROSS:  Your Honor, may I approach?
6              THE COURT:  You may.
7    BY MS. ROSS:
8    Q    I am showing you what's been marked for
9    identification as Government's Exhibit 4.  Do you
10   recognize that?
11   A    Yes.
12   Q    And how do you recognize it?
13   A    This is the inmate handbook provided at the
14   complex.
15   Q    Now, there is a date on this handbook, an effective
16   date; is that correct?
17   A    Yes.
18   Q    When did this handbook become effective?
19   A    August 27th, 2014.
20             MS. ROSS:  Your Honor, may I approach the
21   witness?
22             THE COURT:  You may.
23   BY MS. ROSS:
24   Q    Now, I am showing you what's been marked as
25   Government's Exhibit 5.  Do you recognize that?
```

```
 1    A    Yes.

 2    Q    And can you tell us how you recognize that?

 3    A    That's a page out of the inmate handbook.

 4    Q    Okay.  And from what period of time is this page

 5    from the inmate handbook?  So inmate handbook effective

 6    as of what date?

 7    A    It could be -- it's the same as the 8/27/2014, and

 8    it's the same, I believe, as the previous handbook as

 9    well.

10    Q    Okay.

11              MS. SHINGLER:  Ah --

12    BY MS. ROSS:

13    Q    Now wait a minute.  So you told me that -- you sent

14    me the previous handbook to the 8/27/14, correct?

15    A    Correct.

16    Q    And this is an excerpt from that previous handbook?

17    A    Correct.

18    Q    And I think what you were trying to say, but you

19    correct me if I'm wrong, is that -- well, I'll ask you

20    the question.  Is there a difference between the

21    previous handbook effective before 8/27/14 and -- and

22    the one effective on 8/27/14 with respect to the

23    telephone?

24    A    No, there is no difference.

25    Q    Okay.  So to state it differently, was Government's
```

1    Exhibit 5 the portion of the handbook that was in effect
2    in May of 2014?
3              MS. SHINGLER:  Object.
4    A    Yes.
5              THE COURT:  Let's hear the basis for the
6    objection.
7              MS. SHINGLER:  I think it assumes facts not
8    into evidence.  Mr. Pittman has testified that on August
9    27th a new handbook was authorized.  He says that the
10   day before this, that there was a similar paragraph
11   regarding the mail.  He has not testified that he knew
12   what the telephone call procedure was in the handbook in
13   May of 27 -- May 6th of 2014.  I have not received a
14   copy of the one in existence.  The one that was attached
15   to the opposition is the handbook that is dated August
16   27, 2014, which is clearly not relevant to what happened
17   in May.
18        So certainly without the actual handbook that was
19   in existence, this one page in and of itself is
20   insufficient to demonstrate or to prove what the
21   telephone procedure was in accordance with the handbook
22   on May 6th of 2014.
23             THE COURT:  Okay.  So I don't see any
24   relevance of Government's Exhibit 4.  Government's
25   Exhibit 5, I believe the testimony is that this page in

1    Government's Exhibit 4 is identical to the previous

2    handbook, but Miss Shingler has a point:  Without a copy

3    of the previous handbook, how do we know?  So I turn to

4    you, Miss Ross.

5    BY MS. ROSS:

6    Q    Did you bring the entire previous handbook with

7    you?

8    A    Yes.

9    Q    Okay.

10        THE COURT:  Does Miss Shingler have it,

11    though?

12        MS. ROSS:  No, I do not have it either, but

13    if -- if -- we can make it available to Miss Shingler.

14    In all relevant -- so there were two handbooks,

15    your Honor, that cover the time period that Mr. Jasmin

16    was in jail at Northeast.  There is Exhibit 4, which

17    covers the time that he was in in late August and

18    September.

19        THE COURT:  Okay.  So it has relevance to that

20    time period?

21        MS. ROSS:  Right.

22        THE COURT:  Okay.

23        MS. ROSS:  And there is the prior one which

24    was in effect immediately before then and starting in

25    2012.

1          THE COURT:  Okay.  So what we are going to do

2     is he -- the witness has brought the exhibit with him?

3          MS. ROSS:  I understand that he has brought

4     the entire handbook with him.

5          THE COURT:  Okay.  And it needs to be

6     disclosed to Miss Shingler so that she can cross examine

7     on that issue.  And we also need to see if there's more

8     time this afternoon or another day to continue it

9     because we are at 11.

10         So who has the exhibit now?  Mr. Pittman, you have

11    it right there?

12         THE WITNESS:  Yes, your Honor.

13         THE COURT:  Okay.  And why don't we give it to

14    Miss Shingler at least at this point, but she can't do

15    two things at once, and both review the telephone policy

16    and make sure it's -- corresponds to what the exhibit

17    is, but we will at least give it to her.  Don't worry,

18    we are going to give it back to you and we will give

19    Miss Ross a copy.  The better practice would be to have

20    this happen prior to the hearing.

21         MS. ROSS:  Yes, your Honor, although I do note

22    that this exhibit was equally available to me or Miss

23    Shingler.  This is not somebody who works for the

24    government, and she could have subpoenaed this

25    information before she filed her motion to begin with.

```
 1                    THE COURT:  That's true.
 2    BY MS. ROSS:
 3    Q    Now, that being said, just to -- before we move on
 4    from this subject, I just want to make sure the record's
 5    clear.
 6         Was there any difference with respect to the
 7    telephone policy in the handbook in effect on May 2014
 8    and that one that came into effect on 8/27/2014?
 9    A    Not that I am aware of.
10                    MS. ROSS:  And, your Honor, just so I'm clear,
11    can we move for the admission at this point of
12    Government Exhibit 4, the 8/27/14, or did you wish to
13    hold that in abeyance?
14                    THE COURT:  You reminded me that Mr. Jasmin
15    returned to that facility later in the year, and I
16    assume it's proffered for that purpose.  Let me see if
17    there's any objection to the admission of Government's
18    Exhibit 4.
19                    MS. SHINGLER:  Subject to cross examination,
20    no, Judge.
21                    THE COURT:  It's admitted.
22                    MS. ROSS:  Thank you, your Honor.
23                    (Government's Exhibit 4 was received in
24    evidence.)
25                    MS. ROSS:  And Government 5, am I correct in
```

1    understanding we are holding the admission of that in

2    abeyance until Miss Shingler has an opportunity to look

3    at the full handbook?

4                 THE COURT:  Yes.

5                 MS. ROSS:  Thank you.

6                 THE COURT:  Actually, I don't think she needs

7    to look at the full handbook.  She needs to make sure

8    that Government's Exhibit 5 is what's in that prior

9    handbook.

10                MS. ROSS:  Thank you, your Honor.

11   BY MS. ROSS:

12   Q    Now, Mr. Pittman, if you would, I'd like you to

13   return your attention to Government's Exhibit 1 and take

14   a look at the second entry on Government's Exhibit 1.

15   Can you tell us what that second entry reflects?

16   A    Read the paragraph?

17   Q    Yes.  Does it reflect a meeting between you and Mr.

18   Jasmin?

19   A    Oh, yes.

20   Q    And when did you meet with him?

21   A    On the 7th.

22   Q    Of May?

23   A    Yes.  I'm sorry, I didn't meet with Mr. Jasmin on

24   this date.  Not on the 7th.  That's "offender indirect."

25   Q    Okay.  What does that mean?  You tell us what that

1   means.

2   A    I did not meet with him directly but he was

3   discussed within the correctional facility and a note

4   was made as far as what is necessary --

5   Q    Okay.

6   A    -- to document.

7   Q    I think what you are doing -- let's continue over

8   so that we explain the categories that -- under "type,

9   offender," it says either "indirect" or "direct"; is

10  that correct?

11  A    Yes.

12  Q    And what does "direct" mean?

13  A    I met with the offender directly.  He sat in the

14  chair and we discussed something.

15  Q    And what does "indirect" mean?

16  A    It concerns the offender despite him probably not

17  having gone to my office.

18  Q    So can you read to us the first sentence of your

19  comments on that date?

20  A    Yes.  "I received Mr. Jasmin, Ian's, record check.

21  I have been in contact with our site legal administrator

22  who identified that when Mr. Jasmin was arrested, it was

23  under the name of his brother, Enri."

24  Q    Okay.  And who's your site legal administrator or

25  who was it?

1    A    It's still Shelly Shufelt.

2    Q    Okay.  Now, could you turn your attention to the

3    third entry.  What kind of contact did you have on that

4    date with Mr. Jasmin?

5    A    Direct contact.

6    Q    And what was the date?

7    A    That was May 19th, 2014.

8    Q    And I'd like to direct your attention to the last

9    two sentences of your comments.  Could you read those

10   out loud.

11   A    "I contacted his PO out of New York asking if she

12   wished to speak with Mr. Jasmin.  He wanted to know what

13   charges he was facing out of New York.  We also

14   discussed his PIN sheet issues.  He currently has family

15   depositing money into two accounts, one for Ian and one

16   for Enri Jasmin."

17   Q    Okay.  And when you say "we discussed his PIN sheet

18   issues," what are you referring to when you say "PIN

19   sheet"?

20   A    When -- the PIN sheet -- he was having issues with

21   maintaining phone calls through the inmate telephone

22   system.

23   Q    Okay.  Now, the PIN sheet is the inmate telephone

24   request form; is that correct?

25   A    Correct.

1    Q    And the PIN sheet at that time, as you said

2    earlier, had a disclosure on it with respect to

3    monitoring and recording; is that correct?

4    A    Yes.

5    Q    Okay.  Now, I'd like to turn your attention, if you

6    would, down to the bottom of the first page of

7    Government's Exhibit 1, and if you could identify for us

8    what type of contact you had on that date?

9    A    Direct.

10   Q    That means you met with Mr. Jasmin?

11   A    Yes.

12   Q    And the duration of the meeting was how long?

13   A    Approximately 35 minutes.

14   Q    And when did that meeting take place?

15   A    On June 2nd, 2014, at 1557 hours.

16   Q    And could you read the first three sentences of

17   that entry.

18   A    "I met with Mr. Jasmin today.  He is having issues

19   with his phone accounts.  He had two accounts, one under

20   Ian Jasmin and one under Enri Jasmin.  Now he cannot

21   access either.  I am going to speak with the

22   administrator to see if I can get his account issues

23   resolved tomorrow."

24   Q    Okay.  And who were you going to speak to to get

25   his account issues resolved?

1    A    Shelly Shufelt.

2    Q    And do you know whether you, in fact, did that?

3    A    I did.

4    Q    You did?

5    A    I did.

6    Q    Okay.  And, again, for an inmate to have a phone

7    account, just to be clear, what is required?

8    A    They have to fill out the inmate telephone request

9    form.

10         MS. ROSS:  Your Honor, may I approach the

11   witness.

12         THE COURT:  You may.

13   BY MS. ROSS:

14   Q    Showing you what's been marked for identification

15   as Government's Exhibit 7.  Do you recognize that?

16   A    Yes.

17   Q    Okay.  How do you recognize it?

18   A    It's an e-mail sent from me to -- or from Shelly

19   Shufelt to Erica Przech, which I am also attached to.

20   Q    Okay.

21         MS. ROSS:  Your Honor, the government moves

22   for the admission of Government's Exhibit 7.

23         THE COURT:  Any objection?

24         MS. SHINGLER:  Yes, I object to the relevancy.

25   I don't know what this has to do with anything.

1           THE COURT:  Let's hear a proffer.  I assume

2       the relevance is that two accounts were combined into

3       one at the witness's request?

4           MS. ROSS:  Yes, your Honor.

5           MS. SHINGLER:  I'm not sure that's relevant to

6       the issues here.  I mean, what we have heard thus far is

7       that Mr. Pittman was aware of two accounts far earlier,

8       as early as May 19th of 2014.  This is June 4th.

9           THE COURT:  The government's theory is that

10      the two accounts were allegedly a means of concealing

11      communications from Mr. Jasmin so that any recording

12      would be attributable to Enri Jasmin.  That's at least

13      what I understand from the papers.  And on that basis,

14      it is -- has some relevance.  So Government's Exhibit 7

15      is admitted.

16          (Government's Exhibit 7 was received in

17      evidence.)

18      BY MS. ROSS:

19      Q    Directing your attention to page two of

20      Government's Exhibit 7, Mr. Pittman, could you read that

21      entry?

22      A    "Is there any way the numbers on Enri's could be

23      transferred to Ian's?  I am also sending you another

24      request from Ian to add numbers this morning."

25      Q    Okay.  So the second sentence, "I'm sending you

1    another request," what -- do you know what that refers
2    to?
3              MS. SHINGLER:  Objection.  Speculation.  He is
4    not writing.
5              THE COURT:  Let's not -- first of all, we
6    don't really need to know whether he has previously sent
7    a request, so let's ask a different question.  I am
8    going to sustain the objection.
9    BY MS. ROSS:
10   Q    How does an inmate -- let me strike that.  Start
11   again.
12        Is there any limit on the number of people that an
13   inmate can put on his call list?
14   A    10.
15   Q    And is there any approval process for the call
16   list?
17   A    Yes.
18   Q    Yes?
19   A    Yes.
20   Q    Okay.  And how does an inmate add or delete people
21   on his call list?
22   A    They submit another inmate telephone request form
23   stating whether -- who they would like removed from
24   their call list and who they would like added to their
25   call list.

1   Q    So if an inmate would like numbers added to his

2   call list, what must the inmate do?

3   A    Fill out another inmate telephone request sheet.

4   Q    I'd like to direct your attention to the next page

5   of Government's Exhibit 1, and I'd like to direct your

6   attention to an entry on June 4th of 2014.  Do you see

7   that?

8   A    Yes.

9   Q    Okay.  Can you tell us what that contact was?

10  A    It was a direct contact.

11  Q    And what information, according to your comments,

12  did you share with Mr. Jasmin on that date?

13  A    I met with Mr. Jasmin and let him know that there's

14  been progress in his phone sheet and his commissary

15  issues.

16  Q    And when you refer to his phone sheet, what are you

17  talking about?

18  A    The issue previously mentioned with him trying to

19  combine Ian and Enri's phone numbers and the account

20  into one.

21  Q    And just to be clear, the call list of the approved

22  numbers that an inmate can call, including Mr. Jasmin in

23  this case, where is that listed?  Where is that list of

24  numbers?  Where does the inmate put the list of numbers?

25  A    Inmate telephone request form.

1    Q    Now, if we jump ahead to the third page of this

2    document, we see that you have a contact on July 21st of

3    2014.  Can you explain what that is?

4    A    It's an intake contact note.

5    Q    And why are you doing intake again?

6    A    He left our facility and went to another facility,

7    I believe, and then came back to our facility.

8    Q    And will you please read to us your notes on that

9    date.

10   A    Would you like the paragraph or in completion?

11   Q    I would like the paragraph.

12   A    "I met with Mr. Jasmin, Ian.  We discussed ADA,

13   facility rules and the inmate grievance policy and the

14   PREA pamphlet.  I informed him how to access the inmate

15   handbook and the visiting procure.  I called his lawyer

16   and asked what she -- that she call him on the attorney

17   line.  I also got information regarding New York rehab

18   clinics."

19   Q    And when you informed him how to access the inmate

20   handbook, what did you discuss with him at that time?

21   A    I again let him know that any inmate handbook -- an

22   inmate handbook is accessible at any officer's podium.

23   All you have to do is ask for the most up-to-date copy.

24   Q    And you reference an attorney line.  Is there -- is

25   there a difference between the attorney line and the

1    line that the inmate gets access to using the PIN

2    sheets?

3    A    Yes.

4    Q    What's different?

5    A    It's not recorded.  The attorney has to call the

6    facility through a specified telephone number and

7    provide their -- I believe their lawyer number, and then

8    we transfer the call into the unit for the inmate.

9    Q    Now, if we continue down on that page, it looks

10   like on September 3rd of 2014 there is an entry by

11   someone other than you.

12   A    Yes.

13   Q    Do you see that?

14   A    Yes.

15   Q    Why would -- why would that be?

16   A    Either he was at a different facility or met with

17   someone else who has access to the OMS contact notes.

18   Q    And --

19             MS. ROSS:  Your Honor, may I approach?

20             THE COURT:  You may.

21   BY MS. ROSS:

22   Q    I'm showing you what's been marked for

23   identification as Government's Exhibit 8.  Do you

24   recognize this?

25   A    The form, yes.  I don't think I have ever seen it

```
 1    filled out by Mr. Jasmin before, but the form's the
 2    same.
 3    Q    Okay.  Where would copies of the PIN sheets go
 4    that -- once they are filled out by an inmate?
 5    A    They would go to the -- whoever does the telephone
 6    at our site.  It was Shelly Shufelt at the time.  And
 7    then once it's processed, a copy would go back to the
 8    inmate.
 9    Q    Okay.  And you have seen similar forms; is that
10    correct?
11    A    Yes.
12    Q    And the words addi- -- "A" and "D" on this form, do
13    you know what those mean?
14    A    Yes.
15    Q    What do they mean?
16    A    Add and -- "A" stands for add and "D" stands for
17    delete.
18              MS. ROSS:  If I could have a moment,
19    your Honor?
20              THE COURT:  You may.
21              (Brief pause.)
22              MS. ROSS:  No further questions for this
23    witness.
24              MS. SHINGLER:  If I could have just a moment,
25    Judge?
```

```
1              THE COURT:  You may.
2              (Brief pause.)
3                      CROSS EXAMINATION
4    BY MS. SHINGLER:
5    Q    Good morning.
6    A    Good morning.
7    Q    Let's talk about what's been introduced as
8    Government's Exhibit 8, which is the sign-in sheet?
9              THE COURT:  I don't think that she moved to
10   admit that.
11             MS. SHINGLER:  Okay.
12        Do you have a copy of --
13        May I approach, Judge?
14             THE COURT:  You may.
15             THE WITNESS:  Exhibit 8?
16             MS. SHINGLER:  Yeah, Exhibit 8.
17             THE WITNESS:  Yes.
18   BY MS. SHINGLER:
19   Q    This is dated July 22nd, 2014?
20   A    Mine's dated July 21st, 2014.
21   Q    May I see your copy?
22        Oh, okay.  I was looking down there.
23   A    Oh.
24   Q    Okay.  I'm sorry.  I was looking at the wrong
25   section.
```

```
1          And you testified -- is that your signature at the
2    bottom of it?
3    A    No.
4    Q    Do you know whose signature that is?
5    A    Michele Shufelt.
6    Q    Okay.  Do you know whose handwriting is on the top
7    of defendant's -- or Government Exhibit 8?
8    A    Ian Jasmin?
9    Q    I mean, you are assuming that, correct?
10   A    I would assume based on his name being there, yes.
11   Q    And is this the only inmate telephone system number
12   request form he filled out while he was at the facility?
13   A    I have no way to know that.
14   Q    Well, you said that every inmate telephone system
15   number request form is provided -- a copy is provided to
16   the inmate and then a copy is provided to -- I think you
17   said Miss Shufelt?  Is that correct?
18   A    Yes.
19   Q    And I am assuming that she would retain these
20   inmate request forms, correct?
21   A    I believe so.
22   Q    Okay.  Do you have all of those inmate request
23   forms executed by Mr. Jasmin?
24   A    No.
25   Q    Where did you find this one?
```

1    A    I didn't.  I was handed it today.

2    Q    Okay.  So this isn't something that you went

3    through his files and located?

4    A    Correct.

5    Q    You don't know how this ended up in court as

6    opposed to all the other request forms?

7    A    No idea.

8    Q    Now, you would agree with me that when you go

9    through -- when you meet an inmate, you don't use a

10   checklist, correct?

11   A    No, I do not.

12   Q    Okay.  And when I mean a checklist, I mean

13   something that you would check and that Mr. Jasmin or an

14   inmate would check kind of confirming that that topic

15   has been reviewed?

16   A    Correct.

17   Q    And you would also agree with me that there is no

18   form anywhere in his file that is signed by him showing

19   that he agrees to the conditions of the institution,

20   correct?

21   A    I don't believe there is, no.

22   Q    Okay.  And there's nothing actually -- have you --

23   have you reviewed his personnel file or his inmate file?

24   A    Not since he was at our facility.

25   Q    Okay.  So you didn't review it in preparation for

1    your testimony today?

2    A    No.

3    Q    Okay.  But as you sit here and recall your

4    relationship, you don't remember anything that Mr.

5    Jasmin signed acknowledging that he agreed to these

6    conditions, correct?

7    A    Correct.

8    Q    And as a matter of fact, there's nothing in his

9    signature alone that says he was even read to them,

10   correct?  Or read them, correct?

11   A    Read what?

12   Q    The rules of the facility.

13   A    Correct.

14   Q    Now, when he was in the facility, throughout your

15   contact with him, he was on pretrial detention, correct?

16   A    Correct.

17   Q    He was not serving his sentence, in other words?

18   A    Not for the State of Vermont, no.

19   Q    He was not serving a sentence for anybody, was he?

20   A    That's -- I'm not aware of what his sentence

21   structure was.  I don't recall.  I know I maintained

22   contact with New York probation and parole.

23   Q    Okay.  But you were aware that he wasn't a

24   convicted inmate serving a sentence?

25   A    He was not performing an incarcerative sentence,

1  that is correct.

2  Q    Okay.  Thank you.

3       Now, you have talked about -- you still have

4  Government Exhibit 8 in front of you, correct?

5  A    Correct.

6  Q    And I think you testified on direct examination

7  that -- you called this the PIN sheet?

8  A    Yes.

9  Q    Okay.  So we will call that the PIN sheet.  And I

10 think you testified that the purpose of the PIN sheet is

11 to submit numbers to the facility for approval by them,

12 correct?

13 A    Yes.  That's --

14 Q    And so, for example, if an inmate had a condition

15 of release that said he couldn't talk to Jane Doe, and

16 he included Jane Doe as someone he wanted to make a

17 phone call to, that would be disapproved, correct?

18 A    Correct.

19 Q    Okay.  And he is told -- an inmate is told that if

20 he wants to add people to his phone list, he has to do

21 another PIN sheet?

22 A    Yes.

23 Q    And if he wants to delete people because he could

24 only have a maximum of 10, he has to do that as well?

25 A    Yes.

1    Q    Okay.  And he is told, This is the process by which

2    you add and subtract and maintain -- and obtain approval

3    of phone numbers of people you want to talk to.

4    Correct?

5    A    Yes.

6    Q    And really, that's the primary purpose of those PIN

7    sheets?

8    A    For the most part, yes.

9    Q    Do you know -- you do not know, as you sit here

10   today, whether or not he availed himself of review of

11   the inmate handbook, do you?

12   A    No, I do not.

13   Q    And you don't recall him ever asking to see your

14   inmate handbook and reviewing it, correct?

15   A    No, I do not.

16   Q    Okay.  And you would also agree with me that there

17   is no orientation meeting in which a group of new

18   inmates are seated together and provided with an

19   overview as to the rules and regulations, correct?

20   A    Correct.

21   Q    Do you have Government Exhibit 2 in front of you,

22   which are your case notes?

23   A    I have Exhibit 1, which is my case note.

24   Q    I'm sorry, it was attached to their opposition as

25   Government Exhibit 2.  I apologize.  Do you have that in

1    front of you?

2    A    Yes.

3    Q    The first time you contacted -- or you had contact

4    with Mr. Jasmin was in May -- May 6 of 2014, correct?

5    A    Correct.

6    Q    Was that your first day on the job as a case

7    worker?

8    A    No.

9    Q    How long had you been a case worker prior to that?

10   A    I started at some point in April.

11   Q    Okay.  And did you pick up like an existing case

12   load or --

13   A    Yes.

14   Q    How did you end up being with Mr. Jasmin?

15   A    I took over the -- it's the -- we call it the

16   overflow case load.  It's generally regionalized.

17   There's three case workers in the office.  One handles

18   Washington County, one handles Caledonia and the

19   existing -- or surrounding counties, and I take the case

20   load of the offenders from counties outside of those.

21   Q    And do you recall how large your case load was in

22   May of 2014?

23   A    Not exactly, no.

24   Q    Okay.  Was it -- you said it was an overflow case

25   load?  What exactly does the term "overflow" mean?

1   A   Overflow is -- the offender's not from the other

2   specified counties, like not Caledonia, not Washington,

3   not Lamoille.  So if they come from St. Albans or

4   Rutland, that would be my case load.  The overflow from

5   usually other facilities is how it got its title.

6   Q   Okay.  Do you recall, in terms of the size of your

7   case load, whether it was small or large or --

8   A   Probably average around 30 to 40, somewhere in

9   between there.

10  Q   And referring to Exhibit 1, it indicates that you

11  met with Mr. Jasmin, Enri.  His name was not Enri,

12  correct?

13  A   Correct.

14  Q   Was that information that you received from the

15  previous facility or did he identify himself as that?

16  A   He identified himself as that.

17  Q   You indicated that you discussed the ADA, facility

18  rules, inmate grievance product -- policy, and the PREA

19  pamphlet, correct?

20  A   Correct.

21  Q   You told him how to access the inmate handbook and

22  the visiting procedure and you gave him a phone call for

23  the purpose of bail, correct?

24  A   Correct.

25  Q   And then you talked to him about how he can get a

1    PIN number so he can make phone numbers?

2    A    Yes.

3    Q    Or make phone calls.  Excuse me.

4    A    Yes.

5    Q    You don't -- in this note there's nothing that

6    indicates that you reviewed the monitoring or recording

7    procedure in the tele- -- regarding use of the

8    telephones, correct?

9    A    Correct.

10   Q    And you would move on to May 7th.  That was the

11   indirect contact and that kind of memorializes the work

12   that you had done between the 6th and the 7th to do his

13   record checks, et cetera?

14   A    Correct.

15   Q    It appears that by May 7th, at three o'clock in the

16   afternoon, you knew his name was Ian; is that correct?

17   A    I believe -- yes.

18   Q    I mean, you called him Ian Jasmin.

19   A    Yes.

20   Q    So within -- once you -- how is it that you

21   ascertained Mr. Enri Jasmin of May 6th was Ian Jasmin of

22   May 7th?

23   A    I submitted Enri Jasmin's name for the record check

24   through Shelly Shufelt.  She ran it, called me into the

25   office and told me that she was having issues with the

1    record check, and she believed that Enri was actually

2    Ian Jasmin.

3    Q   Okay.  Did you confront him with the information

4    that you received from her?

5    A   No.

6    Q   But by the time you saw him at three o'clock in the

7    afternoon on May 7th, you knew he was Ian Jasmin, not

8    Enri, correct?

9    A   Correct.

10    Q   Okay.  And, again, as you review your notes, you

11    had -- looks like a half-hour meet- -- oh, no, it wasn't

12    a meeting.  There's nothing in there that talks about

13    recording or monitoring of telephone calls, correct?

14    A   Correct.

15    Q   Now, moving to May 19th, it looks like Ian, Mr.

16    Jasmin, is being frank with you about the two phone

17    accounts.

18    A   Yes.

19    Q   He says that he is having his family deposit money

20    in two accounts and he is having problems obtaining

21    access to them, right?

22    A   Yes.

23    Q   So he was being upfront with you that he had this

24    Ian and Enri accounts?

25    A   Correct.

1    Q    And it wasn't until -- this conversation takes

2    place on May 19th.  His -- the Enri account isn't closed

3    until -- I think we saw June 4th, correct?

4    A    I don't know when it was closed, but that is

5    correct.

6    Q    It was that fax that we saw.  Government's Exhibit

7    7?

8    A    Yes.  You have the e-mail, yes.

9    Q    Yes.  That's the e-mail showing -- and that shows

10   that the Enri account is closed, correct?

11   A    Not necessarily.

12   Q    But that -- that's what resulted in the Enri

13   account being closed, correct?

14   A    I don't know which took place first.

15   Q    Okay.  Once again, back to Government's Exhibit 1,

16   we'll skip the contact on May 20th and go to June 2nd:

17   You meet with Mr. Jasmin today.  He is having issues

18   with his phone accounts.  Once again he references two

19   accounts and is specific saying one under Ian and one

20   under Enri, correct?

21   A    Correct.

22   Q    And isn't it true that he was telling you that the

23   reason for the problem was that the account that moved

24   from where he had been and followed him to Northeast

25   reflected Enri and that he hadn't been able to change it

1   to his real name?

2   A    Correct.

3   Q    And it would be fair to say that it wasn't a huge

4   security issue because it took two weeks to close the

5   Enri account, correct?

6   A    I wouldn't know.

7   Q    Okay.  Now, going on to the second page of your

8   Government's Exhibit 1.  Going through kind of June 3rd,

9   June 4th, June 5th, June 9th, June 13th, those are all

10  meetings that you had with Ian directly, correct?

11  A    Not on -- not on the 13th.

12  Q    Oh, because you are not Dawn Muller.

13  A    Correct.

14  Q    Okay.  Okay, let's stop at June 9th.  On the 3rd,

15  4th, 5th and 9th, those are all notes reflecting actual

16  meetings with Mr. Jasmin, correct?

17  A    Correct.

18  Q    Okay.  And is there any reference in any of those

19  contact sheets that you discussed with him the

20  monitoring of telephone calls and what would happen to

21  recordings taken of phone calls?

22  A    No.

23  Q    Did you ever at any time share with him that his

24  phone calls could be taped and obtained by law

25  enforcement?

1     A     Not that I recall.

2     Q     Okay.

3           MS. SHINGLER:  If I can have a minute,

4     your Honor?

5           THE COURT:  You may.

6           (Brief pause.)

7     BY MS. SHINGLER:

8     Q     Returning to Government Exhibit 8, which is the PIN

9     sheet.  Do you have that in front of you?

10    A     Yes, ma'am.

11    Q     Did you at any time read that bold language at the

12    bottom of it right before -- above the signature to Ian

13    Jasmin?

14    A     No.

15    Q     Did you explain to him what that meant beyond what

16    he could see on the paper?

17    A     No.

18    Q     Did you tell him that call monitoring, recording,

19    means you may be subject to having your phone call

20    seized by police officers?

21    A     No.

22    Q     Did you ever tell him -- give him something like

23    Miranda warnings or tell him that these phone calls are

24    recorded and they can be used against you?

25    A     No.

1    Q    And did you provide him with any explanation as to

2    the authority or the reason for which this language is

3    included?

4    A    No.

5             MS. SHINGLER:  Thank you.  That's all I have.

6             THE COURT:  Any redirect?

7             MS. ROSS:  Yes, your Honor.  Just a few

8    questions.

9                    REDIRECT EXAMINATION

10   BY MS. ROSS:

11   Q    Mr. Pittman, you have discussed the PIN sheet

12   repeatedly both with myself and Miss Shingler, correct?

13   A    Correct.

14   Q    The PIN sheet is -- you first mentioned on May 6th

15   of 2014, in Government's Exhibit 1; is that right?

16   A    Correct.

17   Q    Do you -- and what was your understanding about the

18   status of whether Mr. Jasmin had completed a PIN sheet

19   by May 6th, 2014?

20   A    He stated that he had already filled one out.

21   Q    Okay.  Do you have any reason to believe that the

22   PIN sheet in May of 2014 did not have the disclosure on

23   it that exists on Government's Exhibit 8?

24   A    No.

25   Q    Stated differently, are you certain that a

1   disclosure that "your calls could be subject to

2   monitoring and recording" was on the PIN sheet that he

3   told you he filled out on May 6th, 2014?

4          MS. SHINGLER:  Objection, Judge.  There's no

5   way under the state of the evidence that he can say with

6   certainty that that existed.

7          THE COURT:  Well, he can if he can validate

8   that this was the form in use at that time.  They all

9   had this.  If he filled one out, it would do that, but I

10  am not quite sure, when defendant says he already filled

11  one out, whether it was a different facility that he

12  filled it out and whether they used the same form.

13      So I am going to sustain it on we're missing a

14  little piece of foundation, but the question is

15  otherwise proper.

16         MS. ROSS:  Okay.

17  BY MS. ROSS:

18  Q   So, Mr. Pittman, do you know when Mr. Jasmin first

19  came into the DOC system in May?  When in May?

20  A   When he came to our facility?

21  Q   When he came into the DOC system.

22  A   Yes.

23  Q   Okay.  So when was that?

24  A   Can I look at my --

25         THE COURT:  If you want to refresh your

 1   recollection.

 2            MS. ROSS:  Yes.

 3            THE WITNESS:  Yes.

 4   BY MS. ROSS:

 5   Q    So you want to refresh your recollection; is that

 6   correct?

 7   A    Yes.

 8            MS. SHINGLER:  I guess I'd like to know what

 9   he is looking at.

10            THE COURT:  Absolutely.  So let's -- we

11   actually have fussy little rules about things, but you

12   don't have anything up there that I know that didn't

13   come with you.  So if you can't remember, you can ask to

14   refresh your recollection, but you need to tell us what

15   you are looking at and it's available to opposing

16   counsel.  You look at it, you refresh your recollection,

17   you turn it down.

18        So do you have something there that you brought

19   with you?

20            THE WITNESS:  Yes.

21            THE COURT:  Oh, okay.

22            MS. ROSS:  Yes.

23            THE COURT:  So let's have that go to Miss

24   Ross.  Miss Ross will show it to Miss Shingler.  Then

25   Miss Ross will ask you questions about it, and then you

1    will refresh your recollection.

2         MS. ROSS:  Okay.

3         (Brief pause.)

4         MS. SHINGLER:  I have no problem with him

5    using it to refresh his recollection; however, before

6    the witness is excused, I would like a copy of it, have

7    the opportunity to review it.  It appears to be movement

8    history of Ian Jasmin that I would like to take a look

9    at before the witness is excused.

10        THE COURT:  All right.  We'll label this for

11   identification, which is what has to happen for

12   refreshing recollection; show it to the witness, he will

13   refresh his recollection; we will get a copy of it for

14   you.

15   BY MS. ROSS:

16   Q    Showing you -- returning to you what has now been

17   marked for identification as Government's Exhibit 14.

18   Can you explain, Mr. Pittman, what -- what is that?

19   A    It's the movement history for Ian Jasmin.

20   Q    And what is the movement history?  Explain to us

21   what that is.

22   A    It -- it's basically a timeline of when an offender

23   is moved anywhere from a facility to another facility or

24   to a field office or to court, anything like that.

25   Q    Does the movement history also tell you when an

1    inmate enters the facility?

2    A    Yes.

3    Q    Does it tell you when an inmate exits or is

4    released from a facility?

5    A    Yes.

6    Q    Okay.  Is the movement history something that is

7    available throughout the Department of Corrections

8    system in Vermont?

9    A    It is available in operation -- or the Offender

10   Management System.  I don't know who has access to it,

11   but case workers do.

12   Q    Okay.  So --

13            THE COURT:  So we have a pending question

14   which was:  When did he enter the DOC system?  You are

15   going to look at that, refresh your recollection, answer

16   the pending question, and if you want to ask additional

17   questions, you may do so.

18            THE WITNESS:  The first dated time is December

19   12th, 2000 -- or December 28th, 2013.

20            MS. ROSS:  Okay.

21   BY MS. ROSS:

22   Q    Are you aware whether he had -- do you know whether

23   he had an entry in May into the facility?

24   A    I -- yes.

25   Q    Okay.  Do you know when that was?

1    A    May 2nd he came to Northeast Correctional Complex,
2    I believe.
3    Q    Are you familiar -- Miss Shingler was asking you a
4    lot of questions about the notice to Mr. Jasmin and what
5    you knew about that.  Are you familiar with the inmate
6    phone system at the facility?
7    A    Somewhat, yes.
8    Q    Okay.  Do you know whether any notice is given as
9    part of the phone system?
10   A    It is my understanding that it is.
11   Q    And what is your understanding about that?
12              MS. SHINGLER:  Objection.  Hearsay.
13              THE COURT:  Well, we -- it's not hearsay.  It
14   may be based on lots of things:  seeing it, hearing it,
15   reading it.  So let's get the foundation first.  His
16   understanding is based on what?
17              MS. ROSS:  Okay.  Your Honor, I am happy to do
18   that.  Obviously, since it's a suppression hearing, the
19   rules of evidence don't apply, but --
20   BY MS. ROSS:
21   Q    How do you know or where did you learn, from whom
22   did you learn what the -- what the notice is that's on
23   the phone system?
24   A    I can't remember the original source.  I have
25   always heard it from the offenders, other staff, that

1    it's --

2    Q    And what have you heard?

3    A    That calls are recorded.  And that it tells you.

4    Q    Now, Miss Shingler also asked you about

5    Government's Exhibit 8.  Do you still have that in front

6    of you?

7    A    Yes.

8    Q    And we talked before about the additions and

9    deletions.  Is that correct?

10   A    Yes.

11   Q    When -- why does somebody have to delete a name?

12   What are they doing when they delete a name?

13   A    Either it's someone they don't want to have contact

14   with anymore or they are trying to make room on their

15   PIN sheet to add a number that they don't already have

16   on there.

17   Q    Does the fact that an inmate is requesting a change

18   suggest anything about whether they already had a PIN

19   sheet in place?

20   A    Yes.  In order to delete a number, you have to --

21   it has to have already been on -- or approved through

22   the inmate telephone system.

23   Q    Miss Shingler also asked you about access or about

24   the inmate handbook.  You talked about telling Mr.

25   Jasmin about how to access the inmate handbook, correct?

1    A    Correct.

2    Q    And the inmate handbook was available for you, I

3    think was your testimony?  Is it available for you?

4    A    It is.

5    Q    Where else is it available?

6    A    They have one at AC, the unit leader's desk and the

7    officer's podium in every unit, and I think in the

8    supervisor's office.  I mean, they -- we are also

9    encouraged as correctional officers to carry one on us,

10   a copy.

11            MS. ROSS:  No further questions.

12            THE COURT:  Any recross?

13            MS. SHINGLER:  Yes, briefly, Judge.

14                    RECROSS EXAMINATION

15   BY MS. SHINGLER:

16   Q    So just to be clear, you don't have any of the PIN

17   sheets prior to the July 21st, 2014, PIN sheet that has

18   been identified as Government's Exhibit 8; is that

19   correct?

20   A    Correct.

21   Q    So you don't know whether or not he executed that

22   PIN sheet in your facility or another facility, correct?

23   A    Correct.

24   Q    And you didn't see that -- that first PIN sheet he

25   refers to in your contact notes of May 6th, correct?

1   A    Yeah, not that I recall.

2   Q    Okay.  And we can't see what his previous PIN

3   sheets look like because we don't -- you don't have

4   them, right?

5   A    Correct.

6   Q    Now, you said that you had some knowledge that the

7   phone calls are recorded.  Have you ever called in to

8   the facility to hear what it says?

9   A    I have used the inmate phone system to help

10  offenders out who can't -- or didn't know how to access

11  it because they had their PIN numbers and they had

12  trouble entering it.  It's nothing that I took note of

13  but I do recall hearing a warning.

14  Q    Okay.  So you at some point in your career as a

15  correctional employee have actually heard that with your

16  own ears?

17  A    I believe I have.

18  Q    And do you recall it says:  These phone calls may

19  be subject to monitoring or recording?

20  A    I don't remember what it says.

21  Q    That sounds about right?

22  A    That's what I would anticipate it saying.

23  Q    You would recall it being a very brief,

24  one-sentence warning?

25  A    I honestly have no recollection.  It's probably

1    been a few years since I heard it.

2    Q    Okay.  But if I told you that it was more or less

3    that this phone call may be subject to monitoring and

4    recording, does that comport with your memory?

5    A    Yes.

6    Q    Have you ever heard that kind warning device -- or

7    warning on a phone call when you make other phone calls

8    in your life?

9    A    Yes.

10   Q    I mean, when you call your insurance company, for

11   example, don't -- they say to you every time:  These

12   phone calls may be monitored and recorded?  It was kind

13   of that kind of warning, correct?

14   A    To -- it's comparable.

15   Q    And if I were to tell you I recently contacted the

16   Social Security Administration and heard that my phone

17   call would be monitored and recorded, does that sound

18   consistent with your experience in dealing with Social

19   Security Administration and other kind of facilities

20   like that?

21   A    Yes.

22   Q    If I was an inmate and I wanted to access the

23   handbook, can I go up to the supervisor's podium and

24   gain access without permission?

25   A    I believe they do have copies that are sitting

1  right on top of the officer's podium for access.

2  Q    Do you know that for sure?

3  A    Yes.

4  Q    You see them out and available to be grabbed?

5  A    Yes.

6  Q    Okay.  What would -- what did you mean when you

7  said it was in the officer's podium?

8  A    There's a more -- there's also a hard copy kept in

9  a binder.  That is one that is -- it's mandated to be in

10  there.  But the ones like the one that I gave you for

11  review, we have copies that are more accessible that sit

12  right on top of the officer's desk.

13  Q    Are they all the same version?

14  A    Yes.  Well, it's different depending on where you

15  are in the complex.  There's additional ones also.

16  Q    Excuse me?

17  A    There's --

18  Q    There are different hand- -- different versions of

19  handbooks depending on where you are in the facility?

20  A    It's considered a complex.  So we have the work

21  camp, which is a separate holding facility that you have

22  to be sentenced and you have to qualify to go to.  So

23  while in the complex, their set of rules is different,

24  but that's in a completely different building and

25  inmates.  And the regional side, which is where Mr.

```
1    Jasmin was, wouldn't have access to that.  But just to
2    answer the -- it completely.
3    Q    Okay.  You used an exhibit, I think which was
4    marked 14, which was the movement log or movement
5    history?  Exhibit 14 was the movement history for the
6    defendant?
7    A    Yes.
8    Q    Do you have that in front of you?
9    A    Yes.
10   Q    Is there anything on that that shows you where he
11   was within Northwest -- Northeast State Correctional
12   Facility?
13   A    As in where he was housed?
14   Q    Right.
15   A    No.
16   Q    Okay.  So that exhibit does not show that he was --
17   went from the work camp to B Unit or B Unit to the work
18   camp?
19   A    He wouldn't have access to that work camp at all.
20   Q    Okay.
21   A    But no, I wouldn't.
22   Q    But there are different complexes that are
23   different units in addition to the work camp, correct?
24   A    Yes.
25   Q    With different handbooks?
```

1    A    No.

2    Q    No?

3    A    Those all -- unless you are at the work camp, you

4    all have the same handbook, unless you are in

5    segregation, which has an additional handbook as far as

6    what the expectations there are.

7    Q    Okay.  Do you know whether or not -- you can't tell

8    us, as you look at 14, whether or not Ian was in the

9    work camp?

10   A    I know that he was not at the work camp.

11   Q    Do you happen to know whether or not he was ever in

12   segregation when he was at Northeast?

13   A    I don't recall, but that has the same -- the same

14   handbook.

15   Q    Just with different rules?

16   A    No.  There's an additional added portion to the

17   handbook which is more restrictive because -- and it

18   talks about recreation, like you would only be allowed

19   to use the phone on Saturdays or what status you are on.

20   Q    So it's a further -- it's further restrictions

21   imposed?

22   A    Yes.  It's for closed custody or disciplinary

23   segregation.

24   Q    Okay.  And as far as you know, Ian was never in

25   closed custody or segregation when he was at Northwest?

1  A    Not that I recall without looking at his DR

2  history.  It would be in case notes, actually, but I

3  don't think he was.

4            MS. SHINGLER:  I really would like to take a

5  look at Exhibit 14 and the handbook before he is

6  excused.  I don't know how the Court wants to do it.  I

7  don't mean to jerk this guy around.  I mean, there may

8  be no reason for him to be recalled.

9            THE COURT:  The verification of the handbook

10  is not something -- it's either going to be in or out

11  based on whether it matches.

12            MS. SHINGLER:  Right, and I can do that now.

13            THE COURT:  And it doesn't have anything to do

14  with his testimony.  The movement of the defendant in

15  the facility is what it is, and unless you need some

16  explanation about what that sheet shows, I assume we are

17  going to have another witness who will explain it.

18       So I am going to give you an opportunity to verify

19  that Exhibit 5 is actually in the new handbook in the

20  form -- in the previous handbook in the form it is

21  represented in Exhibit 5.  And I am going to give you an

22  opportunity to have a copy of the movement of the

23  inmate, in this case Mr. Jasmin, but I don't see any

24  reason for holding the witness on that basis.

25            MS. SHINGLER:  That's fine.  And I have had

```
1    the opportunity to compare the 2012 inmate handbook with
2    Government Exhibit 5, and I agree to date it is a copy
3    of the handbook.
4              THE COURT:  All right.  So Government's
5    Exhibit 5 is admitted.
6              (Government's Exhibit 5 was received in
7    evidence.)
8              THE COURT:  I assume you have no further
9    questions.
10        And any redirect?
11             MS. ROSS:  No, your Honor.
12             THE COURT:  All right.  Thank you, sir.  You
13   may step down.
14             THE WITNESS:  Do you need that for a copy?
15             THE COURT:  Oh, if you would give those all to
16   the courtroom deputy, that would be great.
17             (Witness excused.)
18             THE COURT:  So let's talk about more time, and
19   I have Monday, January 25th, if you want a full day.  If
20   not, we can start at 1:30.  Or Wednesday the 27th at
21   1:30 for a half day.
22             MS. ROSS:  Either of those works for the
23   government, your Honor.
24             THE COURT:  Miss Shingler, do you have your
25   calendar with you?
```

1    MS. SHINGLER:  I do not.

2    THE COURT:  So don't worry.  It's not the end

3    of the world.

4    MS. SHINGLER:  I can let you know as soon as I

5    get back to my office.

6    THE COURT:  Fine.  Just be in contact with

7    Jen, and if for some reason those dates don't work, we

8    will find other dates.  I am thinking half day, happy to

9    give you a full day.  What are you thinking you are

10   going to need?

11   MS. ROSS:  Is it -- I am afraid -- I don't

12   think we will need a full day, but I think we might need

13   a little bit more than a half, if that's -- is it

14   possible to start at like a 10 or 10:30 start time on

15   Monday, for example, if the Court has that available?

16   THE COURT:  Sure.  Monday we can start at 10.

17   We will go until you finish, and that's the 25th.  We

18   can do half days.  We will look for a full day.  Be in

19   contact with Jen.  We will set it promptly so Mr. Jasmin

20   is not waiting around until we complete the hearing, and

21   I anticipate we will get it in in the next three weeks

22   and it won't be a problem.

23   Anything further before we break for the day?

24   MS. SHINGLER:  No, Judge.

25   MS. ROSS:  No, your Honor.

1          THE COURT:  Thank you.

2              (Court was in recess at 11:55 a.m.)

3                   *** ** ***

4

5

6

7

8                C E R T I F I C A T I O N

9      I certify that the foregoing is a correct
   transcript from the record of proceedings in the
10  above-entitled matter.

11                     _Anne Nichols Pierce_ (signature)

12  February 3, 2016          _____
   Date                      Anne Nichols Pierce
13

14

15

16

17

18

19

20

21

22

23

24

25