UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

UNITED STATES OF AMERICA     *
                             *
          V           *
                             *
IAN JASMIN               * CRIMINAL FILE NO. 15-37

DEFENDANT'S MOTION TO SUPPRESS INMATE TELEPHONE CALLS
Friday, February 5, 2016
Burlington, Vermont

BEFORE:

     THE HONORABLE CHRISTINA R. REISS
       Chief District Judge

APPEARANCES:

     HEATHER E. ROSS, ESQ., Assistant United States
       Attorney, Federal Building, Burlington, Vermont;
       Attorney for the United States

     KAREN SHINGLER, ESQ., 74 Main Street, Burlington,
       Vermont; Attorney for the Defendant

ANNE NICHOLS PIERCE
Registered Professional Reporter
United States District Court
Post Office Box 5633
Burlington, Vermont   05402
(802) 860-2227

# <u>I N D E X</u>

### E X A M I N A T I O N

| WITNESS NAME | PAGE | LINE |
|---|---|---|
| **MICHELE SHUFELT** | | |
| Direct by Ms. Ross | 5 | 21 |
| | 14 | 5 |
| | 51 | 4 |
| Voir Dire by Ms. Shingler – Re: Exhibit 18A | 12 | 9 |
| – Re: Exhibit 18E | 28 | 16 |
| – Re: Exhibit 16 | 49 | 2 |
| Cross by Ms. Shingler | 56 | 24 |
| **ERICA JOHNSON** | | |
| Direct by Ms. Ross | 69 | 11 |
| Cross by Ms. Shingler | 88 | 8 |
| Redirect by Ms. Ross | 93 | 14 |
| Recross by Ms. Shingler | 94 | 13 |
| **AARON CONCEPCION** | | |
| Direct by Ms. Ross | 95 | 6 |
| Cross by Ms. Shingler | 121 | 25 |
| **DAWN MULLER** | | |
| Direct by Ms. Ross | 135 | 4 |
| Cross by Ms. Shingler | 147 | 17 |
| **MICHELLE DELPHA** | | |
| Direct by Ms. Ross | 149 | 23 |
| Cross by Ms. Shingler | 158 | 14 |

# I N D E X

## E X H I B I T S

| GOVERNMENT'S | DESCRIPTION | IN EVIDENCE |
|---|---|---|
| 3 | Inmate telephone number request form | 87 |
| 8 | Completed inmate  PIN sheet | 45 |
| 9 | NSCF inmate handbook – March 2014 | 144 |
| 10 | Photographs of inmate phones at Rockland County jail | 101 |
| 11 | E-mail chain between Johnson and Shufelt | 37 |
| 12 | Copies of call detail | 74 |
| 12A – 12D | Copies of call detail | 80 |
| 14 | Inmate movement log for I. Jasmin | 54 |
| 14B | Call list | 85 |
| 15 | Placard at phones | 156 |
| 16 | NECC inmate handbook acknowledgment form | 51 |
| 18A | Inmate phone sheets w/e-mail | 14 |
| 18B | Copy of e-mail | 18 |
| 18C | Inmate phone request form w/e-mail | 21 |
| 18D | Shufelt e-mail w/Jasmin phone requests | 26 |
| 18E | Shufelt e-mail w/Jasmin phone requests | 29 |
| 18F | Shufelt e-mail w/Jasmin phone requests | 32 |
| 18G | Shufelt e-mail w/Jasmin's phone rests | 41 |

| DEFENDANT'S | DESCRIPTION | IN EVIDENCE |
|---|---|---|
| A | Letter and subpoena | 90 |

1  FRIDAY, FEBRUARY 5, 2016

2  (The following was held in open court at 12:05 p.m.)

3          COURTROOM DEPUTY:  Your Honor, the matter

4  before the Court is criminal case number 15-CR-37,

5  United States of America versus Ian Jasmin.

6  Representing the government is Assistant United States

7  Attorney Heather Ross.  The defendant is present today

8  with his attorney, Karen Shingler.  And we are here for

9  a hearing on the motion to suppress inmate telephone

10  calls.

11          THE COURT:  Good afternoon.

12          MS. ROSS:  Good afternoon, your Honor.

13          MS. SHINGLER:  Good afternoon, Judge.

14          THE COURT:  My notes suggest we finished our

15  first witness but I am not quite sure.  Are we in

16  agreement on that?

17          MS. ROSS:  That's correct, your Honor.

18          MS. SHINGLER:  Yes, Judge.

19          THE COURT:  Okay.  So the government may call

20  its next witness.

21          MS. ROSS:  Thank you, your Honor.

22      The government calls Michele Shufelt.

23                  MICHELE SHUFELT,

24      having been duly sworn by the courtroom deputy,

25      was examined and testified as follows:

1          THE COURT:  So I understand there's a

2     courtroom of people who have not eaten lunch, so I won't

3     do what my instinct will be which will be to go as long

4     as possible until everybody expires.  We will take a

5     break in, you know, 45 minutes to an hour, have a quick

6     lunch break, and come back in.  I just know that this

7     day was set aside and we kind of blew through our

8     morning with the events, so --

9          MS. SHINGLER:  Well, I don't think it's as

10    long as I anticipated in that I expected we were going

11    to be sitting here for hours listening to phone calls.

12    That is not the case.  So that makes me feel good, but I

13    know that Miss Ross has out-of-state witnesses.  I am

14    hoping she calls them first.  And I have no problem with

15    barreling through at least a couple of those.

16          THE COURT:  Okay.

17          MS. SHINGLER:  If I had known we were going to

18    come back, I would have grabbed a bite to eat.

19          THE COURT:  Okay.

20          MS. ROSS:  Thank you, your Honor.

21                    DIRECT EXAMINATION

22    BY MS. ROSS:

23    Q    Miss Shufelt, you can have a seat.

24    A    Thank you.

25    Q    And, again, Miss Shufelt, could you please just

1   state your name for the record.

2   A    Michele Mitchell Shufelt.

3   Q    And, Miss Shufelt, where do you work?

4   A    I work at the Northeast Correctional Complex in

5   St. Johnsbury, Vermont.

6   Q    How long have you worked there?

7   A    I have worked there for 15 years.

8   Q    And what -- what is your job there?

9   A    My job there is the site legal administrator,

10  therefore any documents, any lodgings, anything to do

11  with the legal, I do that.  And also the phone sheets.

12  Inmate phone sheets.

13  Q    Okay.  Now, in 2014, were you also in that position

14  as site legal administrator?

15  A    Yes.

16  Q    And how long have you held that particular

17  position?

18  A    I have held the site legal administrator position

19  for almost four years.

20  Q    Now, you started to tell us a little bit about your

21  job duties as site legal administrator, and you

22  mentioned phone sheets.  What is your involvement with

23  phone sheets?

24  A    With phone sheets, the process is that I process

25  all inmate phone requests.  Unit leaders put the

1    requests in my mailbox, I pick them up every morning,

2    and I compare the information on the request to my

3    no-contact order as well as my victim no-contact system.

4    Q    Okay.  So let's just make sure we are all talking

5    about the same thing.  Tell us generally what's a phone

6    sheet.  When we use that term, what is that?

7    A    A phone sheet for the offenders for -- to have

8    contact with those on the outside.

9    Q    And who fills out a phone sheet?

10   A    An offender fills out the phone sheets.

11   Q    And when you -- when you talk about unit leaders,

12   who do you mean?  Who are the unit leaders?

13   A    I mean the officers in the units.

14   Q    Okay.

15   A    The unit officers.  We have a unit officer in each

16   unit.

17   Q    And how often do you deal with phone sheets?

18   A    I deal with phone sheets every morning.

19   Q    And is there a set or regular time at which you

20   deal with the phone sheets each day?

21   A    Yes, there is.  I have the phone sheets completed

22   by nine a.m.  I try to have them done by eight.  The

23   policy is for the request to be in my mailbox no later

24   than eight a.m.

25   Q    Okay.  And you were describing, once you retrieve

```
1    them from your mailbox, what is it that you do with the
2    phone sheets?
3    A    I bring them back to my desk and I compare the
4    information, making sure there's no-contact names and
5    victim names, and then I scan -- then I sign them,
6    initial them on the bottom of the form, date them, I go
7    to the copier and I scan them to my e-mail address, and
8    from there I forward them to our PSC administrator,
9    Erica.  And then Erica will complete the request by
10   either adding, deleting, what have you, and return them
11   to me.
12        Once I receive them, I print them and I put them in
13   the unit mailboxes for the officers to take back to the
14   units to distribute to the offenders.
15   Q    Okay.  So how -- let's talk a little bit.  Who is
16   the -- you mentioned PSC administrator.
17   A    Public service communication.
18   Q    Okay.
19   A    Public systems communication.
20   Q    Who does the PSC administrator work for?  What
21   company?
22   A    I believe that is the company.
23   Q    That the name of the company is PS --
24   A    The public service -- yes.
25   Q    Okay.  But not directly -- not -- she is not an
```

1    employee of the Department of Corrections?

2    A    No, she is not.

3    Q    And who -- what's the name of the person to whom

4    you send these requests?

5    A    Erica Johnson.

6    Q    Okay.  Did she used to have a different last name?

7    A    Yes, she did.  And I'm not sure how to pronounce it

8    but I can spell it.  Przech, P-R-Z-E-C-H.

9    Q    Okay.  Now -- so you talked about you scan in the

10   inmate phone sheets after you have done your review of

11   them and sign them, correct?

12   A    That is correct.

13   Q    What do you do with the original?

14   A    The original?  I shred them.  Once I get them back,

15   I confirm that all the requests that I scanned to her I

16   received back, a response back, and then they are

17   shredded.

18   Q    Okay.  So -- and then the copy that you get back

19   you said goes back out to the units?

20   A    Back into the mailbox, the unit mailboxes.

21   Q    Okay.

22   A    And distributed by the unit officers.

23            MS. ROSS:  Your Honor, may I approach the

24   witness?

25            THE COURT:  You may.

1  BY MS. ROSS:

2  Q    I'm showing you what's been marked for

3  identification as Government's Exhibit A.

4            MS. ROSS:  And, your Honor, since we don't

5  have these scanned, I am going to rely on hard copies,

6  including one for the Court.

7            THE COURT:  Great.  So we have a sticker 18A.

8  Is it A or 18A?

9            MS. SHINGLER:  18.

10            MS. ROSS:  18A.  Yes.

11            THE COURT:  Okay.

12  BY MS. ROSS:

13  Q    Now, Miss Shufelt, do you recognize the Exhibit

14  18A?

15  A    Yes, I do.

16  Q    And what kind of document is Exhibit 18A?

17  A    This is a copy of a doc set, or printed from my

18  sent inbox.

19  Q    Okay.  So how does this fit into the process that

20  you just described to us that you undertake with respect

21  to phone sheets?

22  A    This is an example of once when I scan them, I send

23  them to Erica.

24  Q    And who prepared this document?

25  A    I prepared the e-mail but the phone sheets

1    themselves, the offender prepared.

2    Q    Okay.  And this is a regular and customary part of

3    your job, correct?

4    A    Yes, it is.

5    Q    Do you send -- do you send a record like this every

6    day?

7    A    Yes, I do.

8         MS. ROSS:  Your Honor, at this time we move

9    the admission of Government's Exhibit 18A.

10        THE COURT:  Any objection?

11        MS. SHINGLER:  Yes.  The copy I have have a

12   number of inmate phone system complaint forms that

13   appear to have nothing to do with Mr. Jasmin, a number

14   of inmate names.  None of the inmate complaint forms

15   have Mr. Jasmin's name on it, although one of them is in

16   his handwriting and is En- -- regarding Enri Jasmin, but

17   none of the others appear to have anything to do with

18   the case or this motion.

19        THE COURT:  So I think they are for

20   illustrative purposes with the possible exception of

21   Mr. Jasmin's.  Is that true?

22        MS. ROSS:  That's correct, your Honor.  So we

23   are showing that this is the document that she actually

24   sent in its entirety to Miss -- to Erica.  These are all

25   the inmate sheets that were sent on a particular day,

1    including one for Enri Jasmin.

2         Now, you know, if there's some concern --

3              THE COURT:  So let me see if any continuing

4    objection?

5              MS. SHINGLER:  I do.  If I could have an

6    opportunity to voir dire?

7              THE COURT:  You may.

8              MS. SHINGLER:  Thank you.

9                    VOIR DIRE EXAMINATION

10   BY MS. SHINGLER:

11   Q    Do you have the exhibit in front of you, Miss

12   Shufelt?

13   A    Yes, I do.

14   Q    Where did you get these -- the originals of these

15   documents?

16   A    The originals of these documents were in my

17   mailbox.

18   Q    You had testified that once you processed these

19   requests, that you shred the originals?

20   A    That is correct.

21   Q    So these are relative to -- or request forms that

22   are dated May 5th of 2014; is that correct?

23   A    That is correct.

24   Q    So --

25   A    These are copies of -- I printed them from my sent

1    inbox.  These are copies of those.  That is part of my

2    process.

3    Q    Okay.  So is that something that you do every day?

4    A    I do it every day.

5    Q    So --

6    A    I have the same process every day.

7    Q    So if I were to ask you, give me all the phone

8    request forms for May 6th, 2015, you could do that?

9    A    Yes, I could.

10   Q    And if I were to ask you, can you give me all the

11   mail requests for a particular inmate, could you do

12   that?

13   A    All mail request?

14   Q    Inmate request.  If I were to say to you, can you

15   give me copies of all phone requests from a particular

16   inmate, would you be able to do that?

17   A    I would have to answer yes --

18   Q    It would take --

19   A    -- with the exception if I were out of the office.

20   Q    Okay.

21   A    I do have a backup.

22   Q    And do you -- okay.

23        MS. SHINGLER:  Thank you, Judge.  I don't have

24   any objection.

25        THE COURT:  Okay.  Government's Exhibit 18A is

1    admitted.

2                MS. ROSS:  Thank you, your Honor.

3                (Government's Exhibit 18A was received in

4    evidence.)

5                CONTINUED DIRECT EXAMINATION

6    BY MS. ROSS:

7    Q    Now, Miss Shufelt, when did you send the Exhibit

8    18A?  When did you send it to Ms. Przech?

9    A    At 8:21 a.m. on May 6th.

10   Q    Okay.  Now, attached to this e-mail is -- are a

11   number of -- what's attached?  You tell me what's

12   attached to this e-mail.

13   A    What's attached to this e-mail are the copies of

14   the phone sheets that I received prior to eight a.m. on

15   May 6th.

16   Q    Okay.  Do you organize the phone sheets in any

17   particular order?

18   A    Yes, I do.  Again, I follow the same process every

19   day.  I put them alphabetically.

20   Q    So are there other phone sheets from -- that you

21   sent on May 6th that do not appear attached to this

22   e-mail?

23   A    No.

24   Q    Now, I'd like to turn your attention to a -- what's

25   marked as Bates number 002755 down in the right-hand

1    corner of Exhibit 18A.  Are you there?

2    A    Yes, I am.

3    Q    Okay.  What is this document?

4    A    This document is an inmate telephone system request

5    form submitted by inmate Enri Jasmin.

6    Q    And does your handwriting appear anywhere on this

7    form?

8    A    My handwriting does appear on the bottom of the

9    page, received by -- reviewed by staff member MS, for

10   Michele Shufelt, and then the date.

11   Q    And what's the date?

12   A    5/6/14.

13   Q    Okay.  Whose handwriting appears under inmate

14   commissary number?

15   A    That is my handwriting.

16   Q    Okay.  What is an inmate commissary number?

17   A    An inmate commissary number is actually the

18   inmate's identification number within our offender

19   management system.

20   Q    And how do you find the inmate commissary number

21   for a particular inmate?

22   A    I find that number by entering his last name, first

23   name, into our OMS system, and his name appears and

24   there is his name, ID number has already been assigned,

25   and I get it from the OMS system.

1    Q   Okay.  And taking a look at this document, who

2    fills out the inmate name?

3    A   The offender fills out.

4    Q   How about the date of birth?

5    A   The offender.

6    Q   Under inmate signature, who fills that out?

7    A   The offender fills that out.

8    Q   And unit, what does unit mean?

9    A   Unit means that's what unit he resides in.

10    Q   And who fills that out?

11    A   The offender.

12    Q   How about the date at the top, which in this case

13    is 5/5/2014?

14    A   The offender fills that -- the date out as well.

15          MS. ROSS:  Your Honor, may I approach the

16    witness?

17          THE COURT:  You may.

18    BY MS. ROSS:

19    Q   I'm showing you what's been marked for

20    identification as Exhibit 18B.  Now, do you recognize

21    Exhibit 18B?

22    A   Yes, I do.

23    Q   And what kind of document or record is this?

24    A   This is an inmate telephone system request form.

25    Q   Okay.  And how does -- is this part of the process

1    that you described about the phone intake process that

2    you do every day?

3    A    Yes, it is.

4    Q    And, again, tell us how this particular exhibit

5    fits into that process.

6    A    I received this prior to 0800 hours on May 8th, and

7    I compared it to my no contacts and the victims'

8    notification system, and initialed the bottom, dated it,

9    and I scanned it to myself, to my e-mail, and then I

10    forwarded that to the PCS administrator, Erica.  She

11    completed it, returned it back, and I printed a copy and

12    put it in Delta's unit mailbox that day for it to be

13    given back to the offender.

14    Q    And where did you have this particular record?

15    Where did you find this particular record?

16    A    I found this particular record in my inbox sent.

17    I found it in my mailbox the morning of May 8th.

18    Q    Okay.  And --

19        THE COURT:  So let me just stop you there.

20    Inbox sent does not make sense to me.  You mean your

21    sent e-mails?

22        THE WITNESS:  Sent inbox, yes.

23        MS. ROSS:  Okay.

24        THE COURT:  Okay.

25    BY MS. ROSS:

1    Q    You mean your sent mail for your e-mail account?

2    A    Yes.

3    Q    Okay.  And are you required to keep this by any

4    policy at the jail?

5    A    There is no policy to retain these record -- these

6    inmate phone requests.

7    Q    And so did you -- when did you find this document?

8    A    I found this document prior to 0800 hours on May

9    8th.

10   Q    Okay.  By -- a copy of the e-mail that has become

11   Exhibit 18B.

12   A    Okay.  I found a copy of this e-mail on February

13   2nd, 2016.

14   Q    Okay.

15        MS. ROSS:  Your Honor, at this time we move

16   the admission of Exhibit 18B.

17        THE COURT:  Any objection?

18        MS. SHINGLER:  No, Judge.

19        THE COURT:  It's admitted.

20        (Government's Exhibit 18B was received in

21   evidence.)

22   BY MS. ROSS:

23   Q    Okay.  Taking a look at Exhibit 18B, on the first

24   page, Miss Shufelt, tell us about the e-mail between

25   yourself and Erica.  What did you send to Erica?

1    A    I sent Erica the attached phone request on May 8th

2    via e-mail.

3    Q    Okay.  And --

4    A    2014.  May 2014.

5    Q    Now, let me just ask you, if this were put --

6    given -- if this attachment, this inmate phone request,

7    was given to the unit officer in the middle of the day,

8    when do you retrieve it?  Or when does it come to you?

9    A    If this -- at the end of the officer's shift.  Or

10   if an officer takes a break, sometimes they will bring

11   it up other times during the day, but it's an officer's

12   responsibility to bring all phone requests that they

13   receive during their shift in a unit by the end of their

14   shift.

15   Q    Now, looking at the next page, page two of Exhibit

16   18B, what is this document?

17   A    This is an inmate phone request form.

18   Q    In whose name?

19   A    Completed by Enri Jasmin.

20   Q    And does your handwriting appear on this document?

21   A    Yes, it does.

22   Q    And where does it appear?

23   A    It appears at the bottom of the page.

24   Q    Is that your signature?

25   A    Yes, it is.

1      MS. ROSS:  Your Honor, may I approach the

2  witness?

3      THE COURT:  You may.

4  BY MS. ROSS:

5  Q    Showing you what's been marked for identification

6  as Exhibit 18C.  Do you recognize Exhibit 18C?

7  A    Yes, I do.

8  Q    And what kind of document is this?

9  A    This is an e-mail with attachments of inmate phone

10  request forms.

11  Q    Was this prepared in the same manner as you have

12  previously described with respect to Exhibits 18A and

13  18B?

14  A    This was, yes.

15  Q    And is this part of the same phone intake process

16  that you have already described to us?

17  A    Yes.

18  Q    And where did you find -- where did you find

19  Exhibit 18C?

20  A    Do you mean the e-mail or the phone request?

21  Q    The -- the e-mail.  This particular record.  Where

22  did you find the record that's Exhibit 18C?

23  A    I found this on February 2nd, 2016.

24  Q    And where did you find it?

25  A    I found it -- I found it in my sent inbox.

```
1    Q    Okay.  And every time you say "sent inbox," you

2    mean your sent items?

3    A    Yes, my sent items in my e-mail.

4    Q    Okay.

5    A    State of Vermont e-mail system.

6              MS. ROSS:  Your Honor, at this time I move the

7    admission of Exhibit 18C.

8              THE COURT:  Any objection?

9              MS. SHINGLER:  Assuming that it is being

10   introduced for the same purposes as 18A, I have no

11   objection.

12             THE COURT:  Well, it's being introduced

13   probably for beyond illustrative purposes because I

14   assume that -- actually, 18A was as well -- it is --

15   purports to be the defendant's own document.  Correct?

16             MS. ROSS:  Correct.

17             THE COURT:  All right.  So any objection?

18             MS. SHINGLER:  No, Judge.

19             THE COURT:  It's admitted.

20             MS. ROSS:  Thank you, your Honor.

21             (Government's Exhibit 18C was received in

22   evidence.)

23   BY MS. ROSS:

24   Q    Turning your attention to Exhibit 18C, can you

25   explain to us what is page one of 18C?
```

1    A    Page one is an e-mail that I -- a copy of an e-mail
2    that I sent to Erica.
3    Q    And when did you send this to Erica?
4    A    On May 14th, 2014, with attachments of the phone
5    sheets.
6    Q    Okay.  What is behind this page one?
7    A    Behind page one are the -- all the requests that I
8    received on that -- on Monday 14th prior to 800 hours.
9    Q    I'd like you to turn your attention to something
10   that's marked with Bates number 002826.  Are you there?
11   A    Yes.
12   Q    Great.  Can you describe for us what this is?
13   A    Yes.  This is an inmate telephone number request
14   form submitted by Ian Jasmin.
15   Q    Okay.  And what's the date of birth?
16   A    The date of birth, 3/16/84.
17   Q    Who fills that out?
18   A    The offender, Ian Jasmin, filled that out.
19   Q    Okay.  And do you see where it says Unit D?
20   A    Yes.
21   Q    What does that stand for?
22   A    That stands for the unit that he was residing in.
23   Q    And again, what is the inmate commissary number?
24   A    The inmate commissary number is the inmate ID
25   number.

1    Q    Who filled that out?

2    A    Offender Ian Jasmin filled that out.

3    Q    Okay.  And, again, your signature appears on this

4    document, correct?

5    A    My signature is on the bottom of the form.

6    Q    Now, I am going to --

7         MS. ROSS:  May I approach the witness again,

8    your Honor?

9         THE COURT:  You may.

10   BY MS. ROSS:

11   Q    I am going to show you what's already been admitted

12   as Exhibit 18A, and looking at Exhibit 18A again,

13   turning your attention to Bates number 002755, when you

14   look at that and compare it with Exhibit 18C, 002826,

15   what can you tell us about the inmate commissary

16   numbers?

17   A    On Exhibit 002755, I wrote in the inmate commissary

18   number.

19   Q    And that number is what?

20   A    153955.

21   Q    Okay.

22   A    On 002826, offender Ian Jasmin completed the inmate

23   commissary number.

24   Q    And what's that number?

25   A    That is his inmate ID number.

1    Q    Is it the same as what's on Bates number 002755?

2    A    Yes.

3    Q    And why does Enri Jasmin and Ian Jasmin -- why do

4    they have the same inmate commissary number?

5    A    They have the same inmate commissary number as --

6         MS. SHINGLER:   Judge, I would object as --

7    without a foundation.   I mean, it sounds like at this

8    point she is going to be speculating or offering an

9    opinion without any support.

10         THE COURT:   Well, she might, but let's hear

11    why she thinks she knows why they have the same inmate

12    commissary number because it may be that the defendant

13    told her or someone else told her or -- but before we

14    get to that conclusion.

15         MS. ROSS:   Okay.

16    BY MS. ROSS:

17    Q    Well, why don't we hold that thought because there

18    will be an easier way to do this for you, okay?

19    A    Okay.

20    Q    So why don't you hold that thought for a second.

21    And let's --

22         MS. ROSS:   May I approach the witness again,

23    your Honor?

24         THE COURT:   You may.

25    BY MS. ROSS:

1    Q    Showing you what's been marked for identification

2    as Exhibit 18D.  And, Miss Shufelt, do you recognize

3    Exhibit 18D?

4    A    Yes.

5    Q    And what kind of document is this?

6    A    This is a copy of a document from my sent inbox

7    e-mail.

8    Q    Okay.  Is this the part of the process that you

9    have described to us already as part of the phone intake

10   process?

11   A    Yes.  It's the same process I use every day for

12   every request.

13   Q    Okay.  And is document 18D -- is this the same --

14   did you go through the same kind of process in preparing

15   this as you did for documents -- or Exhibits 18A, B and

16   C?

17   A    Yes.

18        MS. ROSS:  Your Honor, we move the admission

19   of 18D based on what the witness has already described

20   about the process.

21        THE COURT:  Any --

22        MS. SHINGLER:  No objection.

23        THE COURT:  It's admitted.

24        MS. ROSS:  Thank you.

25        (Government's Exhibit 18D was received in

1    evidence.)

2    BY MS. ROSS:

3    Q    I'd like to turn your attention to first -- the

4    first page of Exhibit 18D, and please describe for us,

5    Miss Shufelt, what that is.

6    A    The first page of 18D is a copy of a document from

7    my sent inbox.

8    Q    And that -- what -- what kind of document is it?

9    A    It's an e-mail.

10   Q    And to whom did you send this e-mail?

11   A    I sent this e-mail to Erica Przech on May 29th,

12   2014.

13   Q    I'd like to turn your attention to Bates number

14   002979.  What is this document?

15   A    This is an inmate telephone system number request

16   form.

17   Q    Who completed this document?

18   A    Offender Enri Jasmin completed this document.

19   Q    What inmate commissary number did he give?

20   A    The inmate commissary number 153955.

21   Q    And who signed this document?

22   A    The offender Enri Jasmin signed this document.

23   Q    Does your signature also appear on the document?

24   A    My signature does appear on the document at the

25   bottom of the page.

1    Q    And what is the date of your signature of this

2    document?

3    A    May 29th, 2014.

4    Q    Now, can you just explain for us -- tell us about

5    what's the date that the inmate completed the document.

6    A    The inmate completed the document on May 28th,

7    2014.

8    Q    And how does it happen -- how does it fit into your

9    process that you don't send it until May 29th?

10   A    Any phone sheets received on any given day after

11   0800 hours are done the next day's business.

12             MS. ROSS:  Your Honor, may I approach the

13   witness?

14             THE COURT:  You may.

15   BY MS. ROSS:

16   Q    I am going to take 18D back from you.

17   A    Okay.

18   Q    Thank you.

19        I am going to give you what's been marked for

20   identification as 18E.  And do you recognize Exhibit

21   18E?

22   A    Yes.

23   Q    Again, what kind of record is this?

24   A    This is a copy of what is printed from my sent

25   inbox.

1  Q   Was this document prepared and kept in the same

2  manner in which you have described Exhibits 18A, B, C

3  and D were prepared and kept?

4  A   Yes.  I use the same process every day.

5  Q   Okay.  And was this prepared pursuant to the same

6  phone intake process that you have already described to

7  us?

8  A   Yes.

9        MS. ROSS:  Your Honor, at this time I move for

10  the admission of Exhibit 18E.

11        THE COURT:  Any objection?  Any objection?

12        MS. SHINGLER:  Yes, Judge.  If I may voir

13  dire?

14        THE COURT:  You may.

15        MS. SHINGLER:  Thank you.

16                VOIR DIRE EXAMINATION

17  BY MS. SHINGLER:

18  Q   Miss Shufelt, do you have the document in front of

19  you?

20  A   Yes.

21  Q   Can you turn to page 002731.

22  A   Yes.

23  Q   There appear to be three different types of

24  handwriting on this document.  Correct?

25  A   Yes.

1   Q    There's the inmate's purported handwriting,

2   correct?

3   A    Yes.

4   Q    There is some very bold, like on a Sharpie,

5   handwriting?  Do you know who did that?

6   A    That's my handwriting, the Sharpie.

7   Q    Okay.  And the regular ball-point pen indication of

8   the inmate commissary number, who wrote that?

9   A    That is my handwriting.

10  Q    Okay.

11           MS. SHINGLER:  Judge, I have no objection.

12           THE COURT:  All right.  18E is admitted.

13           (Government's Exhibit 18E was received in

14  evidence.)

15  BY MS. ROSS:

16  Q    And looking at the first page of Exhibit 18E, Miss

17  Shufelt, when was this e-mail sent?

18  A    This e-mail was sent on June 4th, 2014, at 7:20

19  a.m.

20  Q    I would like to turn your attention to what's been

21  marked as Bates number 002731.

22  A    Yes.

23  Q    You were just talking with Miss Shingler that it

24  was your handwriting on this document?  Correct?

25  A    Yes.  In the bold.

1  Q    Okay.  And it is your handwriting that has crossed

2  out "Enri" and written "Ian"?

3  A    Yes.

4  Q    And why did you do that?

5  A    I did that because I am also responsible for doing

6  record checks for the Northeast Correctional Complex.  I

7  received a request from a case worker to do a record

8  check on an Enri Jasmin.  Upon doing the record check,

9  there was a red flag.  There was an Enri and Ian that

10  came up on this report with the same F -- Ian's

11  information came up with a different FBI number than

12  what I had.

13       At this point I turned it over to the administrator

14  for the NCIC, Morgan Rogers, and she reviewed it and

15  replied back to me that --

16            MS. SHINGLER:  Objection.

17  A    -- it was actually Ian and not Enri.

18  BY MS. ROSS:

19  Q    That what was actually Ian and not Enri?

20  A    The name.

21  Q    The name of who?  The inmate?

22  A    Of the offender.

23  Q    And do you see where you -- the handwriting in bold

24  next to inmate commissary number?

25  A    Yes.

1    Q    And you said that was your handwriting?

2    A    Yes.

3    Q    Why did you write those numbers there?

4    A    I wrote those numbers there because after we

5    learned that he was actually Ian, the number that was

6    initially assigned by our OMS system for Enri was the

7    153955, which was incorrect.  It was inactive.

8    Q    Okay.  And what number was assigned?

9    A    The number for Ian Jasmin that was assigned through

10   our OMS system is number 156446.

11             MS. ROSS:  Your Honor, may I approach the

12   witness?

13             THE COURT:  You may.

14   BY MS. ROSS:

15   Q    I am going to show you what's been marked for

16   identification as Exhibit 18F, and I'll take back 18E

17   from you.

18        Now, Miss Shufelt, do you recognize Exhibit 18F?

19   A    Yes.

20   Q    Did you prepare and keep it in the same manner in

21   which you have described for Exhibits 18A, B, C, D and

22   E?

23   A    Yes.

24   Q    And is it also part of the same regular and

25   customary phone intake process that you have already

```
 1    described for us?
 2    A    Yes.
 3            MS. ROSS:  Your Honor, at this time I move for
 4    the admission of Exhibit 18F.
 5            THE COURT:  Any --
 6            MS. SHINGLER:  If I could have just a minute
 7    to take a look at it, Judge?
 8            THE COURT:  Yes.
 9            (Brief pause.)
10            MS. SHINGLER:  No objection.
11            THE COURT:  It's admitted.
12            (Government's Exhibit 18F was received in
13    evidence.)
14    BY MS. ROSS:
15    Q    Taking a look at the first page of Exhibit 18F, can
16    you tell us what that is?
17    A    Yes.  This is a document that was printed from my
18    sent inbox.
19    Q    And, Miss Shufelt, who did you send this to?
20    A    I sent this to Erica Przech on --
21    Q    And what did you write on this?
22    A    I wrote on this, "Only if you have time."
23    Q    And why did you write that?
24    A    I wrote this because I had already submitted my
25    phone sheets for June 4th.  With learning of the
```

1   different names and different IDs, I sent this to Erica

2   after 0800 hours, at 11:08 a.m., and I said, "Only if

3   you have time."  That is a process that I use if for

4   some reason I send more than one batch in any given day,

5   which -- that is not a practice of mine, but because of

6   the issues, I sent it, and I said, "Only if you have

7   time."

8   Q    Now, I'd like to direct your attention to Bates

9   number 002704 in Exhibit 18F.  And what is this document

10  at 002704?

11  A    This is an inmate request form submitted -- signed

12  for by offender Ian Jasmin.

13  Q    To whom is this addressed?

14  A    This was addressed to myself, Mrs. Shufelt.

15  Q    Okay.  And what's the date of this?

16  A    The date of this is June 4th, 2014.

17  Q    And what's this about?

18  A    This is about the offender recognizing that he had

19  phone issues due to using different names or having two

20  names and two different IDs within the system, and that

21  he could not make --

22          MS. SHINGLER:  Judge, I have no problem for

23  the exhibit to be admitted.  I don't think she should be

24  interpreting what the inmate wrote on the exhibit, which

25  appears to be what she is doing.

```
1              THE COURT:  I think the exhibit speaks for
2    itself, and I can interpret that, and to move things
3    along, I am going to sustain the objection.
4              MS. ROSS:  Okay.
5              THE COURT:  Go ahead.
6    BY MS. ROSS:
7    Q    So this -- I just want to clarify whose handwriting
8    is whose on this exhibit.  So the -- at the top of the
9    exhibit, under "subject," who wrote the subject?
10             MS. SHINGLER:  Objection.  No foundation.
11             THE COURT:  Well, you can ask her if it's her
12   handwriting.
13             MS. ROSS:  Okay.
14   BY MS. ROSS:
15   Q    Is that your handwriting?
16   A    No, it is not.  My handwriting is only with the
17   note to Erica.
18   Q    Okay.  And so your handwriting appears under
19   "Erica:"?
20   A    Correct.  Yes.
21   Q    And what are you -- what did you write with your
22   handwriting?
23   A    I had told her that this referred to an e-mail that
24   I had sent her earlier today.
25   Q    And who signed this request form?
```

1    A    Offender Ian Jasmin signed this request form.

2    Q    I'd like you to look at the next page, and that's

3    at Exhibit 002705.

4    A    Yes.

5    Q    Can you tell us what this is?

6    A    This is an inmate telephone request form submitted

7    by offender Ian Jasmin signed by Ian Jasmin.

8    Q    Does your signature appear on it?

9    A    Yes.  My signature appears at the bottom.

10   Q    And under inmate commissary number, what does

11   that --

12   A    That's the inmate ID.  They need that to make phone

13   calls.

14   Q    Now, does your handwriting appear anywhere else on

15   this document other than your signature and date at the

16   bottom?

17   A    No.

18            MS. ROSS:  Your Honor, may I approach the

19   witness?

20            THE COURT:  You may.

21   BY MS. ROSS:

22   Q    I'm showing you what has previously been marked for

23   identification as Government's Exhibit 11.  And do you

24   recognize Government's Exhibit 11?

25   A    Yes.

1    Q    What kind of document or record is this?

2    A    This is -- was a printed copy of an e-mail from my

3    sent inbox.

4    Q    Okay.  And who prepared this e-mail?

5    A    I did.

6    Q    And how does it fit into the phone intake process

7    you already described?

8    A    It fits into the phone process I already described.

9    It has to do with the ID numbers.

10   Q    And the ID numbers -- when you say ID numbers, what

11   do you mean?

12   A    The inmate ID numbers and there being a discrepancy

13   with Enri/Ian's inmate ID numbers.

14   Q    Okay.  And when you say inmate ID number, is that

15   the same number as the commissary ID numbers we have

16   talked about previously?

17   A    Yes, it is.  The inmate ID number is the same as

18   the commissary ID number.

19        MS. ROSS:  Your Honor, at this time we move

20   the admission of Government's Exhibit 11.

21        THE COURT:  Any objection?

22        MS. SHINGLER:  I'd like to see it.

23        MS. ROSS:  I gave you a copy, I think.

24        MS. SHINGLER:  Oh, I'm sorry.  I'm sorry, I

25   missed that.

1          THE COURT:  Okay.  Take your time.

2          MS. SHINGLER:  No objection.

3          THE COURT:  Government's Exhibit 11 is

4     admitted.

5          (Government's Exhibit 11 was received in

6     evidence.)

7     BY MS. ROSS:

8     Q    Miss Shufelt, looking at this exhibit, can you

9     explain to us what you were meaning about -- or what you

10    are saying about ID numbers for Enri and Ian Jasmin?

11    A    I had sent this to Erica asking if Enri Jasmin's

12    phone account 153955 was active, and I wanted to advise

13    her if it was, it shouldn't be as he was actually Ian

14    Jasmin with an ID of 156446.

15    Q    Okay.  And did you get a response to that?

16    A    Yes, I did.

17    Q    Did you make any other requests of Erica?

18    A    I had requested for her to make Enri Jasmin's phone

19    account inactive.

20    Q    Okay.  What, if anything, was going to happen to

21    the phone numbers that had been listed on the Enri

22    Jasmin phone sheet?

23    A    Can you repeat that, please?

24    Q    Yes.  What, if anything, was going to happen to the

25    numbers that had been listed by Mr. Jasmin on the Enri

1   Jasmin phone sheets?

2   A    To be inactive.

3   Q    Okay.  You can --

4   A    And I also requested Erica, if possible, if she

5   could transfer the numbers that are on Enri's to Ian's,

6   and I explained to her the reason why.

7   Q    And that being what?

8   A    That being when he was arrested, he identified

9   himself as Enri Jasmin, but due to the record check, it

10  was determined -- I learned at that point that he was

11  actually Ian Jasmin.  And I also referenced that I was

12  sending her another request form from Ian that I

13  received this morning.

14          THE COURT:  So, let's establish, Ian and Ian

15  [phonetic pronunciations different] in your view, are

16  the same person?

17          THE WITNESS:  Are the same person, yes.  I am

18  not sure how to pronounce it, so yes.  Same thing as

19  offender inmate.  Thank you.

20          MS. ROSS:  Thank you, your Honor.

21      Your Honor, may I approach the witness?

22          THE COURT:  You may.

23  BY MS. ROSS:

24  Q    Actually, before I do that, I told you that I was

25  going to get back -- that we would get back to Exhibits

1    18 -- I think it was C -- I think it was B and C.  Do

2    you still have those in front of you?

3    A    Yes.

4    Q    And when you take a look at Exhibit 18B, we were

5    comparing that number on page -- well, you have probably

6    done a better job of keeping the exhibits straight than

7    I have.  So one minute -- one second, please.

8    So page two of Exhibit B.  Do you still have

9    Exhibit B?

10    A    I do not.

11    Q    18B?

12    A    I have A, C, 11.

13    Q    I will bring you my copy, or perhaps your copy.

14    There's 18B.  And do you have Exhibit 18C in front of

15    you?

16    A    Yes.

17    Q    Okay.  And how do the inmate commissary -- so

18    Exhibit 18B is in whose name?

19    A    The name Enri Jasmin.

20    Q    And Exhibit 18C at Bates number 002826?

21    A    Has offender name Ian Jasmin.

22    Q    Do they have the same inmate commissary numbers?

23    A    Yes.

24    Q    Now, we told you earlier in the proceedings that

25    we've -- would get back to having you explain why that's

1    the case.

2    A    That is the case because it was learned through the

3    record check that he had identified himself as Enri

4    Jasmin, whereas he was, in fact, Ian Jasmin.

5    Q    Okay.  Thank you.  And --

6              MS. ROSS:  May I approach the witness,

7    your Honor?

8              THE COURT:  Yes, you may.

9    BY MS. ROSS:

10   Q    Now, I am going to give you what's marked as

11   Exhibit 18G but I am going to take some of these back

12   from you, okay?  I am going to take everything else from

13   you except Exhibit 18G.

14   A    Okay.

15   Q    Thank you.

16   A    You're welcome.

17   Q    And do you recognize Exhibit 18G?

18   A    Yes, I do.

19   Q    How do you recognize it?

20   A    It was printed from my sent inbox.

21   Q    And was Exhibit 18G kept -- prepared and kept in

22   the same manner in which you have described Exhibits

23   18A, 18B, 18C, D, E and F were prepared and kept?

24   A    Yes.  Yes, I used the same process every day.

25              MS. ROSS:  Your Honor, at this time we move

```
 1    for the admission of Exhibit 18G.
 2                THE COURT:  Any objection?
 3                MS. SHINGLER:  No, Judge.
 4                THE COURT:  It's admitted.
 5                (Government's Exhibit 18G was received in
 6    evidence.)
 7                MS. ROSS:  And --
 8                THE COURT:  So, Miss Ross, let me stop you
 9    there because it's the one o'clock mark.  How much more
10    do you have on direct?
11                MS. ROSS:  Maybe 15, 20 minutes.
12                THE COURT:  All right.  So why don't we take a
13    break at this time.  I am going to hurry you through
14    lunch.  We will take about 15 minutes, and then -- give
15    me some estimates as to how much time you think you are
16    going to need for your witnesses.  And can we take the
17    out-of-state witnesses first?
18                MS. ROSS:  We -- yes.  So they are next, each
19    of the out-of-state witnesses, one after the next.
20          I expect Miss Shufelt to be the longest witness
21    today so -- maybe for the direct, maybe 30 minutes for
22    the next two witnesses, maybe 20 minutes for the two
23    after that.
24                THE COURT:  Okay.
25                MS. ROSS:  So I'm --
```

1        THE COURT:  Yes.  We should be able to finish

2   today.

3        Mr. Jasmin, did you get lunch yet?

4        THE DEFENDANT:  Yes, I did, your Honor.

5        THE COURT:  You did.  Okay.  Good.  Everybody

6   else has to hurry through it, and we'll see you, let's

7   say, at 20 after 12 *[sic]*.

8        MS. ROSS:  Thank you.

9   (Court was in recess at 1:00 p.m.)

10  (The following was held in open court at 1:27 p.m.

11       THE COURT:  We are back on the record in

12  United States of America versus Ian Jasmin, and we have

13  Miss Shufelt on the witness stand.  She is still under

14  oath, and we are in the direct examination.

15       And, Miss Ross, you may continue.

16       MS. ROSS:  Thank you, your Honor.

17            CONTINUED DIRECT EXAMINATION

18  BY MS. ROSS:

19  Q    Miss Shufelt, you should have in front of you still

20  Government's Exhibit 18G.

21  A    Yes.

22  Q    And taking a look at the first page of that

23  exhibit, can you describe what that is?

24  A    Yes.  This is printed from my sent inbox.

25  Q    And to whom was it sent?

1    A    It was sent to Erica Przech on July 22nd, 2014.

2    Q    I'd like to direct your attention to Bates number

3    002689.

4    A    Yes.

5    Q    What is this?

6    A    This is an inmate telephone system request form.

7    Q    Okay.  And, again, who was this completed by?

8    A    This was completed by inmate Ian Jasmin.

9    Q    And what is the inmate commissary number on this

10    form?

11    A    156446.

12    Q    Did you sign this form?

13    A    I signed this form on the bottom.

14    Q    And you dated it as well?

15    A    I dated it, yes, as 7/22/14.

16    Q    Okay.  Now, Miss Shufelt, you have described for us

17    earlier that part of the process is that Erica sends the

18    sheets back to you, correct?

19    A    Yes.

20    Q    So what is she doing?  What happens -- what's your

21    understanding of her part of the process?

22    A    Her part of the process is to add these phone

23    numbers or delete phone numbers, do as the offender has

24    requested per the request form of either adding,

25    deleting, changing into her telephone system.

```
 1    Q    Okay.  And what is the point of her -- purpose of
 2    her sending it back to you?
 3    A    Erica sends it back to me to let me know that it's
 4    been completed.
 5             MS. ROSS:  Your Honor, may I approach the
 6    witness?
 7             THE COURT:  You may.
 8    BY MS. ROSS:
 9    Q    I'm showing you -- actually, one second, please.
10             (Brief pause.)
11    Q    I'm showing you what's been marked for
12    identification as Government's Exhibit 8.
13    A    Yes.
14    Q    And do you recognize this document?
15    A    Yes, I do.  It's an inmate telephone request form.
16    Q    Okay.  Is it -- it's the kind record that you deal
17    with in your job daily, correct?
18    A    Every day, the same way.
19    Q    Okay.  Does it fit into the process that you have
20    just described about Erica returning documents to you?
21    A    Yes.  She has indicated completed 7/22/2014.
22    Q    So just to be clear, is there something on this
23    document that indicates Erica's portion of the work has
24    been done?
25    A    Yes.
```

1          MS. ROSS:  Your Honor, at this time we move

2    for the admission of Government's Exhibit 8.

3          THE COURT:  Any objection?

4          MS. SHINGLER:  No problem, Judge.

5          THE COURT:  It's admitted.

6          (Government's Exhibit 8 was received in

7    evidence.)

8    BY MS. ROSS:

9    Q    Okay.  Miss Shufelt, I would like to move on to a

10   different area of your responsibility.  As part of your

11   job duties as site legal administrator, are you familiar

12   with a form called a handbook acknowledgement form?

13   A    Yes, I am.

14   Q    What is that?

15   A    That is a document that when an offender is lodged,

16   that is one piece of the lodging documents that they

17   must sign.  The AC officer is responsible for going over

18   that with him, and then the AC officer will sign the

19   document as well as the offender.

20   Q    Now, when you say AC officer, what does "AC" mean?

21   A    Admissions control.

22   Q    Okay.

23   A    It's for all the intakes.  It's where all lodgings

24   occur, incoming and outgoing.

25   Q    Now, as part of your job duties, do you keep track

1  of where the file on an inmate is sent?

2  A    Yes, I do.

3  Q    Okay.  And how -- what system do you use to do

4  that?

5  A    If it's a new intake, they do not get reported in

6  our -- in my file log.  If it's a transfer from another

7  facility, yes, they are new to our facility, however

8  they are already in our system, they have already been

9  at another facility, they do get -- it does get -- that

10  information gets logged into my transfer file log, the

11  date that I received the file, the offender's name,

12  whether it was a transfer, where it was from, and my

13  initials.

14  Q    So if you wanted to find a file on an inmate, what

15  would you look at?

16  A    I have kept file logs, copies of -- or actually the

17  originals since I started the site legal administrator

18  position in approximately 2012.  I would -- if it was

19  not the current year, I would go to my history -- my

20  file box with the file logs.

21            MS. ROSS:  Your Honor, may I approach the

22  witness?

23            THE COURT:  You may.

24  BY MS. ROSS:

25  Q    I'm showing the witness what's been marked for

1    identification as Government's Exhibit 16.

2    A    Yes.

3    Q    You recognize this?

4    A    Yes, I do.

5    Q    And how do you recognize this?  What kind of

6    document or record do you recognize it to be?

7    A    I recognize it as the NECC inmate handbook form,

8    which is in every file for every lodging, and for every

9    transfer.

10   Q    And how did you obtain this particular document in

11   this case?  Where did this document come from?

12   A    I obtained this document as I went to my file log

13   and it was noted that I had -- when he -- when the

14   offender, Ian Jasmin, was transferred from Northeast

15   Correctional Complex to Northwest State Correctional

16   Facility, I contacted the site legal administrator at

17   that facility and I asked her if she could check in his

18   manila file and send me a copy of all the documents in

19   that file that were the NECC inmate handbook form.

20             THE COURT:  So, Miss Ross, if I can interrupt

21   a minute.  We have what looks like a duplicate original;

22   is that possible?  We have light blue signatures?

23             THE WITNESS:  No, they're two different dates.

24             THE COURT:  Two different dates.

25             THE WITNESS:  Two different dates, because as

1    I said, when they are initially lodged or if they're
2    transferred.
3              THE COURT:  Okay.  So our exhibit should have
4    two pages and in light blue signatures, this copy?
5              MS. ROSS:  So it was printed as a color
6    copy --
7              THE COURT:  Okay.
8              MS. ROSS:  -- so that you could see the
9    different -- what signatures versus what ink was used.
10             THE COURT:  Okay.  Got it.  Thank you.
11   BY MS. ROSS:
12   Q    Now, Miss Shufelt, did you, in fact, obtain this
13   record in the way that you just described?
14   A    Yes.
15   Q    And this record was kept as part of Mr. Jasmin's
16   file as part of the regular course of business for your
17   facility?
18   A    Yes.
19   Q    And it was made at or near the time of the events
20   that are reflected on it?
21   A    Yes.
22             MS. ROSS:  Your Honor, at this time we move
23   the admission of Government's Exhibit 16.
24             THE COURT:  Any objection?
25             MS. SHINGLER:  May I voir dire, Judge?

1          THE COURT:  You may.

2                VOIR DIRE EXAMINATION

3    BY MS. SHINGLER:

4    Q    Miss Shufelt, do you have the exhibit in front of

5    you?

6    A    Yes.

7    Q    I guess I am a little confused.  Are these -- you

8    got these from -- you got -- were the originals of these

9    documents anywhere?

10   A    Yes.

11   Q    Where are they now?

12   A    They are in the offender Jasmin's core file at

13   Northwest State Correctional Facility.

14   Q    Okay.  And have you -- did you go into that core

15   file to obtain these documents?

16   A    I sent an e-mail to the site legal administrator

17   there asking her if she could go into the file and get

18   the originals, and -- if there were any, and scan them

19   to me, and she did that.

20   Q    Okay.  And these are the scanned copies that you

21   received in connection with your request?

22   A    The printed copies from my inbox.

23   Q    And there -- on the first page there appears to be

24   the inmate printed name Ian Jasmin and then the inmate

25   signature; is that correct?

1    A    That's correct.

2    Q    You don't know, as you sit here today, whether or

3    not Mr. Jasmin signed those, correct?

4    A    No, I do not know that.

5    Q    And looking at the second page, that appears to be

6    the inmate handbook acknowledgment of someone by the

7    name of Enri Jasmin, correct?

8    A    That is correct.

9    Q    As you look at the two documents -- oh, never mind.

10         Do you know whether or not Enri Jasmin either

11   printed or signed the name on the second page?

12   A    I don't know if he signed it or not.

13   Q    And do you know if Ian Jasmin, in fact, signed the

14   second page?

15   A    No, I don't.

16   Q    Okay.  And the date at the top page is June 19th,

17   2014?

18   A    That is correct.

19   Q    And I think you testified that's -- this was made

20   on or about that time?

21   A    The first form, yes.

22   Q    The original.

23         MS. SHINGLER:  Okay.  Thank you, Judge.  I

24   have no objection.

25         THE COURT:  All right.  Government's Exhibit

1    16 is admitted.

2              (Government's Exhibit 16 was received in

3    evidence.)

4                    CONTINUED DIRECT EXAMINATION

5    BY MS. ROSS:

6    Q    Now, Miss Shufelt, directing your attention to page

7    two of Exhibit 16, what is the date of this document?

8    A    The date of this document is 5/2/2014.  May 2nd,

9    2014.

10   Q    And this is signed by someone other than the

11   inmate, correct?

12   A    Yes.  It is signed by the staff member, Sara

13   Mercer, a CO2.

14   Q    Okay.  And she is a staff member where?

15   A    At Northeast Correctional Complex.

16   Q    Now, taking a look at page one, what is this

17   document?

18   A    This is the NECC inmate handbook form.

19   Q    Okay.  Do you know why there are two of these

20   documents?

21   A    There are two of these documents because Mr. Jasmin

22   was lodged on May 2nd, 2014, known as Enri.  He was

23   transferred and then returned to our facility on July

24   19th, 20- -- on or about July 19th, 2014.

25   Q    And in addition to the inmate's signature on

1    page -- the first page of Exhibit 16, is there another

2    signature?

3    A    Yes, there is.  A staff signature, Chad Waco, a

4    correctional officer one.

5    Q    Okay.  Where does he work?

6    A    Chad works at Northeast Correctional Complex.

7    Q    Now, as part of your job, do you know how -- are

8    you able to track or understand how inmate -- how an

9    inmate is moved from one facility to another?

10   A    Yes.  I am familiar with the movement history log.

11   I check -- refer to that often.

12   Q    Okay.  And what's a movement history log?

13   A    A movement history log is any time an offender is

14   lodged, they are -- that movement log will indicate that

15   they are at our facility.  Should we transfer them,

16   whether it's to court, temp. medical, to another

17   facility, we do a booking slip, a booking transfer, and

18   that -- the time and date of that transfer is retained

19   in our offender management system.

20   Q    Okay.  And the offender management system where

21   this movement history is maintained, what kind of system

22   is that?  Hard copy?  Electronic?

23   A    Electronic, but you can get printouts.

24   Q    Okay.

25   A    You can print different forms from there as well

1  pertaining to that particular offender.

2  Q    And do you have access to this offender management

3  system?

4  A    I have access to the offender management system.

5  I -- it's the first thing I load up every day.

6  Q    And the offender management system is a system that

7  is used in the normal and customary course of business

8  for the Department of Corrections?

9  A    Yes, it is.

10            MS. ROSS:  Your Honor, may I approach the

11  witness?

12            THE COURT:  You may.

13  BY MS. ROSS:

14  Q    I'm showing you what's previously been marked for

15  identification as Government's Exhibit 14.  Do you

16  recognize that?

17  A    Yes, I do.

18  Q    Okay.  What kind of record is this?

19  A    This is the movement history for Ian Jasmin.

20  Q    Is this the kind of document that's kept on the

21  offender management system as part of the regular course

22  of business?

23  A    Yes.

24  Q    And are entries made onto -- into this system

25  whenever an inmate is moved within the DOC system?

```
1    A    Yes.

2    Q    And so the events that are on this document -- the

3    events that are reflected, were they noted at or about

4    the time they happened?

5    A    Yes.

6         MS. ROSS:  Your Honor, at this time the

7    government moves for the admission of Government's

8    Exhibit 14.

9         THE COURT:  Any objection?

10        MS. SHINGLER:  No objection.

11        THE COURT:  It's admitted.

12        (Government's Exhibit 14 was received in

13   evidence.)

14   BY MS. ROSS:

15   Q    Miss Shufelt, taking a look at Government's Exhibit

16   14, I'd just like you to walk us through how to read

17   this, if you will.  Can you sort of walk us through

18   across the top telling us how we read this document.

19   A    Sure.  He was lodged at CRCF 12/18/2013.

20   Q    What is CRCF?

21   A    Chittenden Regional Correctional Facility.

22   Q    Okay.

23   A    A/K/A CCCC.

24   Q    Okay.  It's also known as the Four Cs?

25   A    The Four Cs.  Chittenden Correctional Regional
```

1    Facility.  He was released to bail from there on the

2    same date.  And then on May 2nd, 2014, at 1504 hours he

3    was lodged at the Northeast Correctional facility in

4    St. Johnsbury.

5    Q    And how do you know that?

6    A    I know that because the book date and time is on

7    this report.

8    Q    Okay.

9    A    And that's when he was lodged in the facility.

10   Q    So what line of the report are you looking at?

11   A    I am looking at the third line, NECC, 5/2/14, 1504

12   hours.

13   Q    Okay.  As you go across that line, if you continue

14   reading across, when you see the next entry, 5/18/2014,

15   what does that refer to?

16   A    The fourth line?  The next line?

17   Q    No.  Just keep going straight across.

18   A    Straight across.  He was released on 5/8/14 at 7:46

19   for court.  You will see the release comments is court.

20   Q    Okay.

21   A    The next line he was released -- he was brought

22   back in at 1313 hours from court.  Then he was released

23   on June 12th, 2014, to Northwest State Correctional

24   Facility.  So he was at my facility from May 2nd through

25   June 12th --

```
 1    Q    Okay.

 2    A    -- 2014.

 3    Q    Did there come a time that he returned to your

 4    facility?

 5    A    Yes.  If you go down to July 18, 2014, Northwest --

 6    NWSCF, which is Northwest State Correctional Facility,

 7    released him at 1740 hours to Northeast Correctional

 8    Complex.  He came into our facility at 2045 hours on

 9    7/18/14, and then he -- on August 6th, he went to court

10    at 723 hours.  He returned at 1303 hours on August 6th,

11    and then on August 25th, 2014, we released him --

12    transferred him to Northwest State Correctional

13    Facility.

14    Q    Okay.  And did he come back to your facility again

15    after that point?

16    A    No, he did not.

17    Q    Thank you.

18    A    And when we do transfer, we send the file along.

19    That's why the file was at Northwest.

20              MS. ROSS:  Your Honor, I have no further

21    questions.

22              THE COURT:  All right.  Any cross examination?

23              MS. SHINGLER:  Yes.

24                        CROSS EXAMINATION

25    BY MS. SHINGLER:
```

1    Q     Good afternoon.

2    A     Good afternoon.

3    Q     All of the information that you had regarding the

4    Enri versus Ian confusion was that Enri was the name

5    he -- Enri was the name Ian gave when he was arrested by

6    the police, correct?

7    A     Yes.

8    Q     And so your --

9              THE COURT:  And so I am going to stop you.  Is

10   your client's first name Ian [pronunciation]?

11             MS. SHINGLER:  He calls himself Ian

12   [pronunciation].

13             THE COURT:  Okay.

14             MS. SHINGLER:  His mother calls him Ian

15   [pronunciation].  I call him Ian [pronunciation].

16             THE COURT:  Good.  We call you what you want

17   to be called, and is it Ian [pronunciation]?

18             THE DEFENDANT:  Yeah.  My mom calls me Ian

19   [pronunciation].  It's like "Ryan" with no R.

20             MS. SHINGLER:  Okay.

21             THE COURT:  Okay.

22             MS. SHINGLER:  I call him Ian (pronunciation).

23             THE COURT:  Got it.

24             MS. SHINGLER:  Okay.  Where were we?

25   BY MS. SHINGLER:

1    Q    Okay.  It was because the person who we now know to

2    be Ian called himself Enri when he was arrested by the

3    police?

4    A    He identified himself as Enri.

5    Q    Right.  And so when he came into the facility, he

6    was pretending to be Enri, correct?

7    A    He identified himself as Enri when he came into the

8    facility.

9    Q    That's fine.  Were you aware that Mr. Jasmin had

10   been trying to straighten out his phone account

11   situation for the month of May while he was at your

12   facility?

13   A    Yes.

14   Q    You were aware that he was complaining to Wayne

15   Pittman that --

16   A    Case worker Pittman.

17   Q    -- that he was having trouble because there were

18   two accounts, correct?

19   A    Yes.

20   Q    And he kept telling people, "I said I was Enri when

21   I was arrested, but I'm really Ian, and I want you guys

22   to straighten this out," more or less.  Correct?

23   A    I received a form from him with that information,

24   yes.

25   Q    Okay.  And were you aware that on May 19th, Ian was

1    meeting with Wayne Pittman and asking him to help him

2    fix the two -- to consolidate the two accounts into one?

3    A    Yes.

4    Q    And as a matter of fact, on the -- on Bates 00274

5    on 18F, which is the inmate request form written to you

6    from Ian --

7              MS. SHINGLER:  May I approach the witness?

8              THE COURT:  You may.

9              MS. SHINGLER:  I'm sorry, I don't know if you

10   have this in front of you.

11             THE WITNESS:  I do not.

12             MS. SHINGLER:  Okay.

13             THE WITNESS:  Thank you.  Yes.

14   BY MS. SHINGLER:

15   Q    -- he writes to you, "Help me.  I have two

16   accounts, and I called myself Enri because that's what I

17   called myself when I was arrested," more or less, right?

18   A    That's what he identified himself as, yes.

19   Q    And he identified himself as Enri before he was

20   incarcerated, correct?

21   A    Yes.

22   Q    Now, you would agree with me that these forms,

23   these phone request forms, the primary purpose is to

24   make sure that -- well, there are a couple of purposes:

25   To make sure that offenders aren't contacting no-contact

1   people, right?

2   A    Yes.

3   Q    And that they are not contacting victims, correct?

4   A    Correct.

5   Q    And it's also a process by which they add or drop

6   names on their phone list, correct?

7   A    Yes.

8   Q    And that's because they have a total of 10, and you

9   cannot have more than 10?

10  A    That is correct.

11  Q    So it is typical for inmates to shift, add and drop

12  in order to keep their 10 people fresh?  Or who knows.

13  They keep doing it.

14  A    Yes, they can.  They have that option, yes.

15  Q    Okay.  And your role is to check those no-contact

16  information and the victim information to make sure that

17  an inmate isn't seeking to have contact with someone

18  they shouldn't?

19  A    Yes.

20  Q    Okay.  Now, I find it interesting that you call the

21  people in the facility as offenders.  Is there any

22  distinction in your mind -- well, let me rephrase that.

23       Does the facility, as you know it, treat

24  pre-convicted inmates different from post-convicted

25  inmates?

1   A    No.

2   Q    So when --

3   A    They don't treat them differently.

4   Q    Okay.  So when you talk about offenders, are you

5   including people who have pled not guilty and have not

6   been convicted?

7   A    I'm including all.  Offender, inmate, same thing.

8   Q    If you're in there, you are calling them an

9   offender?

10           THE COURT:  So to be fair, I think this is a

11  DOC term.

12           MS. SHINGLER:  Oh.

13           THE WITNESS:  It is a DOC term.

14           MS. SHINGLER:  I did not know that.

15           THE COURT:  Yes.

16           THE WITNESS:  An offender, yes.

17           MS. SHINGLER:  An offender, okay.  Got it.

18  BY MS. SHINGLER:

19  Q    Now, I think you said with the phone requests, that

20  they are distributed back to the inmates?

21  A    Yes.

22  Q    A copy of their phone record requests?

23  A    Yes.

24  Q    And what do you know them to do with it?

25  A    The unit officers are responsible for checking the

1     unit mailboxes and hand carrying them back to the

2     offenders.

3     Q    Okay.  And do you know when they fill out their

4     phone request form whether or not they're in the

5     presence of a Department of Corrections individual,

6     employee?

7     A    No, I do not know that.  I don't know.

8     Q    Do you know whether or not an inmate -- or an

9     offender is given a stack of forms and can use them as

10    they want?

11    A    There are forms available at every -- in every

12    unit.

13    Q    Okay.  So an inmate can go and get a form, fill it

14    out and give it back to somebody on their own, correct?

15    A    Give it back to the unit officer.  From offender to

16    the unit officer.

17              MS. SHINGLER:  May I approach?

18              THE COURT:  You may.

19    BY MS. SHINGLER:

20    Q    I am going to give you my copies of what is 18B --

21    or 18A and 18B, and I am turning 18 --

22              MS. ROSS:  Miss Shingler, I can give you the

23    exhibits, if that would be helpful.

24              MS. SHINGLER:  That would be helpful.

25              MS. ROSS:  18A and B, did you say?

1              MS. SHINGLER:  A and C.

2         May I approach?

3              THE COURT:  Yes.

4              THE WITNESS:  Thank you.

5    BY MS. SHINGLER:

6    Q    18A are the phone records from May 5th, correct?

7    May 5th and May 6th of 2014.

8    A    May 6th, 2014.

9    Q    Okay.  And turning to Bates stamp 002755 --

10   A    Yes.

11   Q    -- that's the request form from someone who names

12   himself Enri Jasmin?

13   A    That is the inmate Enri Jasmin.

14   Q    Okay.  And then I'd like you to turn to

15   Government's Exhibit 18C.

16   A    Yes.

17   Q    Let me take a step back.  The inmate commissary

18   number, that's written on 18A, that's in your name -- or

19   your handwriting?

20   A    That is in my handwriting, the inmate commissary

21   number.

22   Q    And 18C is relative to inmate request forms dated

23   May 13th and processed May 14th?

24   A    Yes.

25   Q    And turning to 002826, please.

1    A    Yes.

2    Q    That is the inmate request form for inmate named

3    Ian Jasmin?

4    A    Yes.

5    Q    Correct?

6    A    Yes.

7    Q    And the date on this is May 13th of 2014?

8    A    Correct.

9    Q    And the inmate commissary number that is reflected

10   on that particular piece of paper is written by someone

11   other than you?

12   A    It is written by --

13   Q    Mr. Jasmin?

14   A    Mr. Jasmin.

15   Q    And is it the same number -- is it the same

16   commissary number as that for Enri Jasmin?

17   A    Yes.

18   Q    Are you familiar with the warnings that are

19   provided to an offender when they use the telephone?

20   A    Yes.  They are on the inmate telephone request

21   form.

22   Q    Okay.  And that is -- for example, we can take a

23   look at -- the last one we talked about, the one that

24   appears to be Ian's 002826 on May 14th?

25   A    Yes.

1    Q    You are referring to that statement at the bottom

2    of the record -- request form?

3    A    Yes.

4    Q    Do you know whether or not there ever -- the

5    offenders are told that recordings of their phone calls

6    will be distributed to law enforcement and can be used

7    against them?

8    A    I know that he got a notice as he signed every

9    phone sheet of telephone monitoring and recording.

10   Q    Okay.

11   A    I'm responsible for only one part, and that is to

12   ensure that these phone sheets do not have victim names

13   and the no-contact order names on them.

14   Q    Okay.  Have you ever seen a telephone request form

15   in 2014 while you were working at Northeast Correctional

16   facility that expanded that notice to offenders?

17   A    No, I'm not sure about that.  I know it's on the

18   phone sheets.

19   Q    Okay.  And that's the only thing that's been on the

20   phone sheets during the period in time that we have been

21   talking about, correct, in terms of warnings?

22   A    In terms of what is on the inmate phone request

23   form, yes.

24   Q    Okay.

25              MS. SHINGLER:  May I approach, Judge?

1          THE COURT:  You may.

2     BY MS. SHINGLER:

3     Q    I give you what's been marked for purposes of

4     identification as Defendant's 16.  You have identified

5     those as two -- two acknowledgments by one Enri Jasmin,

6     one Ian Jasmin that they know that there's a handbook

7     out there, correct?

8     A    Yes.

9     Q    Do you know the circumstances under which those

10    documents were signed?

11    A    They were signed at AC upon his intake.

12    Q    At admissions control?

13    A    Admissions control.

14    Q    And do you know how it has happened that he is

15    given them?  How is Mr. Jasmin presented with these

16    documents, if you know?

17    A    The admissions officer would have gone over this

18    with him, and he would have signed it acknowledging that

19    he knew where the -- the inmates' handbooks were and

20    also if accommodations were needed, that they would be

21    available.

22    Q    Okay.  And that's what this is?

23    A    Yes.  That's what that is.

24    Q    And it doesn't indicate that -- it doesn't indicate

25    that he has been provided with an inmate handbook, does

1  it?

2  A    But the statement clearly says the inmate is -- no,

3  I don't know if he has been -- if he was given a copy of

4  the handbook, but I do know that he signed acknowledging

5  that he knew that they were available; where to get

6  them; if accommodations were needed, they would be made.

7  Q    Thank you.

8  A    You're welcome.

9  Q    And was -- were the contents of the inmate handbook

10  explained to Mr. Jasmin when he signed this, if you

11  know?

12  A    I don't know that, but I --

13  Q    Do you know if he was provided with a copy of the

14  handbook, at the time the AC had him sign it, to review?

15  A    No.  As I said before, I don't know if he received

16  a copy of the handbook but I do know that he signed

17  saying that he knew where the handbook would be

18  available; if accommodations were needed, that they

19  would be made.

20  Q    But with respect to the handbook, that's really all

21  you know --

22  A    I know that.

23  Q    -- knowing where they were.

24           THE COURT:  So one thing is, she has got a

25  very hard job to do, and sometimes you know where Miss

1     Shingler is going with a question, and sometimes she can

2     guess what your response is, so you start jumping in and

3     helping each other out, and it makes it impossible for

4     the court reporter.  So wait for the question, and then

5     make sure that you're answering the questions.  It's

6     Miss Ross's job to follow up with you.

7          Go ahead.

8              MS. SHINGLER:  I'll do one better.

9     BY MS. SHINGLER:

10    Q     You would agree with me that what appears on

11    Government's Exhibit 16, which are those two

12    acknowledgments, is the sum total about what you know

13    about Ian Jasmin and his access to the inmate handbook,

14    correct?

15    A     Yes.

16    Q     Thank you.

17             MS. SHINGLER:  If I can have a minute, Judge?

18             THE COURT:  You may.

19             (Brief pause.)

20             MS. SHINGLER:  Nothing further.

21             THE COURT:  All right.  Any redirect?

22             MS. ROSS:  No, your Honor.

23             THE COURT:  Thank you.  You may step down.

24             THE WITNESS:  I'm done?

25             THE COURT:  Yes.

1          THE WITNESS:  Thank you.

2          THE COURT:  Thank you.

3          (Witness excused.)

4          THE COURT:  The government may call its next

5     witness.

6          MS. ROSS:  Thank you, your Honor.  The

7     government calls Erica Johnson.

8                    ERICA JOHNSON,

9     having been duly sworn by the courtroom deputy,

10     was examined and testified as follows:

11                DIRECT EXAMINATION

12     BY MS. ROSS:

13     Q    Good afternoon, Miss Johnson.

14     A    Hi.

15     Q    Could you, just for purposes of the record, state

16     your full name?

17     A    Erica Marie Johnson.

18     Q    And, Miss Johnson, did you previously go by a

19     different last name?

20     A    I did.  It was Przech, P-R-Z-E-C-H.

21     Q    Thank you.

22          So, Miss Johnson, where do you work?

23     A    I work for Global Tel*Link.

24     Q    What is Global Tel*Link?

25     A    It's the -- we do the inmate telephone system for

 1    the State of Vermont.

 2    Q    And so what is your specific job at Global

 3    Tel*Link?

 4    A    I am the site administrator for inmate phones.

 5    Q    What does it mean to be the site administrator for

 6    inmate phones?

 7    A    When an inmate fills out our forms, they have to

 8    give me the 10 people they want to call with the phone

 9    numbers and the name of the person they are calling,

10    along with their ID number, and I give them their last

11    four digits.

12    Q    Okay.  And when you say that Global Tel*Link is --

13    works with Vermont inmate phones, how do they do that?

14    Is there a system that they use?  What does Global

15    Tel*Link do in terms of inmate phones or phone usage?

16    A    Every phone that's in the prisons in the state of

17    Vermont are ours that the inmates use.  And they have to

18    use their PIN number to dial out, and they have an

19    option of one through five, and we record their phones

20    that they are using.

21    Q    Okay.  So is there any kind of system that Global

22    Tel*Link has to keep track of what inmate is making a

23    call?

24    A    Yes.  Their 14-digit PIN number.

25    Q    Okay.  And what's the system that keeps track of

1    that called?

2    A    I don't understand you.

3    Q    Okay.  Do you have a system called something like

4    AMG?

5    A    Yes.

6    Q    What's that?

7    A    I don't know what it stands for but that's what

8    it's recorded on.

9    Q    Okay.  And what kind of records does that system

10   keep or generate?

11   A    We have CDs.

12   Q    And what kind of information is kept on that

13   system?

14   A    Their phone conversations, who they're calling,

15   what time they called, the phone that's used, from what

16   facility.

17   Q    And as part of your job, you are familiar with that

18   system, correct?

19   A    Yes.

20   Q    And it's a regular practice of Global Tel*Link to

21   keep the records that are generated by this system?

22   A    Yes.

23   Q    And the data that's recorded is -- on these records

24   is data that's recorded at or about the time of the

25   events?

1  A    Yes.

2  Q    Is that right?

3  A    Correct.

4  Q    Okay.

5       MS. ROSS:  Your Honor, may I approach the

6  witness?

7       THE COURT:  You may.

8       MS. ROSS:  Actually, before I do that.

9  BY MS. ROSS:

10  Q    Are you familiar with Michele Shufelt?

11  A    Yes.

12  Q    And in what way?  What is your working relationship

13  with Miss Shufelt?

14  A    She used to be the one that sent me the faxes from

15  Northeast and the Caledonia work camp for new inmates,

16  add/deletes, complaint forms.

17  Q    Okay.  And when she sent you those forms, what did

18  you do with them?

19  A    I put them into the computer.  New inmates, give

20  them their IDs.  And then I give them back to Shelly.  I

21  fax them.  eFax.

22  Q    Okay.  And what is the purpose of you sending them

23  back to her?

24  A    So she can hand them out to the inmates.

25       MS. ROSS:  Now may I approach, your Honor?

```
 1                   THE COURT:  You may.
 2    BY MS. ROSS:
 3    Q    I am going to show you what's previously been
 4    admitted as Government's Exhibit 8.  You recognize that?
 5    A    Yep.  This is the forms that inmates use for
 6    add/deletes or a new inmate.
 7    Q    Okay.  And did you make any markings on this
 8    particular form?
 9    A    I did.  I am the one that wrote the "completed" and
10    then 7/22/2014.
11    Q    Okay.  And do you -- is that the kind of activity
12    you do regularly?
13    A    Daily, yes.
14    Q    Daily.  Okay.
15              MS. ROSS:  Your Honor, may I approach?
16              THE COURT:  You may.
17    BY MS. ROSS:
18    Q    I am going to show you what's been marked for
19    identification as Government's Exhibit 12.  Do you
20    recognize this?
21    A    Yes.
22    Q    You said yes, right?
23    A    Yes.  Sorry.
24    Q    Thanks.
25         And what kind of record is this?
```

```
1    A    This is what I give to -- when I am given a
2    subpoena, this is a record of all of the inmate's phone
3    calls, the date that he called, the time, the phone
4    number, the phone used, from what facility, the
5    duration, and the result of the end of the phone call.
6    Q    Okay.  And up in the left-hand corner there's a --
7    it talks about PCS/AGM?
8    A    Correct.
9    Q    Are you familiar with that?
10   A    Yes.
11   Q    Okay.  Is this record one that is kept in the
12   regular course of business as you have previously
13   explained it to us?
14   A    Yes.
15         MS. ROSS:  Your Honor, at this time I move the
16   admission of Government's Exhibit 12.
17         THE COURT:  Any objection?
18         MS. SHINGLER:  No.
19         THE COURT:  It's admitted.
20         (Government's Exhibit 12 was received in
21   evidence.)
22   BY MS. ROSS:
23   Q    So, Miss Johnson, I just would like you to take a
24   look at Government's Exhibit 12 and explain to us --
25   just take us across the top and tell us what each of
```

1    these headings mean.

2        So if we start at the left-hand side and we see

3    something called tool, what does that refer to?

4    A    That's more for me just to listen to the phone call

5    if I need to.  It's a tool telling you you can hit on

6    the speaker to listen to the phone call.

7    Q    Okay.  Now, the next, BTN, what does that stand

8    for?

9    A    Phone number dialed.

10   Q    And the date?

11   A    The date is the day that he made the phone call.

12   Q    Okay.  Next we have time, and the time refers to

13   what?

14   A    The time that his phone call went out, military

15   time.

16   Q    Okay.  So the date in this case is what?

17   A    The date is June 4th, 2014.

18   Q    All right.  And next we have PIN number.  What does

19   that refer to, the PIN?

20   A    That is the -- what the inmate is given to when he

21   becomes a new inmate.  He is given a PIN number to be

22   able to call out.

23   Q    And how do you find out about what that PIN number

24   is?

25   A    I find out from the State of Vermont, from each

1    site.  They give me the first five, and then I give them

2    the last four.

3    Q    All right.  And in what way do they convey that

4    information to you?  How do they tell you that?

5    A    E-mail.

6    Q    Is it listed on the phone sheets?

7    A    Yes.

8    Q    Next, the first and the last name.  How is that

9    first or last -- and last name put into the system?

10   A    I put it into the system after I am given the

11   sheet.  I do it on my computer.

12   Q    Next, it says "phone."  What appears under "phone"?

13   A    NERCF, which is northern state correctional

14   facility -- Northeast, excuse me, and then it's D Pod,

15   which is the name of the phone, and it was the left

16   side, which was the left phone in the unit.

17   Q    Okay.  How does the system determine that -- what

18   goes in under "phone"?

19   A    When they punch in their PIN number, that tells us

20   where they are, and each phone is marked in our system.

21   Our PCS/AGM web page is our home page, and every phone

22   in every site is marked.

23   Q    Okay.  Next we have "duration," and what does that

24   refer to?

25   A    That's as long as his phone conversation was.

1    Q    And then under -- then we have "result."  What kind

2    of information goes in under "result"?

3    A    It's who -- how the phone call ended.  And this

4    example, it said inmate hung up, so he was the first one

5    to hang up.

6    Q    What are the other kinds of things can be a result?

7    A    It can be either the call party hung up or the time

8    ran out, which is "time up," which is just below the

9    first call.  And then sometimes you will get an error,

10   which I don't see one.  Or funds can expire.

11   Q    And when it says "time up," how much time expires

12   before time is up?

13   A    20 minutes.

14   Q    Is there any limitation on an inmate making a

15   call -- another call after they've gotten a time-up

16   expiration?

17   A    No, as long as they have money.

18   Q    So as part of the system that you work with at

19   Global Tel*Link, you said that Global Tel*Link records

20   calls?

21   A    Correct.

22   Q    Will you tell us about that recording?

23   A    What it says when the inmate picks up the phone

24   or --

25   Q    Yes.  What does it say when the inmate picks up the

1    phone?

2    A    It says that these calls may be monitored or

3    recorded.

4    Q    And how do you know that?

5    A    Because I have worked here for eight years and I

6    have listened to many phone calls, and I have checked

7    the phones and they all say that.

8    Q    Now, tell us, if you would, by looking at

9    Government's Exhibit 12, what's the time frame that this

10   exhibit covers?

11   A    It starts from June 4th -- June 4th, 2014, to June

12   22nd, 2014.

13             MS. ROSS:  Your Honor, may I approach?

14             THE COURT:  You may.

15   BY MS. ROSS:

16   Q    I'm showing you what's been marked for

17   identification as 12A through 12D.

18        Give me just one moment.  I am going to ask you if

19   you recognize that.

20             MS. ROSS:  I'm sorry, your Honor, I should

21   have organized these better.

22             THE COURT:  We have how many witnesses after

23   this one?

24             MS. ROSS:  Three.

25             THE COURT:  So we will probably have to pick

1    up the pace a little.

2              MS. ROSS:  Okay.

3    BY MS. ROSS:

4    Q    Now, Miss Johnson, do you recognize those

5    documents?

6    A    Yes.

7    Q    And how do you recognize them?

8    A    I did them.

9    Q    Okay.  And how did you do them?

10   A    Off of my computer.

11   Q    And they are maintained on the same system of

12   records that you've already described for us?

13   A    Yes.

14   Q    And this is part of Global Tel*Link's regular

15   course of business, correct?

16   A    Correct.

17             MS. ROSS:  Your Honor, at this time the

18   government moves the admission of A through D.

19             THE COURT:  Any objection to the admission of

20   12A through D?

21             MS. SHINGLER:  If I could have a moment,

22   Judge?

23             THE COURT:  You may.

24             (Brief pause.)

25             MS. SHINGLER:  No objection, Judge.

1      THE COURT:  They are admitted.

2      MS. ROSS:  Thank you, your Honor.

3      (Government's Exhibits 12A, 12B, 12C and 12D

4   were received in evidence.)

5   BY MS. ROSS:

6   Q    And, Miss Johnson, if you would look at 12A,

7   please.  Could you tell us what period of time 12A

8   covers?

9   A    June 22nd, 2014, to July 11th, 2014.

10   Q    And for what -- for whom do these call detail

11   records pertain?

12   A    Ian Jasmin.

13   Q    How about Government's Exhibit B?  What time frame

14   does this cover?

15   A    This covers July 11th, 2014, to July 28th, 2014.

16   Q    Okay.  And how about Exhibit C?  What does 12C

17   cover, time frame?

18   A    August 1st, 2014, to August 27th, 2014.

19   Q    And lastly, Government's Exhibit D.  Will you

20   please tell us the time frame?

21   A    August 27th, 2014, to September 15th, 2014.

22   Q    Now, how do the -- how do you produce the call

23   detail records when you are requested to do so?

24   A    I go into our PCS/AGM page, and I go into call

25   detail report, and I put in the inmate's either name or

1   PIN number and the time frame that's been asked by the

2   subpoena.

3   Q   Okay.  And what do you produce in addition to this

4   call detail?

5   A   I burn a CD, and then they get a list of the phone

6   numbers allowed to that inmate.

7   Q   Okay.  And does it also -- do you also provide the

8   actual recordings?

9   A   Yes.

10  Q   Miss Johnson, in this case do you have a sense of

11  how many calls were made in Government's Exhibits 12,

12  12A, B, C, D?

13          MS. SHINGLER:  Judge, the documents speak for

14  themselves.

15          THE COURT:  Yes.  And it's not a contested

16  issue, correct?  So the number of calls?

17          MS. ROSS:  Okay.

18  BY MS. ROSS:

19  Q   And, Miss Johnson, are you able to tell us how each

20  of those calls would have began?  What would happen at

21  the beginning of each call that was made on this system?

22  A   Our system picks up and has them -- first it says

23  the calls may -- no, that's last, calls may be monitored

24  or recorded.  And first it tells him that he needs to

25  pick up the phone and dial -- press one for English, and

1    then you follow through, and if you want a debit call,

2    prepaid call, collect call it prompts you.  The phone

3    prompts you to follow the instructions on what type of

4    call you want to make.

5    Q    Now --

6            MS. ROSS:  May I approach the witness,

7    your Honor?

8            THE COURT:  You may.

9    BY MS. ROSS:

10   Q    Miss Johnson, do you recognize Exhibit 14?

11   A    Yes.

12   Q    And how do you recognize it?  What kind of record

13   do you recognize it to be?

14   A    A subpoena.

15   Q    And to whom -- who prepared the subpoena?

16   A    U.S. Attorney Heather Ross, Assistant.

17   Q    Okay.  And how does this subpoena pertain to the

18   Exhibit 12 and 12A through D that you have just been

19   discussing?

20   A    The subpoena asks for phone calls by Ian Jasmin

21   from 5/1/14 to 9/30/2014, excluding any calls with his

22   attorney.

23   Q    Now --

24           THE COURT:  Jen thinks we have two 14s.  Jen's

25   probably right.  Government's Exhibit 14.

1          MS. SHINGLER:  Yes, we do.

2          MS. ROSS:  Two --

3          COURTROOM DEPUTY:  Number 14s.

4          THE COURT:  Do we need a copy --

5          MS. SHINGLER:  We have got the movement

6     sheet --

7          MS. ROSS:  Thank you.  We do.

8          THE COURT:  Do we need a copy of the subpoena?

9          MS. ROSS:  I wasn't going to admit it.

10          MS. SHINGLER:  Yes, we do.

11          THE COURT:  You want it.  Okay.  So let's make

12     this 14A.

13          MS. ROSS:  Your Honor, may I approach?

14          THE COURT:  You may.

15          MS. ROSS:  I was --

16     BY MS. ROSS:

17     Q    I am going to show you what has been marked as

18     Government's Exhibit 14B.  Do you recognize that?

19     A    Yes.

20     Q    And what kind of document is that?

21     A    It's a subpoena.

22     Q    And how do you recognize it?

23     A    It was sent to me from you.

24     Q    And -- what?

25     A    I said it was sent to me from you.

```
1    Q    Okay.  And are there any attachments to this
2    record?
3    A    Yes.
4    Q    And what -- generally speaking, what are those
5    attachments?
6    A    This is -- the first page or page one of one is
7    En- -- I think it's Enri Jasmin.  And it's a list of the
8    people that he can call.
9              MS. SHINGLER:  Heather, I don't have a copy of
10   14B.
11             (Brief pause.)
12             MS. SHINGLER:  I'm sorry, Judge.  Thank you.
13             THE COURT:  That's okay.
14   BY MS. ROSS:
15   Q    And you have responded to this as part of your
16   regular job duties; is that correct?
17   A    Yes.
18   Q    Based on records that are kept in the normal course
19   of business as you have already described them; is that
20   right?
21   A    Yes.
22             MS. ROSS:  Your Honor, at this time we move
23   for the admission of 14B.
24             THE COURT:  Any objection?
25             MS. SHINGLER:  No.
```

1        THE COURT:  It's admitted.

2             (Government's Exhibit 14B was received in

3   evidence.)

4   BY MS. ROSS:

5   Q    And looking at -- Miss Johnson, if you could look

6   at page four of this exhibit.  Could you tell us what

7   this is?

8   A    Are you on the page four of 32?

9   Q    No, I'm sorry.  Just four pages in.  So it says at

10  the top "GTL, page one of 32."

11  A    Okay.

12  Q    Could you tell us generally what this is?

13  A    This is a call detail report that is given with a

14  subpoena request, and it shows his phone calls that were

15  made that are also burned to the CD.

16  Q    Okay.  Is this -- how does this compare to Exhibits

17  12, 12A and -- through 12D that we have already looked

18  at?

19  A    It's the same thing with a different first name.

20  Q    Okay.  What kind of information is compared -- is

21  prepared or exists on this report?

22  A    Phone number dialed, what phone, what facility,

23  date, time, his PIN number used, his last name, and then

24  the WAV file, which is the CD that -- the call that was

25  burned.

1  Q    And what time frame does this exhibit cover?

2  A    May 6th, 2014, to June 5th, 2014.

3  Q    Okay.  And you looked at -- you have looked at

4  Exhibit 8, the phone sheet, already?

5  A    Yes.

6  Q    How often do you deal with those phone sheets?

7  A    Daily.

8  Q    And for how long have you dealt with those kind of

9  phone sheets?

10  A    Eight -- eight and a half years for me.

11  Q    Okay.  And are you familiar with what's contained

12  on them?

13  A    Yes.

14  Q    What kind of information is contained on them?

15  A    It asks for the inmate's name, the date of birth,

16  their ID number, and then they have to sign it.  And

17  then their case worker has to sign it, and they have to

18  fill out the 10 -- if they want 10 numbers, with the

19  names.

20  Q    Okay.  Does Global Tel*Link play any role in

21  preparing those phone sheets?

22  A    Yes.

23  Q    What role is that?

24  A    We prepare them.  We make them.

25  Q    And so --

```
1              MS. ROSS:  May I approach the witness?
2              THE COURT:  You may.
3     BY MS. ROSS:
4     Q    I am going to show you what's been previously
5     marked for identification as Exhibit 3.  Do you
6     recognize that?
7     A    Yes.
8     Q    What kind of record is that?
9     A    This is the record that a new inmate needs to fill
10    out in order to call or if they want to make changes,
11    add/deletes.
12    Q    Now, to your knowledge or based on what you have
13    said, who prepares those?
14    A    GTL.
15    Q    Okay.
16             MS. ROSS:  Your Honor, at this time we move
17    for the admission of Government's Exhibit 3.
18             THE COURT:  Any objection?
19             MS. SHINGLER:  No.
20             THE COURT:  It's admitted.
21             (Government's Exhibit 3 was received in
22    evidence.)
23             MS. ROSS:  If I could have one moment,
24    your Honor?
25             THE COURT:  You may.
```

1          (Brief pause.)

2          MS. ROSS:  I don't have anything further for

3     this witness, your Honor.

4              THE COURT:  All right.  Any cross examination?

5              MS. SHINGLER:  Yes, please.

6          May I approach the witness?

7              THE COURT:  You may.

8                      CROSS EXAMINATION

9     BY MS. SHINGLER:

10    Q    Good afternoon.

11    A    Hi.

12    Q    I give you what's been marked for purposes of

13    identification as Government's Exhibit 14A.  Would you

14    agree with me that you previously testified that this

15    was a subpoena that you received on or about November

16    7th of 2014?

17    A    Yes.

18    Q    And it requires you, Erica Johnson, to appear at

19    the courthouse on November 20th, correct?

20    A    Correct.

21    Q    And to bring documents with you:  phone call logs,

22    call logs, call and visitor logs.  Correct?

23    A    Correct.

24    Q    And the subpoena specifies particular time frames

25    in which it wants you to produce those records, correct?

1    A    Correct.

2    Q    Did you appear in court on November 20th, 2014?

3    A    No.

4    Q    Why not?

5    A    I have no idea.

6    Q    Did you receive a letter with the subpoena?

7    A    I don't know.

8    Q    I give you what's been marked for purposes of

9    identification as Defendant's Exhibit A.

10           MS. ROSS:  Miss Shingler, could I just take a

11   look at it first?

12           MS. SHINGLER:  Sure.

13           MS. ROSS:  Thank you.

14           MS. SHINGLER:  I don't have a copy.

15   BY MS. SHINGLER:

16   Q    Referring to the second page first, does that

17   appear to be a document -- another copy of the subpoena

18   that is dated November 7th?

19   A    The second page, you said?

20   Q    Yes.

21   A    Yes.

22   Q    And the first page, in fact, is the letter that you

23   received with that subpoena that's dated November 7th,

24   isn't it?

25   A    Yes.

1    Q    Okay.

2                MS. SHINGLER:  I move for the admission of

3    Defendant's A into evidence.

4                THE COURT:  Any objection?

5                MS. ROSS:  No objection, your Honor.

6                THE COURT:  It's admitted.

7                (Defendant's Exhibit A was received in

8    evidence.)

9                MS. SHINGLER:  May I approach again?

10               THE COURT:  Yes, you may.

11   BY MS. SHINGLER:

12   Q    The first -- the letter that is the first page of

13   defendant's -- what's been introduced into evidence as

14   Exhibit A, gives you another option to testifying in

15   court on November 20th, doesn't it?

16   A    Yes.

17   Q    And what is that option, starting at the second

18   paragraph?

19   A    "A personal appearance is not required and the

20   subpoena may be complied with with a CD or DVD or

21   documents by certified mail, return receipt requested

22   to" -- you want me to keep going?

23   Q    No.

24   A    Okay.

25   Q    And do you recall doing that instead of appearing

1    in court?

2    A    Yes.  That happens a lot.

3    Q    Okay.  You just -- you get a list of documents that

4    you are supposed to provide to the U.S. Attorney's

5    Office, you create those documents on disks, and you

6    send them to the U.S. Attorney's Office, correct?

7    A    Correct.

8    Q    Now, I just -- I have one more line of questioning

9    just about dates, because as far as I can see, the dates

10   that you have talked about, reviewing records -- calls

11   at Northeast Correctional facility, your colleague, Miss

12   Shufelt, said he wasn't even there.

13        I can --

14             MS. SHINGLER:  May I approach?

15             THE COURT:  Sure.

16   BY MS. SHINGLER:

17   Q    I give you what's a marked-up copy of what's been

18   introduced as Government's Exhibit 14, and I think you

19   talked about this, but is this, in fact, the movement

20   history for Ian Jasmin?

21   A    I have no -- this isn't part of my job.  I wouldn't

22   even know what that was.

23   Q    Okay.  Well, according to Exhibit 14, Ian Jasmin

24   was in Northeast Correctional facility -- that's where

25   you work, right?

1    A    No.

2    Q    Oh, you are statewide?

3    A    I do all the facilities in Vermont.

4    Q    Never mind.  I thought you were just at Northeast

5    Correctional facility.

6    A    No.

7    Q    I think that's it.  Let me just check.

8    How many subpoenas have you received with letters

9    similar to 14A in this case?

10    A    I would say two.  I'm not a hundred percent on

11    that.

12    Q    So there's the one that got you here today, right?

13    A    Correct.

14    Q    It's the one that we have been talking about, 14A,

15    correct?

16    A    Correct.

17    Q    And there's another one out there?

18    A    Nope.  There was -- I said two, didn't I?

19    Q    Yeah.  You mean --

20    A    Okay.

21    Q    That had the letter accompanied with it.

22    A    They always come with a letter.

23    Q    Okay.

24    A    I just -- when you asked, I wasn't -- I do a lot of

25    subpoenas, so I wasn't sure.

```
 1    Q    So every subpoena you get from the U.S. Attorney's
 2    Office comes with a letter --
 3    A    Yes.
 4    Q    -- like this?
 5    A    Yes.
 6    Q    And you respond accordingly?
 7    A    I do.
 8    Q    You dump them onto disks and send them to the
 9    prosecutor?
10    A    Yes.
11              MS. SHINGLER:  Thank you.
12              THE COURT:  Any redirect?
13              MS. ROSS:  Just one quick question.
14                   REDIRECT EXAMINATION
15    BY MS. ROSS:
16    Q    I am going to have you take a look again at
17    Government's Exhibit 14A.  Do you still have that in
18    front of you?
19    A    Yep.
20    Q    So this subpoena -- that's the subpoena, correct?
21    A    Correct.
22    Q    And where does it direct you to appear?  What are
23    you testifying before?
24    A    The United States District Court.
25    Q    Okay.  And it says you are commanded to appear; do
```

1  you see that?

2  A    I do.

3  Q    And what is the rest of that?  To appear --

4  A    "To appear in the United States District Court at

5  the time date and place shown below to testify before

6  the court's grand jury."

7  Q    Okay.  So this is a grand jury -- a subpoena for a

8  grand jury -- it's a grand jury subpoena, correct?

9  A    Correct.

10          MS. ROSS:  Okay.  Nothing further, your Honor.

11          THE COURT:  Any recross?

12          MS. SHINGLER:  Yes.

13                    RECROSS EXAMINATION

14  BY MS. SHINGLER:

15  Q    How many times have you appeared in front of a

16  grand jury in this case?

17  A    None.

18          MS. SHINGLER:  Thank you.

19          THE COURT:  Any redirect?

20          MS. ROSS:  No.

21          THE COURT:  All right.  Thank you.  You may

22  step down.

23          (Witness excused.)

24          THE COURT:  The government may call its next

25  witness.

1     MS. ROSS:  The government calls Aaron

2 Concepcion.

3                    AARON CONCEPCION,

4     having been duly sworn by the courtroom deputy,

5     was examined and testified as follows:

6                  DIRECT EXAMINATION

7 BY MS. ROSS:

8 Q    Good afternoon.

9 A    Good afternoon.

10 Q    Would you please state your name for the record.

11 A    Aaron Concepcion.

12 Q    And, Mr. Concepcion, where do you work?

13 A    I'm with Rockland County jail, but I'm assigned to

14 Rockland County Intelligence Center.

15 Q    Okay.  And what is -- generally speaking, what is

16 the Rockland County Intelligence Center?

17 A    It's a -- it's an officer-support fusion-type

18 center where we have -- we perform multiple types of

19 duties.  We have detectives, ATF agents, FBI.  We assist

20 different agencies with different -- multiple cases,

21 missing persons.  My specialty there is mostly gangs and

22 gang investigations, but I am an investigator assigned

23 there now.

24 Q    Okay.  How long have you been employed by the

25 Rockland County Sheriff's Office?

1    A    Since 2004.

2    Q    And directing your attention to January of 2015,

3    what job did you hold at that time?

4    A    January 2015?

5    Q    January a year ago, 2015.

6    A    I was assigned -- I was still at Rockland County

7    Intelligence Center.

8    Q    Doing the duties -- kinds of duties you have just

9    described?

10   A    Correct.

11   Q    In the course of your job duties as a -- at the

12   intelligence center, what kind of interaction, if any,

13   do you have with inmate phones?

14   A    We -- we're the primary source of monitoring of the

15   phones for the jail, Rockland County jail.

16   Q    So give us a sense of how many calls you have

17   listened to at the Rockland County jail?

18   A    I'd say hundreds.  In one month we can have over --

19   over 6,000 calls made from the county jail.  It's --

20   it's -- takes a lot of time.  We have no time limits set

21   on the phone calls, so they could go from 10 minutes

22   to a -- to a whole hour, so it's a constant thing that

23   we have.

24   Q    Okay.  And how do these calls at the Rockland

25   County jail begin?  How do they begin?  What happens --

1   how do you initiate a call?

2   A    It's -- you are prompted that -- with a saying that

3   these calls are being monitored.  It asks you to put in

4   your PIN.

5       You are saying from when -- the moment that the

6   inmate picks up the phone or from us monitoring?

7   Q    From the moment the inmate picks up the phone, do

8   you know how that works?

9   A    Yes.  It asks for --

10  Q    Okay.

11  A    It asks you to put in your PIN number, which we

12  utilize the inmate's jacket number.  The jacket

13  number -- they put the jacket number in.  It then

14  prompts the person -- it makes a second prompt saying

15  that -- towards the end -- the phone calls can be -- are

16  subject to electronic monitoring.

17  Q    Okay.  Now, are you aware of any other ways that

18  inmates are notified of electronic monitoring?

19  A    Yes.  We have -- in front of every phone in the

20  jail, there's a -- a sign up saying that these calls are

21  monitored.

22  Q    And how do you know that?

23  A    I was part of the primary detail of setting up the

24  new phone systems.  I worked directly with the chief and

25  every -- and all of the sergeants when we were

1    installing the phones, so --

2    Q    And when -- I'm sorry.  When did this new phone

3    system get set up?

4    A    It was up and running in October of 2014.

5    Q    Are you familiar with a Mr. Ian Jasmin?

6    A    Yes.

7    Q    How did you become aware of Mr. Jasmin?

8    A    The -- he was an inmate at the Rockland County jail

9    in the past.  I remember him.  And then I was then --

10   but that's the first time I have ever seen him, at the

11   Rockland County jail.

12   Q    Okay.  You talked about your intelligence job.  Did

13   somebody contact you about Mr. Jasmin?

14   A    Correct.

15   Q    Who contacted you, do you recall?

16   A    Yes.  It was an officer from -- from Vermont's --

17   hold on.  I'm sorry.  I'm trying to remember exactly

18   his -- what his name was.  I believe Gilligan, Detective

19   Gilligan.

20   Q    Okay.  Detective Gilligan.  Do you remember what

21   department he was from?

22   A    I want to say Vermont State Police department.  I'm

23   not a hundred percent sure.

24   Q    And what did he contact you about?

25   A    I believe -- I believe it's -- there's an ongoing

```
 1    investigation, so some of the details I can't -- cannot
 2    discuss.  However, he did ask -- request that we begin
 3    monitoring the phone calls on Ian Jasmin.
 4              MS. SHINGLER:  Judge, if I may, I don't know
 5    if I misunderstood the witness but is he saying that he
 6    is only going to answer part of the question because
 7    there's an ongoing investigation?  Or is he --
 8              THE COURT:  I heard that, but also, you know,
 9    the Court will decide what the questions should be, how
10    the questions should be answered, but I don't know that
11    it's relevant for your motion whether there's an ongoing
12    investigation, a completed investigation, or anything
13    else.
14         You have made a motion to suppress based on
15    legitimate expectation of privacy.  In light of the
16    hour, I am confining the questions to that.
17              MS. SHINGLER:  Very well, Judge.
18    BY MS. ROSS:
19    Q    Now --
20              MS. ROSS:  Your Honor, may I approach?
21              THE COURT:  You may.
22    BY MS. ROSS:
23    Q    Showing the witness what's been marked as
24    Government's Exhibit 10.  Do you recognize that?
25    A    Yes.
```

1    Q    What kind of record is this?

2    A    This is a photo of the phones in the Rockland

3    County jail.  This is right directly above every phone

4    in Rockland County jail.

5    Q    Um --

6    A    This particularly, I believe, was in the B-wing.

7    Q    Okay.  Now -- and are these the kind of notices or

8    photographs of notices that you were talking about as

9    having been in place when you were putting together the

10   new phone system?

11   A    Correct.

12   Q    So as of what date were these notices in place?

13   A    This was up prior to the phone systems being on, so

14   before October of 2014.

15   Q    And when did you -- do you know who took this

16   photograph?

17   A    Yes.

18   Q    Who took it?

19   A    Sergeant Marzella (phonetic) from the Rockland

20   County jail.

21   Q    And do you have reason to believe that this

22   photograph fairly and accurately depicts the phones as

23   they existed in January of last year?

24   A    Yes.

25              THE COURT:  So photographs plural, right?

1         MS. ROSS:  Yes.

2         THE COURT:  Okay.

3         MS. ROSS:  Your Honor, at this time we move

4    the admission of Exhibit 10.

5         THE COURT:  Any objection?

6         MS. SHINGLER:  No.

7         THE COURT:  It's admitted.

8         (Government's Exhibit 10 was received in

9    evidence.)

10   BY MS. ROSS:

11   Q    Looking at the first page of Exhibit 10, would you

12   please share with us what the placard says?

13   A    It says, "Phone calls are subject to electronic

14   monitoring and recording."

15   Q    Now, I am just going to ask you, for purposes of

16   being -- keeping this moving quickly, could you take a

17   look at Bates number 002219.

18   A    Yes.

19   Q    Okay.  What's depicted by this photograph?

20   A    This is showing the jail phones in the B-wing area,

21   and above it is defining each phone.  So we have it

22   numbered by B-2, B-3, B-4 and B-5.  And that's when --

23   when we utilize the jail system, we know exactly what

24   phone the inmate was utilizing by what it was numbered.

25   Q    And the blue sign that appears in this photograph,

1    is that the same or different from what is shown in

2    closeup on the first page of this exhibit?

3    A    It's the same.

4    Q    Now, do you know where Mr. Jasmin was held during

5    the time frame that he was at the Rockland County jail?

6    A    In the B-wing.

7    Q    Now, Officer Concepcion, do you know or have you,

8    as part of your job duties, instances where one inmate

9    has used another inmate's PIN number?

10    A    Yes.

11    Q    Okay.  How do you deal with that as part of your

12    job?  How do you uncover that?

13    A    Well, we have -- one of the main things we do is

14    random -- random listening to multiple different calls.

15    If we have an idea or somebody mentions a hint that

16    they're going to do something like that, we can actually

17    do a search -- the new system is set so we can actually

18    do a search of the wing itself and search for similar

19    phone numbers, numbers that were used in the past by the

20    same inmate.

21    Q    Okay.  And did you find such a case with respect to

22    Mr. Jasmin?

23    A    Yes.

24    Q    How -- and how did that come to your attention?

25    A    There was a phone conversation wherein if the --

1   you put money on the -- the other one, that way -- that

2   way we can talk.  So I would automatically assume that

3   the conversation was going to be billed -- because what

4   we do is -- it's called a BTN number, the number they

5   actually put money on for them to be able to make the

6   conversation or actually talk from the jail.  So -- but

7   that was the hint that another number was going to be

8   utilized or another PIN was going to be utilized.

9   Q    And do you have some -- some document or record

10  that sort of explains how you uncover something like

11  what you did with Mr. Jasmin?

12  A    Yes, I do.

13  Q    And what's that?

14  A    It was a -- it's a PowerPoint or PDF that I put

15  together that shows the process of what the search is

16  like, how -- how we ended up utilizing and looking up

17  the -- the actual number, because you could actually see

18  what numbers are being called to Vermont at that time

19  out of the B-wing itself.

20  Q    And would that help you sort of explain what you

21  uncovered with respect to Mr. Jasmin?

22  A    Yes.

23              MS. ROSS:  Your Honor, may I approach the

24  witness?

25              THE COURT:  You may.

BY MS. ROSS:

Q     I'm showing you what's been marked for

identification as Government's Exhibit 20.  Do you

recognize it?

A     Yes.

Q     How do you recognize it?

A     Because I made it.

Q     Okay.  And just generally speaking, what kind of

information is depicted in this record?

A     This is showing examples of the GTL system, the

upgrade that we have.  It shows examples of how searches

were made and how we discovered the phone numbers, the

other phone numbers being utilized in the B-wing.

Q     So this is a depiction -- this reflects a system of

records that you tap into.

A     Correct.

Q     Is that correct?

A     Correct.

Q     And who maintains that system of records?

A     This is by the GTL.  Global Tel*Link is the company

itself.

Q     And do you have -- in your job duties, do you have

access to this system of records?

A     Yes.

Q     And these are records that are kept in the regular

1  course of business, correct?

2  A    Correct.

3  Q    And these are records that you can search as a

4  regular part of your job duties; is that right?

5  A    Yes.

6  Q    And so you put together a PowerPoint showing

7  what -- what is really screen shots of that system of

8  records?

9  A    Correct.

10          MS. ROSS:  Your Honor, at this time we move

11  for the admission of Government's Exhibit 20.

12          THE COURT:  Any objection?

13          MS. SHINGLER:  She just handed it to me.  It

14  is a fairly complex PowerPoint.  I mean, I am going to

15  need some time to figure out what it is.

16          THE COURT:  All right.  I don't know that it

17  can be offered necessarily for its truth because it's

18  more illustrative of how they came to associate two

19  names with one number.  Correct?

20          MS. ROSS:  Correct.

21          THE COURT:  So I am going to allow you to use

22  it to question the witness, but I don't know that we

23  need to admit it at this time.

24          MS. ROSS:  I would agree, your Honor.

25          THE COURT:  Okay.

1          MS. ROSS:  I would agree.  I would though note

2     for the record that we did turn it over two weeks ago.

3          THE COURT:  Okay.

4     BY MS. ROSS:

5     Q    But -- so, Mr. -- or Investigator Concepcion, let's

6     take a look at the third page of this Exhibit 20.  It's

7     entitled, at the top left, Call Detail Reporting?

8     A    Yes.

9     Q    Do you see where I am at?

10    A    Yes.

11    Q    Can you tell us what we are looking at?  What is

12    this?

13    A     This is an example of the page that -- of how you

14    can do a search multiple different ways.  You can do a

15    search or a combination of a few.  You can put the

16    date -- date, time.  You can put the bill-to number or

17    the person that put the money on their phone that set it

18    up through the system.  You can put -- you can do a

19    search through the guy's jacket number or his personal

20    identification number.  You could do the inmate phones.

21    You could do -- if you know they're going to utilize

22    just five phones, you can just put those in, or for the

23    wing itself.  The guy's -- the inmate's first or last

24    name.

25         And these are just multiple forms of doing the

1    search, but it could get very detailed depending on how

2    much information you want to put in.

3    Q    Okay.  And let's turn the page and have you explain

4    to us what this next page shows, what this is a screen

5    shot of.

6    A    Yes.  The top is the phone call that was made by

7    Ian in the B-wing from B-4, and this was a phone call

8    towards the end that ended up giving hints towards

9    another phone being utilized.

10   Q    Okay.  And how did -- can you tell us -- can you

11   relate the page that we just looked at, how did you use

12   that page to get to this?

13   A    What we did was a search of just B-wing and -- and

14   the calls that were made directly after that call was

15   over.

16   Q    Okay.  And why did you do that kind of search?

17   What prompted you to do that?

18   A    Because I knew that it was going to be done in

19   B-wing, and I knew that that phone conversation finished

20   at that time period, so I -- I figured that the call was

21   going to be made within that time.

22   Q    Okay.  And how did you know that the call was

23   finishing at that time?

24   A    He hung up.  He had no -- we monitored the previous

25   phone call.

1    Q    Okay.  You were listening to it.

2    A    Correct.

3    Q    Correct?

4         Okay.  Now, tell us -- you have something outlined

5    here in red.

6    A    Um-hum.

7    Q    That red box, what does that mean?

8    A    This is showing the -- the phone number

9    that -- that was utilized -- the bill-to number or the

10   number that he used multiple times or contacted multiple

11   times.

12   Q    Okay.  And as we go across, we see the number

13   32889?

14   A    Yes.

15   Q    What's that number?

16   A    That is their -- it was the jacket number or the --

17   his personal PIN number.  That's what you utilize when

18   you are going to make a phone call in the jail.

19   Q    And at the very top of this page in yellow, the

20   highlighted part, the first line, 9144092052, do you see

21   that?

22   A    Yes.

23   Q    What is that?

24   A    That was another bill-to number, a number that he

25   was utilizing a lot.  I believe, if I am not mistaken,

1  it was family.

2  Q   Okay.  And next to that, what is -- what do we see?

3  A   A date.

4  Q   And next to that?

5  A   Time.

6  Q   Yep.  And what's the date and time?

7  A   That's the date that the phone call was made and

8  the time that the phone call began.

9  Q   So when did he make this call?

10  A   He made this call on the 6th -- on February 16th,

11  2015.

12  Q   At what time?

13  A   And it began at 12:28.

14  Q   And how long did it last?

15  A   The duration was for four minutes and five seconds.

16  Q   Okay.  Now, let's turn the page and tell us what --

17  what's being shown on the next page.

18  A   The next page is the process of putting in that

19  time period.  So the start and end date is from the 16th

20  of February, 2015, and below you see selected every

21  phone in the B-wing.

22  Q   Okay.  Now, let's turn to the next page, and tell

23  us what this depicts.

24  A   This depicts the -- that 9144092052 number being

25  called, the date, time of the phone call, the PIN

1    number, his first, last name, the phone that he

2    utilized, and the duration of the phone call, which is

3    four minutes and five seconds.

4    Q    Okay.  And what's the significance of what's

5    depicted under it?

6    A    This was the result of the search that was done

7    prior, that you saw in the page before.  This shows a --

8    a call to the -- one of the numbers that we were very

9    familiar with.  I mean, when you are looking -- when you

10   are looking through, you notice -- the majority of our

11   phone calls made from the county jail are in New York,

12   so we see a lot of 845, 914, you know, those --

13       We are already familiar with the Vermont area code

14   from previous investigation, so we noticed a Vermont

15   number being called on 2/16 beginning at 12:35.

16       So if you count from 12:28 four minutes up -- 28,

17   29, 30, 31, 32, so -- two, three, four, five -- about

18   three minutes of a difference a call to Vermont was

19   being made.

20   Q    Okay.  And did you listen to that call?

21   A    Yes.

22   Q    And when you listened to that call, whose PIN

23   number was it under?

24   A    It was under Brian Koenigsberger.

25   Q    Okay.  And when you listened to the call, did you

1   recognize the voice?

2   A    Yes.

3   Q    And how did you recognize the voice?

4   A    Based off of the hundreds of phone calls we

5   listened to previously.

6   Q    And whose voice did you recognize as the voice that

7   was using this PIN number?

8   A    It was Ian Jasmin.

9   Q    Now, I want you to turn to the next page and

10  explain -- tell us what this is.

11  A    This -- so once we realized that that phone number

12  was being utilized, we put in his PIN number, the Brian

13  Koenigsberger's PIN number, and you got to see every

14  phone call he has made while incarcerated, or any phone

15  call that was utilized using that PIN number.  And the

16  802 number -- these are just showing multiple phone

17  calls made towards that 802 number from this PIN.

18  Q    Okay.  So let's just take the first example, and it

19  shows a billed-to number of 8023732937, correct?

20  A    Yes.

21  Q    Under this PIN -- under what PIN number?

22  A    This is under 44204, which is Brian Koenigsberger.

23  Q    Now, if you compare that -- how does that page,

24  that entry, go back and compare to your earlier page

25  four?

1    A    Which --

2    Q    You have four pages into your PowerPoint.

3    A    Oh.  It's a matching phone number to the bill-to

4    number that's utilized by Ian.

5    Q    Okay.  And the next billed-to number, how does

6    that -- what is that?

7    A    It's another Vermont phone number, 8022959679.

8    Q    And that's the one you referred to on the prior

9    page; is that correct?

10   A    Correct.

11   Q    Now, let's go one more page forward, and tell us

12   what we're looking at on this page.  It should say

13   "advanced reports" at the top.

14   A    Yes.  This is just a section of the -- of the

15   original page with the different searches.  So what --

16   this is just showing -- what we did was we put in the --

17   the actual phone number itself, and we get to see

18   what -- who from the jail has contacted that phone

19   number.

20   Q    Okay.  So you are conducting a search -- on this

21   page you are conducting a search using what?  What's the

22   common factor you are searching for?

23   A    The phone number, to see what other -- what other

24   inmate PINs have called that similar number.

25   Q    Okay.  And in this case, how many PIN numbers did

1   you find were used to call that number?

2   A    Three.  Three different PINs.

3   Q    Now, Investigator Concepcion, what is your -- as

4   part of your job, do you provide information to other

5   law enforcement agencies?

6   A    Correct.

7   Q    Okay.  And how do you do that?  So do you

8   provide -- do you require a subpoena?  Do you provide

9   them copies?  What do you do?

10  A    Yeah, we provide copies.  They have to sign, and

11  whatever information that -- we have a written

12  stipulation of what they can do if they -- it has to be

13  pertaining to their particular case.  If it doesn't

14  pertain, then they have to contact us and we'll -- we

15  move it a step further.

16  Q    Did that happen in this case?

17  A    What was that?

18  Q    Did that process -- was that process followed in

19  this case?

20  A    Yes.

21          MS. ROSS:  Your Honor, at this time we would

22  request to play one of the calls that -- or actually two

23  of the calls that Mr. -- or that Investigator Concepcion

24  just talked about, those being the two calls on February

25  16th of 2015.

1          THE COURT:  All right.  Any objection?

2          MS. SHINGLER:  Yes.  We don't believe that

3     they have any relevance to this.

4          THE COURT:  Well, if they announce that the

5     calls are recorded, they do.  If one is for Mr. Jasmin

6     and the other one is for Mr. Koenigsberger, it has some

7     relevance too.  The contents of the calls are not

8     important.  So I don't need to hear the whole call.

9          MS. SHINGLER:  If I can make -- if I may,

10    Judge?

11         THE COURT:  Sure.

12         MS. SHINGLER:  We would stipulate that that,

13    in fact, is true, that both of -- that on both of the

14    phone calls my client's voice appears.

15         THE COURT:  And are you going to stipulate

16    that the preface to the call is some kind of recording

17    that says that all these -- these phone calls are

18    subjected to electronic monitoring, consistent with this

19    witness's testimony?

20         MS. SHINGLER:  Yes.  And consistent with the

21    photographs.

22         THE COURT:  Okay.

23         MS. SHINGLER:  More consistent with the

24    photographs.

25         THE COURT:  Okay.

1           MS. ROSS:  So there is a third -- third point.
2    Those are two of the points, although I think what is
3    said -- and I do believe Miss Shingler just said this,
4    but what is said is that the calls are subject to
5    monitoring and recording, is the preamble, but the third
6    point is that the content is relevant to the extent that
7    the defendant is talking about making calls on another
8    line to hide his actions, thereby indicating he knows
9    that it's being recorded.
10          THE COURT:  All right.  It can be played for
11   that purpose.
12          MS. SHINGLER:  Judge, your Honor -- or before
13   the Court hears it, we would urge the Court to refrain
14   from listening to the actual contents of the tapes until
15   you make a ruling as to whether or not there was an
16   expectation of privacy.  It's after that point that the
17   Court can perhaps look at the -- listen to the
18   audiotapes.
19          THE COURT:  So I assume you are asking for a
20   jury trial in this case, correct?
21          MS. SHINGLER:  Is that what I asked for right
22   now?
23          THE COURT:  No.  I assume you are asking for a
24   jury trial in this case, so I am not going to be the
25   finder of fact, so what's the concern about playing the

1  tape?  I am not going to include it in my findings

2  because other than that, the point that Miss Ross makes

3  I don't need to.  So what's the concern?  So I am going

4  to hear something?

5          (Defense counsel and defendant confer

6  briefly.)

7          MS. SHINGLER:  Thank you, Judge.

8          THE COURT:  Okay, go ahead.

9          MS. ROSS:  Thank you, your Honor.  We have

10  provided to Miss Shingler, and to the extent that we --

11  we can also provide it to the Court, a summary of the

12  calls that we intend to play, including these two, but

13  all it does is summarize those areas of the call that

14  pertain to this issue of whether he knew and understood

15  that he was being recorded.  It's not the whole call.

16          THE COURT:  Okay.

17          MS. ROSS:  So if we could at this time play

18  the call on February 16th, 2015, at 1228 hours.

19          ROBERT PIETROPAOLI:  From the beginning?

20          MS. ROSS:  We are going to play it from the

21  beginning and then stop it, and then I will tell you

22  where to pick up.

23          (A digital recording was played in open

24  court.)

25          MS. ROSS:  Okay, you can stop it there.

1    BY MS. ROSS:

2    Q    Now, Investigator Concepcion, do you know what PIN

3    number was used to make this call?

4    A    Yes.

5    Q    Okay.  And how do you know that?

6    A    It shows up on the search.

7    Q    What you just explained to us?

8    A    Yes.

9    Q    Correct?

10   A    Correct.

11   Q    And who is the inmate making this call?

12   A    Ian Jasmin.

13            MS. ROSS:  If we could move forward to about

14   five minutes in, or 4:55 in.

15            (A digital recording was played in open

16   court.)

17            MS. ROSS:  Okay, you can stop that.

18   BY MS. ROSS:

19   Q    Now, Investigator Concepcion, tell us how that fits

20   into what you were explaining earlier.

21   A    Yeah.  That's the portion of a conversation that

22   led us to believe that another number was going to be --

23   well, her brother's phone number was going to be

24   utilized, that money was put onto a different phone

25   to -- to be billed through the GTL system.

1    Q    So you did the search that you have already

2    explained to us as illustrated by Exhibit 20, correct?

3    A    Correct.

4    Q    And you came up with a second call at 12:35?

5    A    Correct.

6         MS. ROSS:  So can we go ahead and play

7    February 16th, 2015, at 12:35.

8         (A digital recording was played in open

9    court.)

10         MS. ROSS:  Can you stop it there.

11    BY MS. ROSS:

12    Q    So, Investigator Concepcion, do you recognize the

13    voice?

14    A    Yes.

15    Q    And whose voice do you recognize it to be?

16    A    Ian Jasmin.

17         MS. ROSS:  Let's pick up again at 57 minutes.

18         (A digital recording was played in open

19    court.)

20         MS. ROSS:  Okay, you can stop it there.

21    BY MS. ROSS:

22    Q    Now, I am going to have you, if you would for a

23    minute, Investigator, turn to the last page of your

24    Exhibit 20.  And can you explain to us what we're seeing

25    in this screen shot on your last page?

1    A    Yes.  These are multiple -- well, this was a search

2    done on the 8455532489 number and every PIN that's

3    called it from the jail.

4    Q    Okay.  So again, what's the common factor that you

5    are searching by?

6    A    The -- the phone number itself.

7    Q    The BTN number?

8    A    Yes, the bill-to number.

9    Q    Okay.  And this demonstrates what with respect to

10   PIN numbers?

11   A    This demonstrates more than one PIN dialing that

12   phone number.

13   Q    Okay.  And whose PINs are -- does this reflect are

14   dialing that number?

15   A    This shows Ian Jasmin and Richard Camacho.

16   Q    Did you have reason to believe that it was the same

17   person use -- dialing that phone number?

18   A    Yes.

19   Q    And why is that?

20   A    Well, made sense.  It was a common number and we

21   started to find matching numbers being used by different

22   PINs.  We just listened.

23   Q    Okay.  So you also listened to that -- that phone

24   call?

25   A    Correct.

1          MS. ROSS:  Your Honor, again, I would ask at

2     this time that we play that phone call.

3          THE COURT:  You may do so.

4          MS. ROSS:  So we are -- should be looking at

5     February 20th, 2015, at 1333, please.

6          (A digital recording was played in open

7     court.)

8          MS. ROSS:  Can you stop it there.

9          ROBERT PIETROPAOLI:  Yes.

10    BY MS. ROSS:

11    Q    And do you recognize the voice on that phone call?

12    A    Yes.

13    Q    Whose is it?

14    A    It's Ian Jasmin.

15         MS. ROSS:  Could we move ahead, if you would,

16    to about two minutes and 25 seconds in.

17         (A digital recording was played in open

18    court.)

19         MS. ROSS:  We can stop it there.

20         And, again, I would ask if we could move forward to

21    about 17 minutes and 55 seconds.

22         (A digital recording was played in open

23    court.)

24         MS. ROSS:  Okay.

25    BY MS. ROSS:

1    Q    Now, when you talk about -- if you use -- if you

2    use someone else's PIN number, how does it get billed?

3    A    They -- the person you are calling has to put the

4    money on their phone.  So the bill-to number, that's why

5    it's called BTN, the billed-to number.  For instance, if

6    you were calling me, I'd have to call GTL myself, set it

7    up, pay, put a certain amount of money on my phone

8    number, and then you'd be able to call me.

9    Q    Okay.  So it is not by PIN number that the billing

10   happens?

11   A    No.

12            MS. ROSS:  Just -- if I could have a second,

13   please?

14            THE COURT:  You may.

15            (Brief pause.)

16   BY MS. ROSS:

17   Q    Investigator Concepcion, do you recall the time

18   frame that Mr. Jasmin was at your facility at Rockland

19   County?

20   A    In its entirety, no.

21   Q    Okay.

22            MS. ROSS:  No further questions.

23            THE COURT:  All right.  Any cross examination?

24            MS. SHINGLER:  Yes.

25                      CROSS EXAMINATION

1   BY MS. SHINGLER:

2   Q    Good afternoon.

3   A    Good afternoon.

4   Q    Are you a correctional officer or a law enforcement

5   officer?

6   A    I am -- I am corrections.  What we do is I am

7   assigned to Rockland County Intelligence Center as an

8   investigator, is my title.

9   Q    What is your home port?

10  A    The sheriff's department runs the jail and the

11  sheriff department next door.  I am underneath the

12  sheriff's department assigned to Rockland Intelligence

13  Center.

14  Q    So are you a trained law enforcement officer and a

15  deputy sheriff?

16  A    I am a deputy, yes.

17  Q    Do you do -- do you have duties outside Rockland

18  County Correctional Institute?

19  A    Yes.

20  Q    And are they typical law enforcement?

21  A    Yes.

22  Q    Have you ever --

23  A    Well, investigations.

24  Q    Investigations.  You are not controlling traffic?

25  A    I am not knocking doors down.  I am in an office.

1    Q    Okay.  Did you ever receive a subpoena to produce

2    these phone calls?

3    A    Subpoena, no.

4    Q    You said that you -- let's see -- that there are

5    about 6,000 phone calls a month that come into the

6    facility, correct?

7    A    Approximately.

8    Q    And are they -- are they listened to as they come

9    in simultaneous?

10    A    We can, yes.  It depends.  Most of the time, since

11    there's a small number of people helping monitor, we can

12    only listen to -- we have pretty much a list of who

13    we're listening to on a normal basis.

14    Q    Okay.

15    A    Mostly gang affiliated or otherwise.

16    Q    And there's no evidence that Mr. Jasmin is gang

17    affiliated, is there?

18    A    No.

19    Q    Okay.  But you do over time create a list of kind

20    of your special-interest guys?

21    A    Yes.

22    Q    And so when you say that you monitor -- that

23    there's 6,000 phone calls that come in a month, not all

24    6,000 are listened to, correct?

25    A    Correct.

1    Q    Only a small percentage of those are listened to,

2    correct?

3    A    Correct.

4    Q    And I think you said earlier in your direct

5    examination some of them are listened to on a random

6    basis?  You just pick a phone call and listen to it?

7    A    Correct.

8    Q    And you do that without rhyme nor reason?  It's

9    truly random?

10   A    At times.

11   Q    And then you also listen to kind of your list of

12   super suspects?  You monitor them more closely?

13   A    Correct.  Or a department can call and say, Listen,

14   this guy just got arrested for, let's say, robbery.  Can

15   you just keep an ear out on his phones, without them

16   actually needing to have the phone conversations.

17   Q    And so you do that.  You don't require the issuance

18   of a subpoena or a warrant in order to do that?

19   A    Correct.  No, we don't.

20   Q    And when you listen to -- well, let me ask you

21   this:  How does the U.S. Attorney's Office for the

22   District of Vermont get ahold of those phone calls?

23   A    They have to request -- contact our office and

24   request the phone calls.

25   Q    Okay.  And did that happen in this case?

1   A    Yes.

2   Q    When did that first contact with the U.S.

3  Attorney's Office take place?

4   A    I don't recall the actual date.

5   Q    Can you give me an approximate date?

6   A    To actually -- for the actual recordings

7  themselves?

8   Q    Right.

9   A    Ah --

10   Q    Well, let me take a step back.  When did you first

11  hear from the U.S. Attorney's Office of their interest

12  in Ian Jasmin's phone calls?

13   A    It was way after the contact of the detective.  So

14  I want to say -- I couldn't even give you an actual

15  definite date.  I deal with multiple agencies on a

16  constant basis that are requesting different

17  information.

18   Q    Do you keep a file of your contacts with law

19  enforcement or a U.S. Attorney's Office in connection

20  with an inmate?

21   A    Yes.  Well, if we're going to issue anything, yes.

22   Q    Is there anything that reflects how it is that you

23  sent those disks to the U.S. Attorney's Office?

24   A    I believe we mailed them.

25   Q    Did you receive a letter from anybody?

1    A    Stating -- as a request?

2    Q    Yes.

3    A    Yes.

4    Q    Do you have a copy of that letter with you?

5    A    No, I don't.

6    Q    Who is that letter from?

7    A    We have -- we received an e-mail -- I had an

8    e-mail.  It was an e-mail conversation.

9    Q    From the U.S. Attorney's -- up here in Vermont?

10   A    Correct.

11   Q    Do you have that e-mail?

12   A    I do not.

13   Q    Okay.  Now, you said that -- you are aware that

14   there is a warning on the phone calls, because you

15   evidently listen to a fair amount of them, that calls

16   will be monitored and recorded, correct?

17   A    Correct.

18   Q    There isn't any warning that the calls will be used

19   against you in court and can be turned over to law

20   enforcement, correct?

21   A    Not on the recording.

22   Q    Okay.  And the recordings don't let the inmate know

23   that you, after listening to them, may or may not turn

24   them over to any number of law enforcement agencies,

25   correct?

```
 1    A    It does not say that.

 2    Q    Okay.  And do you have any information, as you sit

 3    here today, that the inmates at Rockland County

 4    correctional facility are advised that their phone calls

 5    may very well be turned over to law enforcement for any

 6    purpose to be used against them?

 7    A    There's nothing stating that, no.

 8    Q    Now, you said that your interest in Ian Jasmin

 9    began when you got a phone call from a Vermont officer,

10    Detective Gilligan from the Vermont State Police.  Do

11    you have any notes or memorializations of that phone

12    call?

13    A    Of the -- of the phone -- no.  No, I don't.

14    Q    Do you remember when the phone -- the very first

15    phone call, the Gilligan phone call, occurred?

16    A    Yes, because -- it was -- I believe in February.

17    Q    February of what year?

18    A    Of 2015.

19    Q    Do you recall whether or not it was before or after

20    the 16th?

21    A    I don't recall.

22    Q    The 16th being the day that you said you heard

23    this --

24    A    Oh, it was prior.  It was prior, definitely.

25    Q    And what do you recall Detective Gilligan telling
```

1    you?

2    A    They had reason to believe there was certain

3    criminal activity going to be discussed, to keep an ear

4    out for -- for -- of the conversations.

5    Q    And did he tell you the reason that he believed

6    that there was going to be conversations about criminal

7    conduct was because he had listened to previous jail

8    phone calls in Vermont?

9    A    He did not go into detail.

10   Q    Did he say that the information he had received had

11   been obtained from the phone calls seized from Vermont

12   correctional facilities?

13            MS. ROSS:  Your Honor, I am going to object.

14   That's assuming facts that aren't in evidence in that

15   question, that Detective Gilligan even received such

16   information.

17            THE COURT:  This witness can answer because he

18   is -- doesn't appear to be confused about the question.

19   Go ahead.

20   A    No, he didn't mention any of that.

21   BY MS. SHINGLER:

22   Q    Okay.  Did he tell you -- do you recall whether or

23   not he told you the source of his information?

24   A    No, I do not recall.

25   Q    Do you recall him relaying the source of the

1    information -- or the details of the information?

2    A    No, I do not recall.

3    Q    But as best as you recall, some Detective Gilligan

4    from the Vermont State Police -- did he e-mail you or

5    call you?

6    A    He called me and then e-mailed.

7    Q    Do you have that e-mail with you?

8    A    I do not.

9    Q    Do you have it anywhere?

10   A    Yes.

11   Q    You could produce it if we asked you to?

12   A    Yes.

13   Q    And that would have the -- was the e-mail on the

14   same day as the phone call?

15   A    The e-mail was I believe the day -- I'm -- I don't

16   recall.  I couldn't tell you.

17   Q    What's your best recollection?

18   A    It would have to be within the day or day after.

19   Q    Phone call, e-mail?

20   A    Yeah.  The problem with the e-mail is because there

21   are names, other names mentioned within the e-mail

22   itself that do not pertain to this case that are part of

23   an investigation.

24   Q    Okay.  But if we removed those -- those pieces of

25   information relative to ongoing investigations, and

1    retaining in the document the information relevant to

2    Mr. Jasmin, you would produce that?  You could produce

3    that --

4    A    Produce the proof that contact was made between

5    him?

6    Q    The contact was made and what he told you about

7    Mr. Jasmin.

8    A    I can show you the -- that an e-mail was given --

9    was sent to me from him with his name on it.

10             THE COURT:  So before we have, especially in

11   light of the hour, discovery problems, if you request

12   it, he can assert, you know, investigative privilege or

13   whatever.  I can look at it *in camera*.  We can redact

14   out other information.  There's a way to do it but not

15   on the witness stand.

16             MS. SHINGLER:  Okay.

17             THE COURT:  So let's move on to another

18   question.

19             MS. SHINGLER:  Very well.

20   BY MS. SHINGLER:

21   Q    But just completing your Officer Gilligan, as you

22   sit here today, the information you received from

23   Officer Gilligan was something to the effect of, "Ian

24   Jasmin is in your facility," correct?

25   A    Correct.

1    Q    "He came from Vermont."

2    A    Correct.

3    Q    He was incarcerated in Vermont?

4    A    I don't believe incarceration became a

5    conversation, a point of --

6    Q    Okay.  Did you happen to know that Mr. Jasmin had

7    moved from a Vermont facility to a New York facility?

8    A    Only after later investigation.

9    Q    Pardon me?

10    A    Only after later investigation of the background.

11    Q    Okay.  And Officer Gilligan, to the best of your

12    knowledge, told you, "Listen to some phone calls --

13    listen to Ian's phone calls.  We believe he is

14    conducting criminal activity from jail"?

15    A    "Listen to the phone calls."  They don't ever

16    really have to specify the details of the investigation

17    to us.

18    Q    Well, I think you said --

19    A    It's just "monitor the phone calls."

20    Q    But you did tell us earlier in your testimony that

21    he gave you a reason.

22    A    Well, it was part of a -- any detective calling me

23    saying, "Hey, listen -- listen to this phone call.

24    Listen to this guy.  He's in your jail.  There could be

25    criminal activity that comes up," I have to.

1   Q    Well, you -- he called you --

2   A    Correct.

3   Q    -- telling you to monitor Mr. Jasmin?

4   A    Yes.

5   Q    He tells -- you are sitting here telling us he

6   didn't tell you why?

7   A    He doesn't have to.

8   Q    He just says do it and you do?

9   A    That's my job.  We are an agency assist.

10   Q    Okay.  And then when he says send them to the U.S.

11   Attorney's Office, you do that too?

12   A    He didn't.

13   Q    The U.S. Attorney's Office did?

14   A    Correct.

15   Q    But I believe your testimony earlier was that

16   Officer Gilligan did tell you, "We have reason to

17   believe he is conducting criminal activity from jail"?

18   A    I said that there's a criminal investigation going

19   on that I couldn't get into detail with.

20   Q    Well, we'll check the record.

21   A    Okay.

22         MS. SHINGLER:  I guess I would like to have

23   that e-mail produced and any other notes regarding

24   Officer Gilligan, state police, who I have never heard

25   of.  I don't know if he exists.  And this is news to me.

1          THE COURT:  But this is not an agent of the

2    government.

3          MS. SHINGLER:  Right.

4          THE COURT:  This is somebody else.  So go

5    through the discovery procedures.  We will deal with it

6    when we deal with it.  If you want to reopen the

7    proceedings, that's fine.

8        I don't personally think what Trooper Gilligan, to

9    the extent the name's even right, provided as

10   information to this individual is particularly relevant.

11   I know you might want to know it, but it doesn't have a

12   lot to do with whether or not these calls are within

13   your client's legitimate expectation of privacy.

14         MS. SHINGLER:  And just for the Court's

15   information, I don't mean to belabor it, but we are

16   expanding and asking the Court to file post-hearing

17   papers.  We are going to be arguing on other grounds

18   that they should -- that the phone calls should be

19   suppressed.

20         THE COURT:  I know what those grounds are.  I

21   assume you are going to claim some kind of Brady

22   violation.  Or at least that's my suspicion.

23         MS. SHINGLER:  And a Rule 17 violation.

24         THE COURT:  Okay.  Well -- but we'll get to

25   that when we get to it.  We have gotta have this witness

```
 1    finish.  So any further questions?
 2               MS. SHINGLER:  Just a second.
 3    BY MS. SHINGLER:
 4    Q    Is it fairly common for inmates to use other
 5    inmates' names or BTNs?
 6    A    It happens.
 7    Q    Regularly?  Occasionally?
 8    A    Occasionally.
 9    Q    Does it necessarily indicate ongoing criminal
10    conduct?
11    A    The majority of the times.
12    Q    But not always?
13    A    Not always.
14               MS. SHINGLER:  Thank you, Judge.  That's all I
15    have.
16               THE COURT:  All right.  Any redirect?
17               MS. ROSS:  No, your Honor.
18               MS. ROSS:  Thank you.
19               THE COURT:  Thank you, sir.  You may step
20    down.
21               (Witness excused.)
22               MS. ROSS:  The government may call its next
23    witness.
24               MS. ROSS:  The government calls Dawn Muller,
25    please.
```

1               <u>DAWN MULLER</u>,

2          having been duly sworn by the courtroom deputy,

3          was examined and testified as follows:

4                     DIRECT EXAMINATION

5     BY MS. ROSS:

6     Q    Good afternoon.  Is it Ms. Muller?

7     A    Mrs. Muller.

8     Q    Mrs. Muller.  Okay.  Mrs. Muller, where do you

9     work?

10    A    I work at the Northwest State Correctional

11    Facility.

12    Q    And how long have you worked there?

13    A    12 years.

14    Q    And what do you do there?

15    A    Right now I am a correctional service specialist.

16    Q    How long have you done that?

17    A    Three years.

18    Q    And what does a correctional service specialist do?

19    A    I meet with the inmates on my case load and

20    introduce them to the facility and kind of tell them how

21    to reach medical, mental health, case worker, go over

22    the phone sheet process, the visiting sheet process,

23    answers any questions or concerns they have.

24    Q    Okay.  And you were -- if I got my timing right,

25    you were in that position in 2014, correct?

1    A    Yes, I was.

2    Q    And prior to that, what did you do?

3    A    I actually worked up front as an administrative

4    assistant for Northwest State.

5    Q    And you mentioned phone sheets as part of your

6    correctional service specialist responsibilities.  What

7    are phone sheets?

8    A    An inmate is given a phone sheet when they come in

9    either by the correctional officer or a case worker or

10   from another inmate, and they have to complete the form.

11   It has the name, date of birth, the unit they reside in.

12   They have to sign the slip also in the unit, and they

13   have to put in the phone numbers that they want

14   approved, either add or delete if they have already had

15   phone sheets, and then they have to submit it to the

16   case worker because we have to review that phone sheet

17   to make sure there's no victims on the phone sheet, if

18   they have some kind of domestic violence or something,

19   and we are the ones that actually call the people on the

20   phone sheet, and we send it up front.

21   Q    Okay.  Now, in your prior administrative position,

22   did you deal with inmates' use of forms at all?

23   A    Yes, I did.

24   Q    Okay.  And what did you do -- how did you deal with

25   inmates' use of phones in that position?

1    A    So in that position I would actually be the one who

2    would get the phone sheets from the case worker and

3    reviewed them and entered any information such as inmate

4    I.D. if it was missing.  If a signature was missing, I'd

5    send it back in to get a signature.  I was the one that

6    faxed it to Erica Przech Johnson back then.

7         I also was very involved -- if inmates had problems

8    in the unit, I would actually go in the unit and help

9    them learn how to use the phone system and help them

10   learn how to use their PIN.

11   Q    Okay.  So have you ever -- when you were doing

12   that, did you ever listen to the inmate phone system?

13   A    Yes, I have.

14   Q    Okay.  And so tell us how that works.  What -- what

15   is the inmate phone system like?

16   A    So you pick it up and it specifically gives you

17   directions:  One for English, you press your English

18   button, and then it tells you if you want to call

19   collect or use debit, you push which button you want.

20   You punch in your PIN number.  You punch in the phone

21   number you are calling.  And it then plays a recording

22   that this phone call can be monitored or recorded, and

23   you can hear the other person answer the phone and

24   actually like press whatever button they are going to

25   say if they are accepting or not, and then that person's

1    on the other end.

2    Q    Okay.  Now, in your job duties as a correction

3    service specialist, you meet with inmates, correct?

4    A    Yes, I do.

5    Q    Okay.  And do you document those meetings?

6    A    Yes, I do.

7    Q    And where -- where are those notes or

8    documentation -- where is that kept?

9    A    They're in our system.  It's called OMS now.  We

10   have like a case document where you go in, you do a case

11   note, you have to put the time and date that you met

12   with them, how long you met with them, and then what you

13   discussed with them at the time.

14            THE COURT:  So, Miss Ross, I am being advised

15   that I have a final revocation hearing scheduled for

16   three p.m. today.  We've kind of gone way over the time

17   I thought we would have.  So we're going to finish as

18   many witnesses as we can today, but I am thinking I

19   should take a break, do that, you can then take your

20   break, which nobody's had -- poor Anne will still be

21   working -- we'll come back with this witness, and let's

22   make sure we don't do any asked-and-answered stuff, but

23   I do have somebody waiting for that hearing.

24            MS. ROSS:  Okay.

25            THE COURT:  Is that okay for everybody?

1          MS. SHINGLER:  I asked before how late do we

2    go, and I kept hearing until we're done.  We go until

3    it's done?

4          THE COURT:  We're going to be reasonable.  I

5    don't -- do you have -- this witness is local.  You have

6    another out-of-state witness?

7          MS. ROSS:  No.  No.  Also just then the agent,

8    Agent Delpha.

9          THE COURT:  So we are not going to be crazy

10   because we have another day we can do this, and so I

11   don't think we are going to go past five.  And we will

12   see what we can do about that.  Okay?

13         MS. ROSS:  Thank you, your Honor.

14         THE COURT:  So let me just take a break and

15   attend this next hearing.

16   (Court was in recess at 3:45 p.m.)

17   (The following was held in open court at 4:25 p.m.)

18         THE COURT:  We are back on the record in

19   United States of America versus Ian Jasmin.  And we have

20   Miss -- Mrs. Muller on the witness stand.  She is still

21   under oath.  We are in the direct examination.  My

22   apologies for that interruption.  The day started out

23   chaotic, and it's finishing this way.  So let's

24   continue.

25         MS. ROSS:  Thank you, your Honor.

1     May I approach the witness, your Honor?

2          THE COURT:  You may.

3  BY MS. ROSS:

4  Q    I'm showing you what's previously been admitted

5  into evidence as Government's Exhibit 1.  I am going to

6  ask you to turn the page until you see Bates number

7  002259.  Are you there?

8  A    Yes.

9  Q    Okay.  Do you -- do you see notes that were made by

10 you on this page?

11 A    Yes, I do.

12 Q    Okay.  And can you tell us the date and time those

13 notes were made?

14 A    June 13th, 2014, at 11:54.

15 Q    And can you tell by looking at this document what

16 kind of contact you would have had and with whom on that

17 date?

18 A    Yes, I can.

19 Q    Okay.  And who would you have had contact with?

20 A    Ian Jasmin.

21 Q    And how do you know that?

22 A    Because I -- it's -- it's a case note for his case

23 load.  And he was new to the unit, and I wrote "direct

24 jail contact."

25 Q    Okay.  And what kind of information did you go over

1   with him as somebody -- as an offender new to the unit?

2   A    So I reviewed the PREA orientation form, and the

3   offender understood what to do and who to contact if

4   there was a PREA incident, and I designated him as PREA

5   incident.  I also reviewed the facility orientation as

6   well as how to access mental health, medical in the CSS,

7   and we reviewed phone and visiting sheet process.

8        I also completed his CSSI child survey, and his CVS

9   appeared up to date, which is classification that we do

10  on all offenders coming in new.

11  Q    Okay.  And when you talk about facility

12  orientation, what do you do typically during a facility

13  orientation?

14  A    I tell them how to access mental health, like where

15  to get the slips and forms; how to access medical.  I

16  talk to them about visiting, that they are allowed to

17  have visitors, and how many they are allowed, and that

18  they can submit a request every three months.  I explain

19  the phone process, that they need to fill out the phone

20  sheet and submit it to them, and they are allowed up to

21  10 callers, and how that works if they want to add or

22  delete.

23  Q    Okay.  And are you familiar with the handbook for

24  Northwest?

25  A    Yes, I am.

1    Q    Is that part of your facility orientation?

2    A    It's not part of my orientation.  I believe they

3    get information about the handbook when they first come

4    into booking, and they have a handbook in the unit, and

5    at one time we had them in all the cells, but I don't

6    know that that is the case at this time, but they were

7    in all the cells at one time.

8    Q    Okay.  And --

9              MS. ROSS:  May I approach, your Honor?

10              THE COURT:  You may.

11   BY MS. ROSS:

12   Q    I'm showing you what's previously been admitted as

13   Government's Exhibit 3.  Do you recognize that?

14   A    Yes, I do.

15   Q    What is it?

16   A    It's an inmate telephone system number request form

17   that an inmate must fill out when they come into the

18   facility and want to use the phone.

19   Q    All right.  And when you talked about the phone

20   sheets in your notes, is that what you mean by a phone

21   sheet?

22   A    Yes, it is.

23   Q    And do you see that -- in bold on it -- on Exhibit

24   3 there's some writing in bold?

25   A    Yes, I do.

1    Q    Okay.  Are you familiar with that language?

2    A    Yes, I am.

3    Q    And is that on the phone sheets that you used?

4    A    Yes, it is.

5         MS. ROSS:  May I approach, your Honor?

6         THE COURT:  You may.

7    BY MS. ROSS:

8    Q    I am going to show you what is marked for

9    identification as Government's Exhibit 9.  Do you

10   recognize that?

11   A    Yes, I do.

12   Q    And how -- how do you recognize it?  What kind of

13   record is it?

14   A    It's an inmate handbook for the facility.

15   Q    Okay.  And do you know when that document was

16   prepared?

17   A    March 2014.

18   Q    And is that the document that you previously

19   discussed as something available in the units?

20   A    Yes.

21        MS. ROSS:  Your Honor, at this point in time

22   we move the admission of Government's Exhibit 9.

23        THE COURT:  Any objection?

24        MS. SHINGLER:  No.

25        THE COURT:  It's admitted.

```
 1              (Government's Exhibit 9 was received in
 2    evidence.)
 3    BY MS. ROSS:
 4    Q    And, Mrs. Muller, if you could direct your
 5    attention to page 24 of that handbook in Government's
 6    Exhibit 9.
 7    A    Yes.
 8    Q    Are you familiar with this portion of the handbook?
 9    A    Yes, I am.
10    Q    And what information is conveyed in this portion of
11    the handbook?
12    A    It's information about the telephone system on page
13    24.
14    Q    And what, if anything, does it tell the inmates
15    about monitoring and recording?
16    A    "Telephones may be monitored and recorded by DOC
17    staff to ensure facility safety and security.  Using the
18    system other than how it is intended, such as call
19    forwarding, three-way calling or conference calling,
20    will result in discipline.  Telephones may be used from
21    8 -- 0800 each morning until 2115 hours at night."
22    Q    Mrs. Muller, are you familiar with something called
23    movement history of an inmate?
24    A    Yes, I am.
25    Q    And how do you -- how are you familiar with that?
```

1    A    I am familiar in both ways because I used to be an

2    admin. person, so I used to keep track of all the

3    booking records when I worked up front of who came in,

4    who went out, if they got transferred to another

5    facility, if they got transferred with the U.S.

6    Marshals, because I would have to make sure that I was

7    sending the files and paperwork to the right facility or

8    closing out their file if they were being transferred.

9         I also know it because I am a case worker, and I

10   have to keep track of who's coming in new on my case

11   load to make sure I meet with them in a timely manner.

12   Q    Okay.  And how quickly do you try to meet with an

13   inmate who comes in new to your case load?

14   A    Within five business days.

15   Q    And what's the point of meeting with them within

16   five business days?

17   A    To make sure they're oriented with the facility,

18   make sure they don't have anything coming up for court

19   that they need to be aware of, making sure their phone's

20   accessible, their visiting sheets are in for the

21   weekend.

22   Q    Okay.

23             MS. ROSS:  May I approach, your Honor?

24             THE COURT:  You may.

25   BY MS. ROSS:

1  Q    I am going to show you what's previously been

2  admitted as Government's Exhibit 14 and ask you to take

3  a look at that.

4  A    Okay.

5  Q    Do you recognize that?

6  A    I do.

7  Q    And what is it?

8  A    It's a movement history for Ian Jasmin.

9  Q    Can you tell by looking at this movement history

10 when he arrived at your facility?

11 A    Yes, I can.

12 Q    Okay.  Would you tell us that?

13 A    He arrived at Northwest State on 6/12/2014 at 1656

14 p.m.

15 Q    And did he remain at your facility -- how long did

16 he remain at your facility?

17 A    It looks like he left us on 6/16/2014 at 1848 to go

18 to Chittenden.

19 Q    Did he return to your facility?

20 A    Yes, he did.

21 Q    And when did he return to your facility?

22 A    On 6/17/2014 at 1916.

23 Q    And did he remain there?

24 A    He did until July 18, 2014, and then he went to

25 NECC.

1    Q    Which is what?

2    A    I believe it's Northeast Correctional facility.

3    Q    Okay.  And was there a time that he came back to

4    your facility after that?

5    A    Yes, he did.  He came back August 25th, 2014, at

6    1627.

7    Q    And for how long did he remain at your facility?

8    A    He only remained at our facility until August 27th,

9    2014, 2040, where he went back to Chittenden again.

10   Q    And, again, did he then return to your facility?

11   A    Yes, he did.

12   Q    And when was that?

13   A    8/28/2014, at 1945.

14           MS. ROSS:  Nothing further.

15           THE COURT:  All right.  Any cross examination?

16           MS. SHINGLER:  Just briefly.

17                       CROSS EXAMINATION

18   BY MS. SHINGLER:

19   Q    You are aware that there are no signs near the

20   phones which the inmates use about monitoring and

21   recording of phone calls, correct?

22   A    Yes.

23   Q    Now, Ms. Ross asked you about the meeting that you

24   had with Ian Jasmin on June 13th.  Do you have an

25   independent recollection of that meeting?

1    A    Are you saying do I remember every word I said?

2    No, I do not.

3    Q    No.  Do you remember --

4    A    But I do -- I do remember meeting Mr. Jasmin.  Yes,

5    I do.

6    Q    Okay.  And so you said that during that review,

7    you -- it is -- reviewing the handbook is not part of

8    your process.  Correct?

9    A    It is not.

10   Q    And you said that you reviewed his PRO -- PREA

11   orientation form and pamphlet.  What were -- what was

12   that form and what was that pamphlet?

13   A    That PREA orientation is our sexual violence

14   screening tool for any inmate that comes in.  We have to

15   go over the sexual violence to make sure they understand

16   what safety is and who they can report to.

17   Q    And the pamphlet is associated with that as well?

18   A    Yes, it is.  Absolutely.

19   Q    And then you reviewed facility orientation as to

20   how to access mental health, medical and CCS, reviewed

21   phone and visiting sheet, meaning you told him how to

22   add and drop people on his phone?

23   A    Absolutely.

24   Q    Okay.  Now, you never saw anything that warned

25   Mr. Jasmin that his -- the copying and recording of his

1    phone calls could be given to law enforcement and be

2    used in court against him, did you?

3    A    No.  Whatever --

4    Q    It's similar to a Miranda?

5    A    No.

6    Q    Okay.

7           MS. SHINGLER:  Thank you.  I think that's all

8    I have.

9           THE COURT:  All right.  Any redirect?

10          MS. ROSS:  No, your Honor.

11          THE COURT:  Thank you.  You may step down.

12          THE WITNESS:  Thank you.

13          (Witness excused.)

14          THE COURT:  Let's have a proffer.  Do you

15    think you can get your last witness in?

16          MS. ROSS:  I think I might be able to.

17          THE COURT:  All right.  Let's try.

18          MS. ROSS:  The government calls Michelle

19    Delpha.

20                 MICHELLE DELPHA,

21      having been duly sworn by the courtroom deputy,

22      was examined and testified as follows:

23             DIRECT EXAMINATION

24    BY MS. ROSS:

25    Q   Good afternoon, Agent Delpha.

1    A    Good afternoon.

2    Q    You conducted an investigation into Mr. Jasmin; is

3    that correct?

4    A    Yes.

5    Q    And as part of that investigation, the grand jury

6    process was used to subpoena inmate calls; is that

7    correct?

8    A    Yes.

9    Q    Who were the inmate calls subpoenaed from, do you

10   know that?

11   A    Subpoena went to Global Tel*Link for phone calls

12   for Ian Jasmin.

13   Q    And did you receive those -- copies of those inmate

14   calls?

15   A    Yes.

16   Q    Okay.  And have you compared the copies that you

17   received with the copies that were sent to the U.S.

18   Attorney's Office originally?

19   A    Yes.

20   Q    And how do they compare?

21   A    They're the same.

22   Q    How many of the inmate calls -- how many inmate

23   calls have you listened to in this case?

24   A    I'm still listening, but right now over 1800.

25   Q    And are you able to identify who the inmate is that

1  you've been listening to on the calls?

2  A    Yes.

3  Q    How are you able to do that?

4  A    Well, first by name.  The subpoena had the name Ian

5  Jasmin, so the calls came -- I would assume that that

6  would be Ian Jasmin's calls, but I have also interviewed

7  a witness who listened to some of the calls and

8  identified him as the voice in the other calls -- or in

9  the calls.  Also, in calls, his name is used, so people

10 refer to him as Ian in the calls.

11 Q    Okay.  Are you aware that he is called anything

12 other than Ian?  Does he have a nickname?

13 A    He has a couple.  He has Flea and Jon-Jon.

14 Q    Okay.  Now, in the course of your listening to the

15 many, many calls that you listened to, were there any

16 discussions, or what, if any, discussions occurred about

17 whether those calls were being listened to or recorded?

18 A    As far as what he said or on the phone call?

19 Q    On the phone call.

20 A    There's a preamble at the beginning of each call

21 that says calls are monitored -- are subject to

22 monitoring and recording.

23 Q    And during the -- were there some calls that you

24 listened to in which there was a discussion between

25 Mr. Jasmin and others about the calls being listened to

1  or recorded?

2  A    Yes.

3        MS. ROSS:  Your Honor, at this time I'd like

4  to have introduced through Agent Delpha a few of the

5  calls that she listened to, just to -- with respect to

6  the issue of him talking about whether these calls could

7  be accessed, listened to, recorded.

8             THE COURT:  Any objection?

9             MS. SHINGLER:  Same grounds, Judge.

10             THE COURT:  Same ruling.  Go ahead.

11             MS. ROSS:  If we could please take a look at

12  one that is identified as June 20, 2014, at 11:31.

13             (A digital recording was played in open

14  court.)

15             MS. ROSS:  You can stop it there.

16  BY MS. ROSS:

17  Q    And, Agent Delpha, do you recognize the voices on

18  that call?

19  A    I do.  The male is Ian Jasmin.

20             MS. SHINGLER:  If we could please pick up at

21  approximately two minutes and 40 seconds.

22             (A digital recording was played in open

23  court.)

24             MS. ROSS:  You can stop there.

25        Can we listen to June 25th, 2014, at 9:23 a.m.

```
 1              (A digital recording was played in open
 2    court.)
 3              MS. ROSS:  Can you stop it there, please.
 4    BY MS. ROSS:
 5    Q    And do you recognize the voices on this call?
 6    A    I do.  The male voice is Ian Jasmin.
 7              MS. ROSS:  Could we pick it up, please, at
 8    about eight minutes 45 seconds.
 9              (A digital recording was played in open
10    court.)
11              MS. ROSS:  We can stop it there.
12         And August 13th of 2014, at 11:46 a.m., please.
13              (A digital recording was played in open
14    court.)
15              MS. ROSS:  Can you stop it there, please.
16    BY MS. ROSS:
17    Q    Agent Delpha, do you recognize the voices?
18    A    I do.
19    Q    And who is it?
20    A    The male voice is Ian Jasmin.
21    Q    And the -- was a name said in the -- in this
22    recording?  Did you hear a name said?
23    A    The preamble had Flee.
24    Q    And who do you understand that to be?
25    A    Flee is a nickname for Ian Jasmin.
```

```
 1              MS. ROSS:  Could we go ahead to about 11
 2    minutes and 15 seconds.
 3              (A digital recording was played in open
 4    court.)
 5              MS. ROSS:  You can stop it there, please.
 6    BY MS. ROSS:
 7    Q    Now, Agent Delpha, in all the calls you listened
 8    to, has the -- what has the preamble or warning been
 9    like?
10    A    The same.
11    Q    In preparation for the -- this hearing, did you
12    speak to somebody at the -- within DOC?
13    A    I did.  I spoke to two people.
14    Q    And who did you speak to?
15    A    I spoke to Doug Hanrahan at the Northeast
16    Correctional facility.  He is the supervisor of security
17    and operations of that facility.  And I spoke with Brian
18    Reed, who is the same position as Doug Hanrahan but at
19    the Northwest facility.
20    Q    And what information, if any, did they share with
21    you about the monitoring and recording of calls at their
22    respective facilities?
23    A    Well, I had asked for why they monitor and record
24    phone calls at their facilities, and I was told that one
25    of the reasons is due to -- like for threats to the --
```

1    threats to the security of the facility, and another is

2    for detection of criminal activity.

3        They gave me examples, like if there's plans for an

4    escape or plans to introduce contraband into the

5    facility, contacts with people they are not -- inmates

6    are not supposed to have contact with, or criminal

7    activity.

8    Q    Did you -- what conversation, if any, did you have

9    with them about whether there are any notices near the

10   phones in their facilities?

11   A    So I asked Brian Reed if there were any signs or

12   postings at the phones at the Northwest facility, and he

13   told me no, that there weren't.  I asked Doug Hanrahan

14   the same question about any signs or postings at the

15   phones at the Northeast Correctional facility, and there

16   are.

17   Q    And what, if any, further information did

18   Mr. Hanrahan provide you in that respect?

19   A    He took or had someone take -- he sent me a photo

20   of a -- a couple photos of one of the postings at a

21   phone.

22            MS. ROSS:  Your Honor, may I approach the

23   witness?

24            THE COURT:  You may.

25   BY MS. ROSS:

1   Q    Showing you what's been marked for identification

2   as Government's Exhibit 15.  Do you recognize it?

3   A    Yes, I do.

4   Q    And what kind of document is this?

5   A    They're the two photos that were sent to me by Doug

6   Hanrahan.

7   Q    Okay.  And what did you learn about when these

8   photographs were taken?

9   A    The same day I spoke to him, which was a couple

10  weeks ago.

11  Q    And what, if anything, was Mr. Hanrahan able to

12  tell you about for how long these, what's depicted in

13  this photograph, existed?

14  A    So what's depicted in here as the placard -- he

15  referred to it as a placard, and he told me that these

16  placards were put on the phones in preparation for an

17  audit in 2013 at the Northeast facility.

18           MS. ROSS:  Your Honor, at this time the

19  government moves for the admission of Government's

20  Exhibit 15.

21           THE COURT:  Any objection?

22           MS. SHINGLER:  No, Judge.

23           THE COURT:  It's admitted.

24           (Government's Exhibit 15 was received in

25  evidence.)

1  BY MS. ROSS:

2  Q    I'd like you to turn your attention to the first

3  page of Government Exhibit 15 and tell us, Agent Delpha,

4  what does this depict?

5  A    Yeah.  It's upside down so if you have to flip it.

6  It's of the phone with the placard above the handset of

7  the phone.

8  Q    Okay.  So the placard, the green area, is at the

9  top?

10  A    Yes.

11  Q    Is that correct?

12  A    Yes.

13  Q    Now, what do we see on page two?

14  A    It's a closeup of the placard.  So that green

15  placard.

16  Q    And what, if anything, does this information --

17  does this provide about monitoring and recording?

18          THE COURT:  So I can read that, right?  It

19  speaks for itself.

20          MS. ROSS:  Yes.

21          THE COURT:  Okay.  And how much more do you

22  have on direct?

23          MS. ROSS:  A couple more minutes.

24          THE COURT:  Okay.

25  BY MS. ROSS:

1    Q    And is this -- based on your -- do you know or did

2    you ask Mr. Hanrahan in which units these placards or

3    these phones with placards are?

4    A    The placards are in all units except for the Alpha

5    unit at Northeast.  And I also asked Mr. Hanrahan what

6    units Ian Jasmin was in in 2014, and he was in the

7    Charlie and Delta units, and he spent one day in the

8    Alpha unit.  So the majority of his time was spent in

9    Charlie and Delta units, and the placards were on the

10   phones in those units.

11             MS. ROSS:  Thank you.  No further questions.

12             THE COURT:  All right.  Any cross examination?

13             MS. SHINGLER:  Yes.

14                    CROSS EXAMINATION

15   BY MS. SHINGLER:

16   Q    We perhaps were -- anyway.

17        The -- as you have heard at least 1800 times and as

18   I have heard several hundred as well, the warning is

19   called "may be subject to monitoring and record,"

20   correct?

21   A    Yes.

22   Q    Okay.  Now, at any time during the course of your

23   investigation of this case, did you apply for a warrant

24   to get these phone calls?

25   A    It was a grand jury subpoena for the Vermont calls.

1    Q    Okay.  Do you know if anyone was summoned and, in

2    fact, appeared in front of the grand jury and produced

3    these calls?

4    A    No.

5    Q    Do you, in fact, know that that did not happen?

6    A    I'm not aware of it happening.

7    Q    Okay.  Now, you would agree with me that with

8    respect to the phone calls, there was no exigency,

9    right?

10   A    No, there was none.

11   Q    I mean no one was saying he is going to escape or

12   blow the place up or threatening a guard, correct?

13   A    That's correct.

14   Q    And there was no risk that the evidence was going

15   to be destroyed, because it was up there in Global

16   Tel*Link custody, correct?

17   A    Correct.

18   Q    And Ian was incarcerated during this period of

19   time, obviously?

20   A    At the time we subpoenaed the phone records?

21   Q    Right.

22   A    No, he was not.

23   Q    He was not in custody.  And as we said, there

24   was -- you don't -- prior to you issuing or getting the

25   grand jury subpoena issued, you were aware there was no

1    threat to institutional security, right?

2    A    That's correct.

3    Q    Now, how many subpoenas were issued for the phone

4    calls?

5    A    I am aware of the subpoena for the -- well, there's

6    been two subpoenas.

7    Q    And when was the first one?

8    A    November 2014.

9    Q    And was that the one that had a letter accompanying

10   to it that said you don't have to appear in front of the

11   grand jury?  All you have to do is mail the stuff in to

12   the U.S. Attorney's Office?

13   A    I didn't serve the subpoena.

14   Q    Did you serve any of the subpoenas?

15   A    No.

16            MS. SHINGLER:  May I approach, Judge?

17            THE COURT:  You may.

18   BY MS. SHINGLER:

19   Q    Not a trick question.  Exhibit A, have you ever

20   seen it before?

21   A    I'm sorry, I wish I had my glasses here.

22   Q    You want to use mine?

23   A    Thank you.

24        I have not seen this front page.

25   Q    Okay.

1        MS. SHINGLER:  That's it.

2        THE COURT:  All right.  Any redirect?

3        MS. ROSS:  No, your Honor.

4        THE COURT:  Thank you.  You may step down.

5        (Witness excused.)

6        THE COURT:  And with at least a minute to

7   spare before five o'clock.

8        Let me ask you if -- I am going to close the

9   evidence at this point.  You can move to reopen if you

10  decide to.  Does anybody need to file anything

11  post-hearing in terms of written memoranda?  I thought

12  you both did a nice job of briefing the issues.

13       MS. SHINGLER:  Yes.  As much as I love legal

14  writing, I think that there have been a few legal issues

15  that have been developed over the course of the

16  testimony that I -- have not been appropriately

17  addressed in my motion, so I would like that

18  opportunity.

19       I have also ordered the transcripts.  I have

20  ordered -- I will be ordering a transcript of this

21  hearing.  Just like many people in this room, the court

22  reporter is going to be vanishing into someplace warm at

23  the end of next week and has asked the Court -- me to

24  ask the Court to take that into consideration as to

25  deadlines under which I should file post-hearing

1    memorandum.

2              THE COURT:  All right.  So give me your

3    proposed deadline, I will see if Miss Ross agrees with

4    it, and if she wants to file anything, if it's

5    reasonable I will give it to you.

6              MS. SHINGLER:  Anne told me to ask for six

7    weeks.

8              THE COURT:  Six weeks, okay.  How do you feel

9    about that, Miss Ross?

10             MS. ROSS:  So, your Honor, I -- the government

11   does not intend to file anything further except in

12   response to what Ms. Shingler might file.  I would say,

13   though, that raising new legal issues after the hearing,

14   that the government objects to doing that.  I'd also say

15   that, you know, the Second Circuit has clearly said that

16   there's not a reasonable expectation of privacy in jail

17   calls, and, you know, there has been a lot of evidence

18   put on about even if there were such a reasonable

19   expectation, why there shouldn't be an expectation in

20   this case.  So I feel like a lot of time and attention

21   has been devoted to this issue, and putting it off, a

22   resolution, for at least another six weeks, I'm not sure

23   it's warranted.

24             THE COURT:  All right.  I am going to allow

25   Miss Shingler to file a post-hearing brief.  You may

```
 1    have six weeks to do so.  I think the issues are legal.

 2    I don't think there's any doubt as to what the evidence

 3    is and what it was not, but I am not going to preclude

 4    you from requesting a transcript.  And you will have an

 5    opportunity -- let's say we will give you seven business

 6    days thereafter to file any response?

 7              MS. ROSS:  Yes.

 8              THE COURT:  All right.  And then I am going to

 9    take the motion under advisement, and I will have my

10    time period to get the decision done.  Does that work

11    for everybody?

12              MS. SHINGLER:  Yes, Judge.  Thank you very

13    much.

14              MS. ROSS:  Yes, your Honor.

15              THE COURT:  All right.  Thank you.

16              (Court was in recess at 5:03 p.m.)

17                      *** ** ***

18

19

20                   C E R T I F I C A T I O N

21         I certify that the foregoing is a correct
      transcript from the record of proceedings in the
22    above-entitled matter.

23                              _Anne Nichols Pierce_

24    March 9, 2016              _____
      Date                      Anne Nichols Pierce
25
```