U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2016 MAY -2  PM 1: 54

CLERK

BY _____
DEPUTY CLERK

UNITED STATES OF AMERICA          )
                                  )
            v.                    )          Case No. 2:15-cr-37
                                  )
IAN JASMIN                        )

## OPINION AND ORDER DENYING DEFENDANT'S
## MOTION TO SUPPRESS INMATE TELEPHONE CALLS
(Doc. 32)

This matter came before the court on January 20, 2016 and February 5, 2016 for an evidentiary hearing on Defendant Ian Jasmin's motion to suppress inmate telephone calls (Doc. 32). On March 29, 2016, Defendant filed his post-hearing memorandum. The government responded on April 15, 2016, at which time the court took the pending motion under advisement.

Pursuant to a Superseding Indictment, Defendant is charged with one count of conspiracy to distribute cocaine and heroin, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), 846; two counts of distributing cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C); and two counts of possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2).

Defendant seeks suppression of the recordings of his telephone calls while incarcerated, arguing that he did not consent to those recordings, their interception violates Vermont's Constitution, and they were not made pursuant to a law enforcement officer's "ordinary course" of duties. In his post-hearing memorandum, Defendant argues that suppression is warranted for the further reason that the government improperly obtained the recordings in violation of Fed. R. Crim. P. 17 and failed to disclose documents requesting production consistent with *Brady v. Maryland*, 373 U.S.

83 (1963).  The government opposes the motion and claims Defendant's Rule 17 and *Brady* arguments are untimely.

The government is represented by Assistant United States Attorney Heather E. Ross.  Defendant is represented by Karen R. Shingler, Esq.

## I.    Findings of Fact.

On or about May 2, 2014, Defendant was arrested by the Vermont State Police for offenses arising from a motor vehicle stop.  He was subsequently incarcerated at Northwest State Correctional Facility ("NSCF") in Swanton, Vermont, and Northeast Regional Correctional Facility ("NRCF") in St. Johnsbury, Vermont (collectively, the "Vermont facilities").  He was released from the Vermont facilities on September 15, 2014.

At the Vermont facilities, Global Tel*Link manages the telephone system and routinely records all inmate telephone calls.  Vermont prison officials also regularly monitor inmates' telephone calls to detect "plans for an escape or plans to introduce contraband into the facility, contacts with people . . . inmates are not supposed to have contact with, or criminal activity."  (Tr. 2/5/16 at 155:3-7.)

In order to place a telephone call from the Vermont facilities, inmates must have a personal identification number ("PIN").  Inmates obtain a PIN by submitting an Inmate Telephone System Number Request form (the "PIN sheet") and receiving institutional approval.  The PIN sheet provides in bold lettering: "**Your acceptance of a PIN and use of the Inmate Telephones shall be deemed as consent to the conditions and restrictions placed upon inmate telephone calls, including monitoring, recording and call detail**."  (Gov't Ex. 3 at 1.)  The PIN sheet is also used to add or delete the individuals whom an inmate may contact by telephone.  An inmate may therefore submit many PIN sheets during his or her incarceration.

While incarcerated at the Vermont facilities, Defendant submitted several PIN sheets.  On some of those PIN sheets, Defendant indicated his name was "Enri Jasmin."  On other PIN sheets, Defendant used his own name.  Until the Vermont Department of

2

Corrections ("DOC") discovered that Defendant provided two different names on his PIN sheets, he maintained two separate inmate telephone accounts.

Defendant made numerous non-attorney telephone calls from the Vermont facilities. At the beginning of each telephone call placed from those facilities, a recorded message advises the caller and the recipient that the call may be monitored and recorded. At NRCF, a placard is posted above the telephones in the Charlie and Delta housing units. The placard notifies inmates that "ALL CALLS ARE SUBJECT TO MONITORING AND RECORDING[.]" (Gov't Ex. 15 at 2.) While incarcerated at NRCF, Defendant was detained in the Charlie or Delta housing units for all but one day.

At NSCF, the Inmate Handbook is available in each unit and explains that "[t]elephones may be monitored and recorded by DOC staff to [e]nsure facility safety and security." (Gov't Ex. 9 at 24.) At NRCF, the Inmate Handbook states that, "[w]ith the exception of properly placed (or received) Attorney Calls, all telephone calls are subject to monitoring and recording." (Gov't Ex. 5 at 1.) Inmate caseworkers at NRCF explained to Defendant how to obtain a copy of the Inmate Handbook.

On January 17, 2015, approximately four months after his release from the Vermont facilities, Defendant was arrested in New York. He was thereafter incarcerated at the Rockland County Correctional Facility ("RCCF") until his arrest in connection with the instant case. At RCCF, Global Tel*Link manages the telephone system and routinely records inmates' telephone conversations. Prison officials at RCCF also monitor inmates' telephone calls, particularly when they have reason to believe that an inmate is using the telephone to further criminal activity. In this case, the Intelligence Center at RCCF received information from a Vermont State Police trooper that Defendant was the subject of an ongoing investigation. On that basis, Defendant's telephone conversations were monitored more closely.

While incarcerated at RCCF, Defendant again made numerous non-attorney telephone calls. The telephone system at RCCF provides a statement at the beginning of each telephone call, informing the caller and the recipient that the call is subject to monitoring and recording. Above each telephone in RCCF, a sign states that "PHONE

3

CALLS ARE SUBJECT TO ELECTRONIC MONITORING AND RECORDING[.]"
(Gov't Ex. 10 at 1.)

On November 7, 2014, the government served a subpoena for "[d]ocument(s) or
[o]bject(s)" signed by the Clerk of Court requiring Erica Johnson, the Site Administrator
for Inmate Telephones at Global Tel*Link, "to appear in this United States District
Court [on November 20, 2014] to testify before the Court's grand jury." (Def. Ex. A at
2.) The subpoena required Ms. Johnson to bring call logs, call lists, visitor logs, and all
call recordings involving Defendant while he was incarcerated at the Vermont facilities.
Accompanying the subpoena, the government provided a letter signed by the United
States Attorney, stating that "[a] personal appearance is not required and the subpoena
may be complied with a CD/DVD or Documents by certified mail" sent to the United
States Attorney's Office. *Id.* at 1.[1] In response, Ms. Johnson mailed the documents in
lieu of appearing before the grand jury. On March 4, 2015, Federal Bureau of
Investigation ("FBI") Agent Michelle Delpha emailed Investigator Aaron Concepcion at
the RCCF Intelligence Center, requesting copies of all calls that Defendant made while
incarcerated at RCCF.[2] Agent Delpha instructed Investigator Concepcion to mail the
recordings to the United States Attorney's Office, and Investigator Concepcion complied.

Excerpts from Defendant's non-attorney telephone conversations, which were
admitted into evidence as Government Exhibit 13, unequivocally establish that Defendant
knew that his inmate telephone calls were subject to monitoring and recording. For
example, on June 25, 2014, in a telephone call with his girlfriend, Defendant expressed
his discontent that she required a lengthy explanation regarding a task that Defendant had
asked her to perform, noting that his explanation over the telephone exposed him to

---

[1] It is unclear when the government provided Defendant a copy of this letter. The government
maintains that it had no obligation to disclose the letter, but nonetheless emailed Defendant a
copy of it on September 17, 2015.

[2] Defendant contends that a copy of the email from Agent Delpha to Investigator Concepcion
was not provided to him until February 18, 2016, after the suppression hearing. The government
does not address whether it provided the email to Defendant at an earlier time, and if not,
whether it had an obligation to do so.

criminal consequences. *See* Gov. Ex. 13, Disk 16 at 8:46-9:34 (Defendant stating that every time he has to provide details over the telephone, he "risk[s] another indictment"). On August 13, 2014, Defendant repeated his concern that he had to "spell everything out" on the telephone, which placed him at risk for additional punishment. (Gov't Ex. 13, Disk 18, at 11:37-40.)  On February 18, 2015, during a telephone call with his sister, Defendant stated that he had something important to say, but that he could not state it over the telephone.

Defendant's conduct while incarcerated buttresses the conclusion that he was aware his telephone calls may be monitored and recorded.  During multiple telephone calls, Defendant used coded language to obscure the topic of conversation.[3]  While incarcerated at RCCF, Defendant used other inmates' telephone accounts in an apparent effort to conceal his identity as the caller.  On February 16, 2015, Defendant used the telephone account of "Brian," another inmate, to place a call to his girlfriend.  During that call, Defendant advised her that, "[n]ow you can say whatever you want to say [because] it's not recorded under my PIN code."  (Gov't Ex. 13, Disk 14, at 1:35-40.)  On February 20, 2015, Defendant used the telephone account of "Richard," another inmate, for the same apparent purpose.

## II.   Conclusions of Law and Analysis.

### A.   Whether the Recordings Should Be Suppressed Because They Were Unlawfully Intercepted.

Defendant argues that the government unlawfully intercepted his conversations, in violation of 18 U.S.C. §§ 2510-2515, because he did not expressly or impliedly consent to their recording, and because their interception was not made pursuant to an officer's

---

[3] For example, Defendant used the code word "bread" in an apparent reference to large sums of cash, which he recommended his girlfriend should avoid transporting in her vehicle. *See* Gov't Ex. 13, Disk 49, at 14:40-15:10 (Defendant's girlfriend stating that she "ha[s] no idea" what he means, and Defendant responding that "this isn't on [his] line" and explaining that "bread" refers to more than a thousand dollars in cash).  On a separate call, while using another inmate's account, Defendant instructed his girlfriend that on future calls from his own account he would use a particular code word. *See* Gov't Ex. 13, Disk 14, at 28:04-32 (Defendant stating that he "need[s] to be able to say [something] over [his] own phone[,]" and that it needs to be "simple and clear that 'molly' is what we call 'coffee' . . . because [it is] brown sass.").

"ordinary course" of duties. The government counters that Defendant provided express consent at the Vermont facilities by submitting his PIN sheets, and that Defendant's consent may be implied because he had ample notice of the recording policies at NSCF, NRCF, and RCCF. The government further argues that the recordings were made pursuant to the "ordinary course" of law enforcement duties.

"Title III generally forbids the intentional interception of wire communications, such as telephone calls, when done without court-ordered authorization." *United States v. Workman*, 80 F.3d 688, 692 (2d Cir. 1996) (citing 18 U.S.C. §§ 2510-2522); *see also* 18 U.S.C. § 2515 ("Whenever any wire or oral communication has been intercepted, no part of the contents of such communication . . . may be received in evidence in any trial . . . if the disclosure of that information would be in violation of this chapter."). "Title III excepts certain communications from its provisions, however, including communications where one of the parties [to the communication] has either expressly or impliedly consented to interception, and [telephone] communications intercepted . . . by . . . an investigative or law enforcement officer in the ordinary course of his duties[.]" *United States v. Friedman*, 300 F.3d 111, 120-21 (2d Cir. 2002) (citation and internal quotation marks omitted).[4]

The Second Circuit has "long recognized that, under certain circumstances, prisoners are deemed to have given consent for purposes of Title III to the interception of their calls on institutional telephones." *Workman*, 80 F.3d at 693. Consent may be either express or implied. *See United States v. Willoughby*, 860 F.2d 15, 19 (2d Cir. 1988). Implied consent exists where prisoners "used the telephone with awareness of the possible surveillance." *Workman*, 80 F.3d at 693.

---

[4] Although some of the recordings derive from Defendant's detention at the Vermont facilities, federal law dictates whether those recordings are admissible in federal court. *See Workman*, 80 F.3d at 695 (citing with approval *United States v. Nelligan*, 573 F.2d 251, 253 (5th Cir. 1978), which held that the "tape recording of [a] conversation made with [the] consent of one party in compliance with Title III [was] admissible in [a] federal prosecution despite [a] state statute requiring consent of all parties to [the] conversation"); *United States v. Miller*, 116 F.3d 641, 661 (2d Cir. 1997) (observing that "a state's more stringent statutory requirements . . . have never been applied to bar the introduction of wiretap evidence").

6

At the Vermont facilities, Defendant expressly consented to the interception of his telephone conversations by submitting PIN sheets and thereafter using the facilities' telephones. *See* Gov't Ex. 3 at 1 (the PIN sheet, which provides, "Your acceptance of a PIN and use of the Inmate Telephones shall be deemed as consent to the conditions and restrictions placed upon inmate telephone calls, including monitoring, recording and call detail.") (emphasis omitted); *Willoughby*, 860 F.2d at 20 (holding that an inmate had expressly consented where "[j]ust above a line for the signature of the inmate, the form included the statement, 'I understand that telephone calls I make from institution telephones may be monitored and recorded[]'").

In addition, at all three correctional facilities, Defendant had clear and unambiguous notice that his telephone conversations may be recorded. *See United States v. Amen*, 831 F.2d 373, 379 (2d Cir. 1987) (holding that the defendant had impliedly consented, and noting that "at least four sources" explained the prison's recording policy). Defendant's statements, conduct, and coded language reveal his knowledge of the facilities' recording policies and the possibility that his statements could be used as evidence against him. *See Workman*, 80 F.3d at 693 (observing that the defendant's "statements on the recordings show that he was successfully informed by the prison's notification program" in concluding that he had given implied consent); *Friedman*, 300 F.3d at 123 (noting that the inmate "used cryptic language, evincing his understanding of the possibility that the calls would be monitored or taped" in finding that the prisoner had received notice of the telephone interception policy) (emphasis omitted). Defendant's use of the telephone systems thus reflected his implied consent to law enforcement's interception of his communications. *See Amen*, 831 F.2d at 378 (holding that the Second Circuit "impl[ies] consent in fact from surrounding circumstances indicating that the appellants knowingly agreed to the surveillance"); *Workman*, 80 F.3d at 693 ("When an inmate has repeatedly received notice that calls placed on prison telephones are subject to surveillance, the evidence indicates that he is in fact aware of the monitoring program, and he nevertheless uses the telephones, by that use he impliedly consents to be monitored for purposes of Title III.")

7

For the foregoing reasons, the government's interception and seizure of Defendant's non-attorney telephone conversations while he was incarcerated did not violate Title III. *See* 18 U.S.C. § 2511(2)(c) ("It shall not be unlawful . . . for a person acting under color of law to intercept a wire, oral, or electronic communication, where . . . one of the parties to the communication has given prior consent to such interception."). Defendant's motion to suppress on that basis is therefore DENIED.

The recordings of Defendant's non-attorney telephone conversations are exempt from Title III for the further reason that they were made in the "ordinary course" of correctional officers' law enforcement duties. *See Friedman*, 300 F.3d at 123 ("Because . . . the recording of the jail-cell calls was also motivated by legitimate . . . law enforcement motives and routine, the recordings did not violate Title III.") (citation and internal quotation marks omitted). The recording of telephone calls in a correctional facility may be necessary to thwart escapes, prevent the introduction and possession of contraband, hinder witness tampering, and ensure that incarcerated individuals do not harass victims or engage in unlawful criminal activities. As the Second Circuit has observed, telephone recording systems at correctional facilities may be "an extremely effective tool in helping to maintain internal security." *Willoughby*, 860 F.2d at 21. Denial of Defendant's motion is thus warranted because the recording of his telephone calls occurred as part of the "ordinary course" of correctional officers' duties. *See* 18 U.S.C. § 2510(5)(a).

### B. Whether the Recordings Should Be Suppressed Because Their Seizure Violated Article 11 of the Vermont State Constitution.

As an alternative ground for suppression, Defendant argues that the recording of his telephone conversations violated Article 11 of the Vermont Constitution.[5] Defendant

---

[5] Article 11 of the Vermont Constitution provides:

> That the people have a right to hold themselves, their houses, papers, and possessions, free from search or seizure; and therefore warrants, without oath or affirmation first made, affording sufficient foundation for them, and whereby by any officer or messenger may be commanded or required to search suspected

points out that the Supreme Court has rejected the "silver platter" doctrine "which formerly held admissible in [f]ederal prosecutions evidence that had been seized in violation of Fourth Amendment standards by state police." *United States v. Lai Ming Tanu*, 589 F.2d 82, 89 (2d Cir. 1978) (citing *Elkins v. United States*, 364 U.S. 206 (1960)).

The Supreme Court's rejection of the "silver platter" doctrine does not render evidence seized in violation of a state constitution inadmissible in federal prosecutions. *See United States v. Pforzheimer*, 826 F.2d 200, 204 (2d Cir. 1987) (holding that the federal exclusionary rule, rather than the state exclusionary rule, "should apply to this federal criminal prosecution, even though the underlying investigation leading to prosecution was conducted solely by state officials"). There is thus no requirement that "evidence procured by a state official should be excluded from a federal prosecution if the state official failed to conform to state constitutional standards[.]" *Workman*, 80 F.3d at 694-95. Moreover, there is no evidence that Article 11 was violated. *See State v. Berard*, 576 A.2d 118, 124 (Vt. 1990) (the Vermont Supreme Court observing that "[l]ike the Supreme Court in *Hudson v. Palmer*, 468 U.S. at 527, . . . though on independent and different grounds under our Constitution, '[w]e strike the balance in favor of institutional security' and hold that the routine, random and warrantless search of a prisoner's cell in the case before us was reasonable and not in violation of Article Eleven"). Accordingly, the court DENIES Defendant's motion to suppress on state constitutional grounds. *See Workman*, 80 F.3d at 695.

### C.   Whether the Recordings Should Be Suppressed Because the Government Violated Fed. R. Crim. P. 17.

In his post-hearing memorandum, Defendant argues that suppression is required because the government's letter permitting Ms. Johnson to produce documents in lieu of a grand jury appearance violated Fed. R. Crim. P. 17. Because the government relied on the recordings it obtained from Ms. Johnson when investigating Defendant's activities at

---

places, or to seize any person or persons, his, her or their property, not particularly described, are contrary to that right, and ought not to be granted.

RCCF, Defendant argues that the recordings from RCCF should be suppressed as "fruit of the poisonous tree." The government contends that Defendant's argument is untimely. It further argues that the approach it took to production was permissible as the government provided the witness the option of exercising her right to appear before the grand jury. Because Defendant's argument fails on other grounds, the court need not address whether Defendant's argument was timely raised.

Fed. R. Crim. P. 17(a) requires that a subpoena "state the court's name and the title of the proceeding, include the seal of the court, and command the witness to attend and testify at the time and place the subpoena specifies." Fed. R. Crim. P. 17(c)(1), in turn, states that:

A subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates. The court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence. When the items arrive, the court may permit the parties and their attorneys to inspect all or part of them.

"'[R]ule 17(c) is designed as an aid for obtaining relevant evidentiary material [from a third party] that the moving party may use at trial.'" *United States v. Holihan*, 248 F. Supp. 2d 179, 183 (W.D.N.Y. 2003) (quoting *United States v. Cuthbertson*, 630 F.2d 139, 144 (3d Cir. 1980)).

In this case, the government obtained a signed subpoena for "[d]ocument(s) or [o]bject(s)" to present to the grand jury. (Def. Ex. A at 2.) There is no argument that the subpoena itself was improper. *See United States v. Salameh*, 152 F.3d 88, 110 (2d Cir. 1998) (where the defendant argued "that the subpoena was somehow illegal because it purported to be a subpoena *ad testificandum* when it actually was a subpoena *duces tecum*[,]" the Second Circuit held that any "technical error" would not render the subpoena "invalid" or "improper"). It was therefore within the government's discretion to permit production of documents and other evidence in lieu of a grand jury appearance for a subpoena it issued after obtaining authorization from the court. Other courts have approved the practice at issue here. *See, e.g.*, *United States v. Nathan*, 816 F.2d 230, 234 (6th Cir. 1987) ("The government's action in permitting the employees to submit

10

documents in lieu of a grand jury appearance is the kind of conduct held not to be unconstitutional nor impermissible[.]"); *United States v. McComb*, 744 F.2d 555, 561 (7th Cir. 1984) ("The use of appearance waivers such as the ones here have been held not to usurp the function of the grand jury.").

Defendant's reliance on *United States v. Binh Tang Vo*, 78 F. Supp. 3d 171 (D.D.C. 2015) does not alter the analysis.[6]  In that case, the defendants sought to quash two trial subpoenas, not to suppress evidence.  The subpoenas in question were issued without court authorization, for the purpose of conducting discovery, and after the defendants had been indicted.  Although the Supreme Court has concluded that Rule 17 applies to grand jury subpoenas,[7] Defendant does not cite any authority for suppressing evidence because of a non-constitutional defect in the manner in which the evidence was obtained for presentation to the grand jury.

The absence of authority is consistent with the difference between trial subpoenas and grand jury subpoenas.  "A grand jury subpoena is . . . much different from a subpoena issued in the context of a prospective criminal trial[.]"  *United States v. R. Enters., Inc.*, 498 U.S. 292, 297 (1991).  "Because the grand jury does not finally adjudicate guilt or innocence, it has traditionally been allowed to pursue its investigative and accusatorial functions unimpeded by the evidentiary and procedural restrictions applicable to a criminal trial."  *United States v. Calandra*, 414 U.S. 338, 349 (1974).  The United States Attorney's Office, in turn, gathers and presents evidence for the grand jury's consideration.[8]  "[A] presumption of regularity attaches to grand jury proceedings,

---

[6] Not all courts agree with the approach taken in *Binh Tang Vo*.  *See, e.g.*, *United States v. Smith*, 245 F.R.D. 605, 611 (N.D. Ohio 2007) (observing that although a Rule 17 subpoena "would direct production at court, . . . the parties could agree to produce elsewhere").

[7] *See United States v. Calandra*, 414 U.S. 338, 346 n.4 (1974) ("The grand jury is subject to the court's supervision in several respects.  In particular, the grand jury must rely on the court to compel production of books, papers, documents, and the testimony of witnesses, and the court may quash or modify a [subpoena] on motion if compliance would be unreasonable or oppressive.  Fed. R. Crim. P. 17(c).") (citations and internal quotation marks omitted).

[8] *See United States v. Ciambrone*, 601 F.2d 616, 622 (2d Cir. 1979) ("As a practical matter, . . . [the grand jury] must lean heavily upon the United States Attorney as its investigator and legal

[and] a defendant seeking to exclude evidence obtained by a post-indictment grand jury subpoena has the burden of showing that the [g]overnment's use of the grand jury was improperly motivated[.]" *United States v. Leung*, 40 F.3d 577, 581 (2d Cir. 1994) (citations omitted). Here, Defendant has not demonstrated any irregularity, nor has he alleged that the government was improperly motivated. *See also First Nat'l Bank of Tulsa v. U.S. Dep't of Justice*, 865 F.2d 217, 219 (10th Cir. 1989) (observing that "a presumption of regularity attaches to a grand jury subpoena, and those challenging its regularity have the burden of showing irregularity," and that "the United States Attorney is allowed considerable leeway in preparing for a grand jury investigation"); *United States v. Kleen Laundry & Cleaners, Inc.*, 381 F. Supp. 519, 521-22 (E.D.N.Y. 1974) ("It is now the United States Attorney who gathers the evidence for later presentation to the grand jury. . . . So broad is his role in practice that courts are loath to review prosecutorial actions.").

Assuming *arguendo* that the subpoena was technically defective, Defendant does not allege that he suffered any prejudice as a result of Ms. Johnson's decision to produce the recordings and other documents instead of appearing before the grand jury. *See Arizona v. Evans*, 514 U.S. 1, 16 (1995) ("Application of the [*United States v. Leon*, 468 U.S. 897 (1984)] framework supports a categorical exception to the exclusionary rule for clerical errors[.]"); *United States v. Duncan*, 598 F.2d 839, 867 (4th Cir. 1979) (the government's Rule 17(c) subpoena directing documents to be produced to the FBI prior to trial was a "harmless technical irregularity at most" that caused no prejudice). Nor does Defendant allege that suppression on the basis of Rule 17 would deter future misconduct by law enforcement. *See United States v. Raymonda*, 780 F.3d 105, 117 (2d Cir. 2015) ("Neither a personal constitutional right nor a means to redress the injury of an

---

advisor to present to it such evidence as it needs for its performance of its function and to furnish it with controlling legal principles."); *see also John Doe Co. v. United States*, 350 F.3d 299, 303 (2d Cir. 2003) ("The U.S. Attorney's office in its sole discretion decides what evidence will be placed before the grand jury."); *In re Grand Jury Subpoena Dated Feb. 2, 2012*, 908 F. Supp. 2d 348, 351 (E.D.N.Y. 2012) ("[A]lthough courts must ensure that the grand jury process is not being abused by the government, it is not the role of the courts to micromanage the government's presentation of evidence to the grand jury.").

unconstitutional search, the exclusionary rule is designed to deter future Fourth Amendment violations.") (internal quotation marks omitted); *see also Davis v. United States*, 564 U.S. 229, 246 (2011) ("[W]e have said time and again that the *sole* purpose of the exclusionary rule is to deter misconduct by law enforcement.") (emphasis in original). The court therefore DENIES Defendant's motion to suppress on the grounds of an alleged Fed. R. Crim. P. 17 violation.

      **D.**    **Whether the Recordings Should Be Suppressed Because the Government Failed to Fulfill its *Brady* Obligations.**

Finally, Defendant argues that the government violated its *Brady* obligations by failing to timely disclose the letter attached to the subpoena and the e-mail sent to RCCF requesting recordings of Defendant's telephone calls.[9]  The government argues that it provided the letter to Defendant on September 17, 2015, and that it has otherwise complied with its disclosure obligations.

The Second Circuit has explained that:

> The government's obligations under *Brady v. Maryland*, . . . are seemingly well-established.  The prosecution has a constitutional duty to disclose evidence favorable to an accused when such evidence is material to guilt or punishment.  This duty covers not only exculpatory material, but also information that could be used to impeach a key government witness. *Brady* does not, however, require the prosecution to disclose *all* exculpatory and impeachment material; it need disclose only material "that, if suppressed, would deprive the defendant of a fair trial."  In the context of *Brady*, a defendant is deprived of a fair trial only where there is a reasonable probability that the government's suppression affected the outcome of the case, or where the suppressed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict[.]"

*United States v. Coppa*, 267 F.3d 132, 135 (2d Cir. 2001) (citations omitted).  "*Brady* material must be disclosed in time for its effective use at trial[.]"  *Id.* at 142.

---

[9] Whether *Brady* applies in a pre-trial suppression hearing is an unresolved issue in the Second Circuit.  *See United States v. Barcelo*, 628 F. App'x 36, 38 (2d Cir. 2015) ("This Court has never addressed the question of whether the *Brady* disclosure obligation applies to pre-trial suppression hearings.").  Because Defendant's *Brady* challenge fails on other grounds, the court need not decide this issue.

The letter and email requesting copies of the recordings at issue in this case do not pertain to Defendant's guilt or innocence, and have no apparent bearing on "impeach[ing] a key government witness." *See id.* at 135. To the contrary, they are merely requests for copies of telephonic recordings. It is therefore highly questionable whether they could be reasonably characterized as *Brady* material. Moreover, Defendant neither argues nor demonstrates that the government's failure to provide the letter and email to him pre-hearing inflicted any prejudice, let alone prejudice rising to the level of depriving him of a fair trial. *See Strickler v. Greene*, 527 U.S. 263, 281 (1999) ("[T]here is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict."). As no *Brady* violation occurred, Defendant's motion to suppress on that basis is DENIED.

## CONCLUSION

For the foregoing reasons, the court DENIES Defendant's motion to suppress inmate telephone calls (Doc. 32).

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 2nd day of May, 2016.

Christina Reiss, Chief Judge
United States District Court